**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RYAN NOAH SHAPIRO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 16-1263 (RBW) |
| | ) |
| DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Ryan Noah Shapiro, brings this civil action against the defendant, the

Department of Justice, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

<u>See</u> Complaint ("Compl.") ¶¶ 3–7, ECF No. 1.  Currently pending before the Court are (1) the

defendant's motion for summary judgment, <u>see</u> Defendant's Motion for Summary Judgment

("Def.'s Mot." or the "defendant's motion") at 1, ECF No. 24; and (2) the plaintiff's cross-

motion for summary judgment, <u>see</u> Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s

Mot." or the "plaintiff's motion") at 1, ECF No. 27.  Upon careful consideration of the parties'

submissions,[1] the Court concludes for the following reasons that it must grant in part and deny in

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision:  (1) the Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."), ECF No. 24; (2) the Defendant's Statement of Material Facts ("Def.'s Facts"), ECF No. 24-1; (3) the Declaration of David M. Hardy ("Hardy Decl."), ECF No. 19-1; (4) the Declaration of Sophia Y. Kil ("Kil Decl."), ECF No. 23-11; (5) the Declaration of Ms. Karen Richman ("Richman Decl."), ECF No. 23-11; (6) the Declaration of Kim E. Campbell[,] Special Agent in Charge Liaison Division and Freedom of Information Act and Privacy Act Officer, United States Secret Service ("Campbell Decl."), ECF No. 23-11; (7) the Declaration of Patrick C. Schreiber ("Schreiber Decl."), ECF No. 23-11; (8) the Declaration of Vanessa R. Brinkmann ("Brinkmann Decl."), ECF No. 24-2; (9) the Declaration of Katherine L. Myrick ("Myrick Decl."), ECF No. 24-4; (10) the Declaration of Kristi Scarantino ("Scarantino Decl."), ECF No. 24-4; (11) the Declaration of John W. Kornmeier ("Kornmeier Decl."), ECF No. 24-4; (12) the Declaration of Patrick N. Findlay ("Findlay Decl."), ECF No. 24-4; (13) the Declaration of Mark H. Herrington ("Herrington Decl."), ECF No. 24-4; (14) the Second Declaration of David M. Hardy ("2d Hardy Decl."), ECF No. 23; (15) the Memorandum of Points and Authorities in Support of Plaintiff's Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem."), ECF No.

(continued . . .)

part the defendant's motion for summary judgment, and grant in part and deny in part the plaintiff's cross-motion for summary judgment.

## I.    BACKGROUND

This case concerns multiple FOIA requests submitted by the plaintiff to two components of the defendant, the Federal Bureau of Investigation ("FBI") and the Office of Information Policy ("OIP").  See Def.'s Facts ¶¶ 1–20; Pl.'s Resp. to Def.'s Facts ¶¶ 1–20.

### A.    Requests Submitted to the FBI

The plaintiff submitted eighteen Freedom of Information/Privacy Acts ("FOIPA") requests to the FBI.[2]  See Def.'s Facts ¶¶ 1–18; Pl.'s Resp. to Def.'s Facts ¶¶ 1–18.

### 1.    Requests Classified by the FBI as FOIA Requests

#### a.    FOIPA Request No. 1196229-000

In FOIPA Request No. 1196229-000, which was submitted "[b]y letter dated July 31, 2012," the plaintiff requested "any and all records relating to or referring to [FBI domestic terrorism administrative record] 66F-HQ-1328110."  Def.'s Facts ¶ 1; see Pl.'s Mot at 1; Pl.'s Resp. to Def.'s Facts ¶ 1.  "By letter dated August 7, 2012, the FBI acknowledged receipt of [the p]laintiff's request . . . and advised [the p]laintiff [that] it was searching the indices to the Central Records System [('CRS')] for information responsive to his request."  2d Hardy Decl. ¶ 7.  "By letter dated July 17, 2014, the FBI advised [the p]laintiff [that] it had reviewed 124 pages and

---

(. . . continued)

26; (16) the Plaintiff's Statement of Material Facts ("Pl.'s Facts"), ECF No. 27-1; (17) the Response to Defendant's Statement of Material Facts ("Pl.'s Resp. to Def.'s Facts"), ECF No. 26-2; (18) the Reply in Further Support of Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Def.'s Reply"), ECF No. 30; (19) the Second Declaration of Vanessa R. Brinkmann ("2d Brinkmann Decl."), ECF No. 30-1; (20) the Third Declaration of David M. Hardy ("3d Hardy Decl."), ECF No. 30-2; (21) the Plaintiff's Reply in Support of Cross-Motion for Summary Judgment ("Pl.'s Reply"), ECF No. 36; and (22) the Defendant's Notice ("Def.'s Notice"), ECF No. 37.

[2] However, some of the plaintiff's requests were classified as non-FOIA requests by the FBI.

released 68 pages in full or in part[,]" and that it had "withheld [material] pursuant to FOIA Exemptions (b)(6) [('Exemption 6')], (b)(7)(A) [('Exemption 7(A)')], (b)(7)(C) [('Exemption 7(C)')], (b)(7)(D) [('Exemption 7(D)'),] and (b)(7)(E) [('Exemption 7(E)')]." Id. ¶ 8; id., Exhibit ("Ex.") D (FBI's Release Letter Dated July 17, 2014, ("FBI July 2014, Letter")), ECF No. 23-3. The FBI further "advised [the p]laintiff [that] a search of the FBI Headquarters electronic surveillance indices was not conducted [because] file numbers are not searchable." Id. ¶ 8. On August 31, 2014, the plaintiff filed a summary report request to appeal the "OIP['s decision] regarding the FBI's July 17, 2014[,] response to" his request. Id. ¶ 9; id., Ex. E (Plaintiff's Summary Report Request Dated August 31, 2014 ("Pl.'s Aug. 2014, Summary Report Request")), ECF No. 23-3. "In a letter dated January 8, 2015, [the] OIP affirmed the FBI's July 17, 2014[,] determination to withhold certain responsive records pursuant to [ ] Exemptions [6, 7(A), 7(C), 7(D), and 7(E),]" and "determined [that] the FBI's search for records responsive to [the p]laintiff's request was adequate and reasonable." Id. ¶ 11; id., Ex. G (OIP's Appeal Determination Letter Dated January 8, 2015, ("OIP Jan. 8, 2015, Letter")), ECF No. 23-3. Finally, "[b]y letter dated March 9, 2018, the FBI provided a Vaughn-coded copy of the originally processed version of [FBI domestic terrorism administrative record] 66F-HQ-1328110 from July 17, 2014[.]" Id. ¶ 12 (footnote omitted); id., Ex. H (FBI's Release Letter Dated March 9, 2018, ("FBI Mar. 9, 2018, Letter")), ECF No. 23-3. "During the process of coding the originally processed material, the FBI determined [that] two additional pages could be released." Id. ¶ 12; id., Ex. H (FBI Mar. 9, 2018, Letter).

**b. FOIPA Requests Nos. 1333446-000 & 1333446-001**

In FOIPA Request No. 1333446-000, which was submitted "[b]y a[n email] communication dated July 21, 2015[,]" the plaintiff requested (1) "any and all records to a search

of the Universal Index; Investigative Case Management; Electronic Case File; Sentinel; and Data Integration and Visualization System for FBI file 66-HQ-1328110;" and (2) "any and all other records constituting, mentioning, or referring to FBI file 66-HQ-1328110."  Def.'s Facts ¶ 2; see Pl.'s Resp. to Def.'s Facts ¶ 2.  "By letter dated July 29, 2015, the FBI acknowledged receipt of [the p]laintiff's request" and "advised [the p]laintiff that it was searching the indices to the [CRS] . . . for information responsive to his request."  2d Hardy Decl. ¶ 14; id., Ex. J (FBI's Acknowledgement Letter Dated July 29, 2015, ("FBI's Jul. 29, 2015, Letter")), ECF No. 23-4. "By letter dated August 31, 2015, the FBI advised [the p]laintiff [that] 'unusual circumstances' applied to the processing of his request[,]" which "could include the following scenarios:"  (1) "a need to search for and collect records from the field officers and/or other officers that are separate from the FBI Record/Information Dissemination Section ("RIDS")[,]" (2) "a need to search for, collect, and examine a voluminous amount of separate and distinct records[,]" or (3) "a need for consultation with another agency or two or more [Department] components."  Id. ¶ 15; id., Ex. K (FBI's Request Determination Dated August 31, 2015, ("FBI Aug. 31, 2015, Letter")), ECF No. 23-4.  The FBI also "denied [the p]laintiff's request for a fee waiver, concluding that he had 'failed to demonstrate . . . that the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government."  Id. ¶ 15 (citing 28 C.F.R. § 16.10(k)(1)); id., Ex. K (FBI Aug. 31, 2015, Letter).

"By letter dated September 8, 2015, the FBI advised [the p]laintiff [that] it [had] located approximately 3,093 potentially responsive pages," as well as "approximately three [compact discs ('CDs[')] consisting of audio and video files potentially responsive to the subject of [the p]laintiff's request[.]"  Id. ¶ 16; id., Ex. L (FBI's Cost Letter Dated September 8, 2015, ("FBI

Sept. 8, 2015, Letter")), ECF No. 23-4. The FBI further informed the plaintiff that "duplication fees [for the approximately 3,093 potentially responsive pages were] estimated at $149.65 for a paper copy or $85.00 to receive the releases on six . . . []CDs[]" and "duplication fees [for the approximately three CDs were] estimated at $45.00[.]" Id. ¶ 16; id., Ex. L (FBI Sept. 8, 2015, Letter). On "October 27, 2015, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's August 31, 2015[,] response to" this request. Id. ¶ 17; id., Ex. M (Plaintiff's Administrative Appeal Letter to OIP Dated October 27, 2015, ("Pl.'s Oct. 27, 2015, Letter")), ECF No. 23-4. "In a letter dated August 8, 2015, [the] OIP informed [the p]laintiff [that,] because he [had] filed an associated lawsuit, it was closing his administrative appeal[.]" Id. ¶ 19; id., Ex. O (OIP's Appeal Determination Letter Dated August 8, 2015, ("OIP Aug. 8, 2015, Letter")), ECF No. 23-4.

"By email dated October 21, [2015], [the p]laintiff responded to the FBI's [September 8, 2015] letter[,] committing to paying $130.00 for release of the records on CDs" and representing that he had "filed an administrative appeal of the FBI's denial of his fee waiver with [the] OIP." Id. ¶ 20; id., Ex. P (Plaintiff's Response to FBI's Cost Letter Dated October 21, 2015, ("Pl.'s Oct. 21, 2015, Resp.")), ECF No. 23-5. "By letter dated October 26, 2015, the FBI acknowledged receipt of [the p]laintiff's agreement to pay [the required] fees, re-opened [the p]laintiff's" request "and assigned it FOIPA Request N[o.] 1333446-001." Id. ¶ 21; id., Ex. Q (FBI's Acknowledgement Letter Dated October 26, 2015, ("FBI Oct. 26, 2015, Letter")), ECF No. 23-5; see Def.'s Facts ¶ 3 (explaining that "FOIAPA Request No. 1333446-001 is the number that the FBI assigned to [the] plaintiff's re-opened FOIAPA Request No. 1333446-000"); see also Pl.'s Resp. to Def.'s Facts ¶ 3 (noting this fact as undisputed). The FBI further advised the plaintiff that "it was searching the indices to the [CRS] . . . for information

responsive to his request" and, "[f]or purposes of assessing fees," the plaintiff "would be charged applicable search and duplication fees in accordance with 5 [U.S.C.] § 552[](a)(4)(A)(ii)(III)." 2d Hardy Decl. ¶ 21; id., Ex. Q (FBI Oct. 26, 2015, Letter).  On "December 23, 2015, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's August 31, 2015[,] response" to his "FOIA Requests N[os.] 1333446-000 and 133[3]446-001."  Id. ¶ 22; id., Ex. R (Plaintiff's Administrative Appeal Letter to OIP Dated December 23, 2015, ("Pl.'s Dec. 23, 2015, Letter")), ECF No. 23-5.  The plaintiff filed a further "appeal with [the] OIP" on March 3, 2016, "regarding the FBI's search for responsive records" and "fee waiver and news media fee category denial responses[.]"  Id. ¶ 24; id., Ex. T (Plaintiff's Administrative Appeal Letter to OIP Dated March 3, 2016, ("Pl.'s Mar. 3, 2016 Letter")), ECF No. 23-5.  "In a letter dated August 8, 2016, [the] OIP informed [the p]laintiff [that,] because he [had] filed [the instant] lawsuit, it was closing [this second] administrative appeal] regarding" the FBI's search and waiver denials.  Id. ¶ 26; id., Ex. V (OIP's Determination Letter Dated August 8, 2016 ("Pl.'s Aug. 8, 2016, Letter")), ECF No. 23-5.

"By letter dated November 30, 2016, as its first interim release of information responsive to [the p]laintiff's request, the FBI" informed the plaintiff that it had "reviewed 514 pages and released 178 pages in full or in part[,]" and withheld material pursuant to "FOIA Exemptions (b)(1) [('Exemption 1')], (b)(3) [('Exemption 3')], (b)(5) [('Exemption 5')]," 6, 7(C), and 7(E). Id. ¶ 28; id., Ex. W (FBI's First Interim Release Letter Dated November 30, 2016, ("FBI Nov. 30, 2016, First Interim Release Letter")), ECF No. 23-5.  The FBI also "reviewed 172 photographs and withheld them in their entirety pursuant to" Exemptions 6, 7(C), and 7(E)."  Id. ¶ 28; id., Ex. W (FBI's Nov. 30, 2016, First Interim Release Letter).  The FBI also "advised [the p]laintiff [that] it was consulting with another government agency [ ] and would respond once

the consultation was complete[d]." Id. ¶ 28; id., Ex. W (FBI Nov. 30, 2016, First Interim

Release Letter). "By letter dated January 1, 201[6][3], as its second interim release of information

responsive to [the p]laintiff's request, the FBI" informed the plaintiff that it had "reviewed 518

pages and released 167 pages in full or in part[,]" but had withheld material pursuant to

Exemptions 5, 6, 7(A), 7(C), 7(D), and 7(E).  Id. ¶ 29; id., Ex. X (FBI's Second Interim Release

Letter Dated January 1, 2016, ("FBI Jan. 1, 2016, 2d Interim Release Letter")), ECF No. 23-5.

The FBI further "advised [the p]laintiff [that] it was [again] consulting with [another government

agency] [ ] and would respond once the consultation was complete."[4]  Id. ¶ 29; id., Ex. X (FBI

Jan. 1, 2016, 2d Interim Release Letter).  "By letter dated February 1, 2017, as its third interim

release of information responsive to [the p]laintiff's request, the FBI" informed the plaintiff that

it had "reviewed 553 pages and released 242 pages in full or in part[,]" and withheld material

pursuant to Exemptions 1, 3, 5, 6, 7(A), 7(C), and 7(E).  Id. ¶ 30; id., Ex. Y (FBI's Third Interim

Release Letter Dated February 1, 2017, ("FBI Feb. 1, 2017, 3d Interim Release Letter")), ECF

No. 23-5.  The FBI further "advised [the p]laintiff [that] it was consulting with [another

government agency] [ ] and would respond once the consultation was complete[d]."  Id. ¶ 30; id.,

Ex. Y (FBI Feb. 1, 2017, 3d Interim Release Letter).

 "By letter dated February 27, 2017, as its fourth interim release of information responsive

to [the p]laintiff's request, the FBI" informed the plaintiff that it had "reviewed 526 pages and

released 183 pages in full or in part[,]" and withheld material pursuant to Exemptions 1, 3, 6,

7(A), 7(C), 7(D), and 7(E).  Id. ¶ 31; id., Ex. Z (FBI's Fourth Interim Release Letter Dated

---

[3] In David M. Hardy's Second Declaration, he attests that this letter was dated January 1, 2017, but the actual exhibit provides that the letter was sent on January 1, 2016.  Accordingly, the Court has made this change in the bracket to reflect the correct date.

[4] The FBI's second interim release in response to FOIPA Requests Nos. 1333446-000 & 1333446-001 also included "material responsive to FOIA Request No. 1319790-000[,]" specifically 89 of the 518 pages reviewed and 86 of the 167 pages released.  2d Hardy Decl. ¶ 29 n.11.

February 27, 2017, ("FBI Feb. 27, 2017, 4th Interim Release Letter")), ECF No. 23-5.  "By letter dated March 31, 2017, as its fifth interim release of information responsive to [the p]laintiff's request, the FBI" informed the plaintiff that it had "reviewed 583 pages and released 230 pages in full or in part[,]" and withheld material pursuant to Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E).  Id. ¶ 32; id., Ex. AA (FBI's Fifth Interim Release Letter Dated March 31, 2017, ("FBI Mar. 31, 2017, 5th Interim Release Letter")), ECF No. 23-5.  The FBI also "advised [the p]laintiff [that it was] consulting with [another government agency] and would respond once the consultation was complete[d]."  Id. ¶ 32; id., Ex. AA (FBI Mar. 31, 2017, 5th Interim Release Letter).  "By letter dated May 31, 2017, as its sixth interim release of information responsive to [the p]laintiff's request, the FBI advised [the p]laintiff that despite constant follow[-]up phone calls and emails to the [other government agency], the FBI had not been provided with a response to the consultations[,]" and that the other agency "required an additional thirty (30) days to complete work on the consultation" and "the FBI intended to provide a release of the information to [the p]laintiff no later than July 31, 2017."  Id. ¶ 33; id., Ex. BB (FBI's Sixth Interim Release Letter Dated May 31, 2017, ("FBI May 31, 2017, 6th Interim Release Letter")), ECF No. 23-5.  "By letter dated July 31, 2017, as its seventh and final release of information responsive to [the p]laintiff's request, the FBI" informed the plaintiff that it had "reviewed 92 pages and released [to him] 5 pages in full or in part[,]" but withheld material "pursuant to FOIA Exemptions (b)(4)[('Exemption 4')]," 6, 7(C), and 7(E).  Id. ¶ 34; id., Ex. CC (FBI's Seventh Letter Dated July 31, 2017, ("FBI July 31, 2017, 7th Release Letter")), ECF No. 23-5.

### c.  FOIPA Request No. 1350391-000

In FOIPA Request No. 1350391-000, which was submitted "[b]y letter dated May 2, 2016," the plaintiff requested "[]any and all records that constitute, mention, or refer to any and

all FBI Headquarters Classification 66 '00' files."  Def.'s Facts ¶ 4; see Pl.'s Resp. to Def.'s

Facts ¶ 4; 2d Hardy Decl., Ex. DD (Plaintiff's Request Letter Dated May 2, 2016, ("Pl.'s May 2,

2016, FOIA Request")) at 1, ECF No. 23-6.  The plaintiff also requested "66F 'zero' files."  Pl.'s

Resp. to Def.'s Facts ¶ 4; 2d Hardy Decl., Ex. DD (Pl.'s May 2, 2016, FOIA Request).  "By

letter dated May 16, 2016, the FBI acknowledged receipt of [the p]laintiff's request" and

"advised [the p]laintiff [that] it was searching the indices to the [CRS] . . . for information

responsive to [this] request."  2d Hardy Decl. ¶ 36; id., Ex. EE (FBI's Acknowledgement Letter

Dated May 16, 2016, ("FBI May 16, 2016, Letter")), ECF No. 23-6.  The FBI further advised the

plaintiff that the same "'unusual circumstances' applied to the processing of his request" and

"denied [the p]laintiff's request for a fee waiver, concluding [that] he had failed to demonstrate

the requirement that the requested information is in the public interest[.]"  Id. ¶ 36 (internal

quotation marks omitted); id., Ex. EE (FBI May 16, 2016 Letter); see 28 C.F.R. § 16.10(k)(1).

The FBI advised the plaintiff that "unusual circumstances could include the following"

situations:

> There is a need to search for and collect records from the field offices and/or other offices that are separate from the FBI/Records Information Dissemination Section ("RIDS").
>
> There is a need to search for, collect, and examine a voluminous amount of separate and distinct records.
>
> There is a need for consultation with another agency or two or more DOJ components.

2d Hardy Decl. ¶ 36.

"By [email] dated May 19, 2016, [the p]laintiff submitted an updated Letter of

Support/Commitment to Publish documentation from William Potter discussing [the p]laintiff's

'FOIA about FOIA' project."  Id. ¶ 37; id., Ex. FF (Plaintiff's "Letter of Support/Commitment to

Publish" Documentation Dated May 19, 2016, ("Pl.'s May 19, 2016, Letter")), ECF No. 23-6.

"By letter dated June 17, 2016, the FBI advised [the p]laintiff" that "his request does qualify for

favored status" as "a 'representative of the news media[,]' in accordance with 5 U.S.C.

§ 552[](a)(4)(A)(ii)[]" and "28 C.F.R. § 16.10(b)(6)," and informed the plaintiff that "it was

considering [his] fee waiver request[.]"  Id. ¶ 39; id., Ex. HH (FBI's Fee Category Status Letter

Dated June 17, 2016, ("FBI June 17, 2016, Letter")), ECF No. 23-6.  On "June 18, 2016, [the

p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's May 16 and 25,[5]

2016[,] response[s] to" his request.  Id. ¶ 40; id., Ex. II (Plaintiff's Administrative Appeal Letter

to OIP Dated June 18, 2016, ("Pl.'s June 18, 2016, Appeal Letter")), ECF No. 23-6.

"By letter dated July 14, 2016, the FBI advised [the p]laintiff [that] it had determined

[that] his request was not a valid [FOIA] request" because it "did not comport with the

requirements of 28 C.F.R. § 16.3(b), as it did not provide enough detail to enable personnel to

locate records 'with a reasonable amount of effort'[;]" "was overbroad in scope[;] sought

information in vague and undefined terms[;] prescribed no time-frame limits[;] and was unduly

burdensome."  Id. ¶ 42; id., Ex. KK (FBI's "[U]nusual [C]ircumstances" and Unduly

Burdensome (Initial Processing) Letter Dated July 14, 2016, ("FBI July 14, 2016 Letter")), ECF

No. 23-6.  The FBI also informed the plaintiff that "it would take [ ] 185,873 hours" "to

complete initial processing of the request[.]"  Id. ¶ 42; id., Ex. KK (FBI July 14, 2016, Letter).

"By letter dated July 21, 2016, the FBI [further] advised [the p]laintiff [that] it had determined"

that, "in order to complete processing of the request, it would take 1,035,898 work hours[.]"

Id. ¶ 43; id., Ex. LL (FBI's Unduly Burdensome (Processing) Letter Dated July 21, 2016, ("FBI

---

[5] "By letter dated May 25, 2016, the FBI re-submitted to [the p]laintiff its initial response letter specifying [that]
FOIPA Request No. 1350391-000 [wa]s assigned to [the p]laintiff's request for FBI Classification 66 '00' files."  2d
Hardy Decl. ¶ 38; id., Ex. GG (FBI's Acknowledgement Letter (Re-Sent) Dated May 25, 2016 ("FBI May 25, 2016
Letter")), ECF No. 23-6.

July 21, 2016, Letter")), ECF No. 23-6.  On "July 28, 2016, [the p]laintiff filed an administrative

appeal with [the] OIP regarding the FBI's July 21, 2016[,] response[,]" id. ¶ 44; id., Ex. MM

(Plaintiff's Administrative Appeal Letter to OIP Dated July 28, 2016, ("Pl.'s July 28, 2016,

Letter")), ECF No. 23-6, and on "August 2, 2016, [the p]laintiff re-filed [this] . . . appeal[,]" id.

¶ 45; id., Ex. NN (Plaintiff's Administrative Appeal Letter to OIP (Re-Filed) Dated August 2,

2016, ("Pl.'s Aug. 2, 2016 Letter")), ECF No. 23-6.  "By letter dated September 7, 2016, [the]

OIP affirmed the FBI's July 21, 2016[,] determination[,] stating that [the p]laintiff's request for

records 'would require the FBI to conduct an unreasonably burdensome search and [to expend]

an unduly burdensome amount of processing time[,]'" specifically "'1,035,898 hours to search

for a process all of the files potentially responsive' to [the p]laintiff's request."  Id. ¶ 48 (quoting

id., Ex. QQ (OIP's Determination Letter Dated September 7, 2016, ("OIP Sept. 7, 2016 Letter")),

ECF No. 23-6).

> **d.  FOIPA Request No. 1310257-000**

In FOIPA Request No. 1310257-000, which was submitted "[b]y letter dated

November 4, 2014," the plaintiff requested "any and all records prepared, received, transmitted,

collected, and/or maintained by the FBI, the Terrorist Screening Center, the National Joint

Terrorism Task Force, or any Joint Terrorism Task Force, constituting or referring to issues

involving news media fee category classification policy and training."  2d Hardy Decl. ¶ 50

(internal quotation marks omitted); id., Ex. SS (Plaintiff's Request Letter Dated November 4,

2014, ("Pl.'s November 4, 2014, Letter")), ECF No. 23-7; Def.'s Facts ¶ 5 (internal quotation

marks omitted); see Pl.'s Resp. to Def.'s Facts. ¶ 5.  "By letter dated November 17, 2014, the

FBI acknowledged receipt of [the p]laintiff's request[]" and "advised [the p]laintiff [that] it was

searching the indices to the [CRS] . . . for information responsive to his request."  2d Hardy

Decl. ¶ 51; id., Ex. TT (FBI's Acknowledgement Letter Dated November 17, 2014, ("FBI Nov. 17, 2014, Letter")), ECF No. 23-7.  The FBI further informed the plaintiff that "his fee waiver was being considered and [that] he would be advised of the decision at a later date."  Id. ¶ 51; id., Ex. TT (FBI Nov. 17, 2014, Letter).  "By letter dated December 21, 2014, [the p]laintiff requested estimated completion dates for" his request, and "[t]he FBI advised [the p]laintiff [that] the estimated completion date . . . was January 2016."  Id. ¶ 52; id., Ex. UU (Plaintiff's Request For "Estimated Completion Date" Dated December 21, 2014, ("Pl.'s Dec. 21, 2014, Request")), ECF No. 23-7.  "By letter dated September 16, 2016, the FBI advised [the p]laintiff [that] his request was being administratively closed[]" because it "was aggregated in FOIPA Request N[o.] 1319790-000 under the subject 'RIDS Intranet Sharepoint Site (Specific Records),' as these requests shared like information."  Id. ¶ 53; id., Ex. VV (FBI's Combined FOIA Response Letter Dated September 16, 2016, ("FBI Sept. 16, 2016, Resp.")), ECF No. 23-7.  On "October 28, 2016, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's September 16, 2016 response[.]"  Id. ¶ 54; id., Ex. WW (Plaintiff's Administrative Appeal Letter to OIP Dated October 28, 2016, ("Pl.'s Oct. 28, 2016 Letter")), ECF No. 23-7.  "By letter dated February 15, 2017, [the] OIP affirmed the FBI's September 16, 2016[,] determination that the FBI's response was correct to administratively close the cited [r]equest[s,] . . . as the material responsive to those requests was currently in process within Request N[o]. 1319790."  Id. ¶ 56; id., Ex. YY (OIP's Determination Letter Dated February 15, 2017, ("OIP Feb. 15, 2017, Letter")), ECF No. 23-7.

### e.  FOIPA Request No. 1350753-000

In FOIPA Request No. 1350753-000, which was submitted "[b]y letter dated May 2, 2016," the plaintiff requested "any and all records mentioning or referring to certain FBI and

[Department] FOIPA requests."  Def.'s Facts ¶ 6; see Pl.'s Resp. to Def.'s Facts ¶ 6; see also 2d
Hardy Decl. ¶ 57 (listing the specific "FBI and [Department] FOIPA requests" referred to in the
plaintiff's FOIA request).  "By letter dated May 26, 2016, the FBI acknowledged receipt of [the
p]laintiff's request" and "advised [the p]laintiff [that] it was searching the indices to the
[CRS] . . . for information responsive to his request."  2d Hardy Decl. ¶ 59; id., Ex. AAA (FBI's
Acknowledgement Letter Dated May 26, 2016, ("FBI May 26, 2016, Letter")), ECF No. 23-7.
"By letter dated June 17, 2016, the FBI advised [the p]laintiff" that "his request does qualify for
favored status" "as a 'representative of the news media[,]' in accordance with 5 U.S.C.
§ 552[](a)(4)(A)(ii)[]" and "28 C.F.R. § 16.10(b)(6)[.]"  Id. ¶ 60; id., Ex. HH (FBI June 17,
2016, Letter).  "By letter dated June 28, 2016, the FBI advised [the p]laintiff [that] his request for
71 cited FOIA numbers was administratively closed" because (1) "the FOIA does not require
federal agencies to answer questions, create records, conduct research, or draw conclusions
concerning queried data[;]" and (2) "the FOIA provides for access to [g]overnment records
where the records sought are 'reasonably describe[d.]'"  Id. ¶ 61 (quoting 5 U.S.C.
§ 552(a)(3)(A)); id., Ex. BBB (FBI's Response Letter Dated June 28, 2016, ("FBI June 28, 2016,
Letter")), ECF No. 23-7.  On "July 2, 2016, [the p]laintiff filed an administrative appeal with
[the] OIP regarding the FBI's June 28, 2016 response[.]"  Id. ¶ 62; id., Ex. CCC (Plaintiff's
Administrative Appeal Letter to OIP Dated July 2, 2016, ("Pl.'s July 2, 2016, Letter")), ECF No.
23-7.  "In a letter dated September 23, 2016, [the] OIP informed [the p]laintiff [that,] because he
[had] filed a lawsuit, it was closing his administrative appeal[.]"  Id. ¶ 64; id., Ex. EEE (OIP's
Determination Letter Dated September 23, 2016, ("OIP Sept. 23, 2016, Letter")), ECF No. 23-7.

**f.  FOIPA Request No. 1350828-000**

In FOIPA Request No. 1350828-000, which was submitted "[b]y letter dated May 2, 2016," the plaintiff requested "any and all records mentioning or referring to the following subjects from January 1, 2009, to present: Sparrow Media; The Sparrow Project; www.sparrowmedia.net; Twitter.com/sparrowmedia; andy@sparrowmedia.net; or andy@fitzbiggonmedia.com."  Def.'s Facts ¶ 10; <u>see</u> Pl.'s Resp. to Def.'s Facts ¶ 10.  "By letter dated May 26, 2016, the FBI acknowledged receipt of [the p]laintiff's request[] . . . and advised [the p]laintiff [that] it was searching the indices to the [CRS] . . . for information responsive to his request."  2d Hardy Decl. ¶ 85; <u>id.</u>, Ex. PPP (FBI's Acknowledgement Letter Dated May 26, 2016, ("FBI May 26, 2016, Letter")), ECF No. 23-8.  The FBI further "advised [the p]laintiff [that] 'unusual circumstances' applied to the processing of his request" that "would delay the FBI's ability to make a determination on his request."  <u>Id.</u> ¶ 85; <u>id.</u>, Ex. PPP.  The FBI again advised the plaintiff that "unusual circumstances could include the following" situations:

> There is a need to search for and collect records from the field offices and/or other offices that are separate from the FBI/Records Information Dissemination Section ("RIDS").
>
> There is a need to search for, collect, and examine a voluminous amount of separate and distinct records.
>
> There is a need for consultation with another agency or two or more DOJ components.

2d Hardy Decl. ¶ 85.

"By letter dated June 17, 2016, the FBI advised [the p]laintiff" that "his request [ ] qualif[ied] for favored status" "as a 'representative of the news media,' in accordance with 5 U.S.C. § 552[](a)(4)(A)(ii[)] and 28 C.F.R. § 16.10(b)(6)[.]"  <u>Id.</u> ¶ 86; <u>id.</u>, Ex. HH (FBI June 17, 2016, Letter).  On "June 18, 2016, [the p]laintiff filed an administrative appeal with [the] OIP

regarding the FBI's May 26, 2016[,] response[.]"  Id. ¶ 87; id., Ex. QQQ (Plaintiff's

Administrative Appeal Letter to OIP Dated June 18, 2016 ("Pl.'s June 18, 2016, Letter")), ECF

No. 23-8.

"By letter dated July 14, 2016, the FBI advised [the p]laintiff [that] a search of the

[CRS,] . . . to include any Electronic Surveillance ("ELSUR") records, identified no records

responsive to [the p]laintiff's request."  Id. ¶ 89; id., Ex. SSS (FBI's No Record Response Letter

Dated July 14, 2016, ("FBI July 14, 2016, Letter")), ECF No. 23-8.  "By letter dated August 11,

2016, [the] OIP affirmed the FBI's May 26, 2016[,] determination [that the p]laintiff's request

included 'unusual circumstances[,]'" because "the records [that the p]laintiff sought required the

FBI to conduct searches at FBI Headquarters and in one or more of the FBI's field offices," and

the FBI "need[ed] to search for, collect, and examine 'a voluminous amount' of records[.]"  Id.

¶ 91 (quoting 5 U.S.C. § 552(a)(6)(B)(i), (iii)); id., Ex. UUU (OIP's Determination Letter Dated

August 11, 2016, ("OIP Aug. 11, 2016, Letter")), ECF No. 23-8.  Finally, "[i]n a letter dated

October 14, 2016, [the] OIP informed [the p]laintiff [that,] because he [had] filed a lawsuit, it

was closing his administrative appeal[.]"  Id. ¶ 92; id., Ex. VVV (OIP's Determination Letter

Dated October 14, 2016, ("OIP Oct. 14, 2016, Letter")), ECF No. 23-8.

### g.  FOIA Request No. 1355663-000

In Non-FOIPA Request No. 56399, which was later categorized as FOIPA Request No.

1355663-000, see Def.'s Facts ¶ 13; Pl.'s Resp. to Def.'s Facts ¶ 13, and submitted "[b]y letter

dated May 2, 2016," and the plaintiff requested "any and all records mentioning or referring to

twitter.com/sparrowmedia, from January 1, 2009[,] to present[,]" Def.'s Facts ¶ 12; see Pl.'s

Resp. to Def.'s Facts ¶ 12.  "By letter dated August 25, 2016, the FBI advised [the p]laintiff

[that] a search of the CRS, to include any ELSUR records, identified no records responsive to"

this request.  Def.'s Facts ¶ 13; see also Pl.'s Resp. to Def.'s Facts ¶ 13.  "By letter dated May

26, 2016, the FBI acknowledged [the p]laintiff's request [ ] and informed him of the 'unusual

circumstances' delaying the FBI's response to his request[, which were the same circumstances

he was informed of in regards to FOIPA Request No. 1350828-000]."  2d Hardy Decl. ¶ 100; id.,

Ex. PPP (FBI May 26, 2016, Letter).  "By letter dated June 20, 2016, the FBI advised [the

p]laintiff [that] his request for twitter.com/sparrowmedia[] . . . was administratively closed"

because the "request [wa]s not searchable in the FBI's indices[,]" as "[t]he CRS is not arranged

in a manner that allows for the retrieval of information by individual Twitter handle[,]" and "the

FOIA does not require federal agencies to answer inquir[i]es, create records, conduct research, or

draw conclusions concerning queried data."  Id. ¶ 101; id., Ex. ZZZ (FBI's Response Letter

Dated June 20, 2016, ("FBI June 20, 2016, Letter")), ECF No. 23-8.  On "June 29, 2016, [the

p]laintiff filed an administrative appeal with OIP regarding the FBI's June 20, 2016[,]

response[.]"  Id. ¶ 102; id., Ex. GGG (Plaintiff's Administrative Appeal Letter To OIP Dated

June 29, 2016, ("Pl.'s June 29, 2016, Letter")), ECF No. 23-7.  "By letter dated July 22, 2016,

[the] OIP remanded [the p]laintiff's June 29, 2016[,] appeal to the FBI for further processing[,]"

advising "the FBI to conduct a search for responsive records, and send any and all releasable

records directly to [the p]laintiff, subject to any applicable fees."  Id. ¶ 104; id., Ex. BBBB

(OIP's Determination Letter Dated July 22, 2016, ("OIP July 22, 2016[,] Letter")), ECF No. 23-

8.

    "By letter dated August 25, 2016, the FBI advised [the p]laintiff [that] a search of the

CRS, to include any ELSUR records, identified no records responsive to [the

p]laintiff's . . . request[.]"  Id. ¶ 105; id., Ex. CCCC (FBI's No Record Response Letter Dated

August 25, 2016, ("FBI Aug. 25, 2016, Letter")), ECF No. 23-8.  On "September 12, 2016, [the

p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's August 25, 2016[,] response[.]"  Id. ¶ 106; id., Ex. DDDD (Plaintiff's Administrative Appeal Letter To OIP Dated September 12, 2016, ("Pl.'s Sept. 12, 2016, Letter")), ECF No. 23-8.  "By letter dated November 21, 2016, [the] OIP affirmed the FBI's August 25, 2016[,] determination[]" and "advised [the p]laintiff [that] the FBI had" "conducted an adequate, reasonable search" because it had "conducted a search for responsive records in its automated indices and its Sentinel database and located no records."  Id. ¶ 108; id., Ex. FFFF (OIP's Determination Letter Dated November 21, 2016, ("OIP Nov. 21, 2016, Letter")), ECF No. 23-8.  The OIP further "advised [that the p]laintiff's allegation of improper invocation of a FOIA exclusion to withheld records was without merit."  Id. ¶ 108; id., Ex. FFFF (OIP Nov. 21, 2016, Letter).

### h.  FOIPA Request No. 1365651

In FOIPA Request No. 1365651, which was also categorized as Non-FOIPA Request No. 56400, the plaintiff requested "[b]y letter dated May 2, 2016," "any and all records mentioning or referring to andy@sparrowmedia.net, from January 1, 2009, to present."  Def.'s Facts ¶ 14; see Pl.'s Resp. to Def.'s Facts ¶ 14.  "By letter dated February 16, 2017, the FBI advised [the p]laintiff [that] a search of the CRS, to include any ELSUR records, identified no records responsive to [the p]laintiff's May 2, 2016[,] request[.]"  Def.'s Facts ¶ 15; see Pl.'s Resp. to Def.'s Facts ¶ 15.  "By letter dated May 26, 2016, the FBI acknowledged [the p]laintiff's request and informed him of the 'unusual circumstances' delaying the FBI's response to his request[, which were the same unusual circumstances previously conveyed to the plaintiff in regards to his prior FOIA requests]."  2d Hardy Decl. ¶ 110; id., Ex. PPP (FBI May 26, 2016, Letter).  But subsequently, "[b]y letter dated June 20, 2016, the FBI advised [the p]laintiff [that] his request for andy@sparrowmedia.net[] . . . was administratively closed[]" because it was "not

searchable in the FBI's indices[,]" which are "not arranged in a manner that allows for the retrieval of information by individual electronic mail address." Id. ¶ 111; id., Ex. GGGG (FBI's Response Letter Dated June 20, 2016, ("FBI June 20, 2016, Letter")), ECF No. 23-9. The FBI further "advised [the plaintiff that] the FOIA does not require federal agencies to answer inquir[i]es, create records, conduct research, or draw conclusions concerning queried data." Id. ¶ 111; id., Ex. GGGG (FBI June 20, 2016, Letter). "By letter dated June 29, 2016, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's June 20, 2016[,] response[.]" Id. ¶ 112; id., Ex. GGG (Plaintiff's Administrative Appeal Letter to OIP Dated June 29, 2016, ("Pl.'s June 29, 2016, Letter")), ECF No. 23-7. "By letter dated August 25, 2016, [the] OIP remanded [the p]laintiff's June 29, 2016[,] appeal to the FBI for further processing[,] . . . advis[ing] the FBI to conduct a search for responsive records, and send any and all releasable records directly to [the p]laintiff, subject to any applicable fees." Id. ¶ 114; id., Ex. IIII (OIP's Determination Letter Dated August 25, 2016, ("OIP Aug. 25, 2016, Letter")), ECF No. 23-9.

"By letter dated February 16, 2017, the FBI advised [the p]laintiff [that] a search of the CRS, to include any ELSUR records[,] identified no records responsive to [the p]laintiff's [request.]" Id. ¶ 115; id., Ex. JJJJ (FBI's No Record Response Letter Dated February 16, 2017, ("FBI Feb. 16, 2017, Letter")), ECF No. 23-9. On "February 28, 2017, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's February 16, 2017[,] response[.]" Id. ¶ 116; id., Ex. KKKK (Plaintiff's Administrative Appeal Letter to OIP Dated February 28, 2017, ("Pl.'s Feb. 28, 2017, Letter")), ECF No. 23-9. "By letter dated April 30, 2017, [the] OIP affirmed the FBI's February 16, 2017[,] determination" and "advised [the p]laintiff [that] the FBI had" "conducted an adequate, reasonable search for such records" because it "had conducted a

search for responsive records subject to the FOIA and located no records in its files." Id. ¶ 118;

id., Ex. MMMM (OIP's Determination Letter Dated April 30, 2017, ("OIP Apr. 30, 2017,

Letter")), ECF No. 23-9. The OIP further advised the plaintiff that his "allegation of improper

invocation of a FOIA exclusion to withheld records was without merit." Id. ¶ 118; id., Ex.

MMMM (OIP Apr. 30, 2017, Letter).

   i.   **FOIPA Requests Nos. 1272610-000 & 1272610-001**

In FOIPA Request No. 1272610-000, which was submitted "[b]y letter dated June 5,

2014," the plaintiff requested "any and all records that were prepared, received, transmitted,

collected and/or maintained by the FBI, the Terrorist Screening Center, the National Joint

Terrorism Task Force, or any Joint Terrorism Task Force constituting, or relating or referring to

FBI policies or standard operating procedures regarding fee waivers for FOIPA requests." Def.'s

Facts ¶ 17 (internal quotation marks omitted); see Pl.'s Resp. to Def.'s Facts ¶ 17. "By letter

dated June 19, 2014, the FBI acknowledged receipt of [the p]laintiff's request[]" and "advised

[the p]laintiff [that] it was searching the indices to the [CRS] . . . for information responsive to

his request." 2d Hardy Decl. ¶ 126; id., Ex. RRRR (FBI's Acknowledgement Letter Dated June

19, 2014, ("FBI June 19, 2014, Letter")), ECF No. 23-9. The FBI further "advised [the p]laintiff

[that] 'unusual circumstances' applied to the processing of his request[,]" which "would delay

the FBI's ability to make a determination on his request." Id. ¶ 126; id., Ex. RRRR (FBI June

19, 2014, Letter). "By letter dated July 1, 2014, the FBI advised [the p]laintiff [that] his request

was administratively closed" because "the FBI FOIA fee waiver policy is governed by [the] OIP

and may be found in the 'United States Department of Justice Guide to the Freedom of

Information Act' (2009 Edition)[, which is] available at the Government Printing Office." Id.

¶ 127; id., Ex. SSSS (FBI's Response Letter Dated July 1, 2014, ("FBI July 1, 2014, Letter")),

ECF No. 23-9.  On August 31, 2014, the plaintiff filed a summary report request to appeal the OIP's decision to administratively close the plaintiff's request.  See id. ¶ 128; id., Ex. TTTT (Plaintiff's Summary Report Request to OIP Dated August 31, 2014, ("Pl.'s Aug. 31, 2014, Letter")), ECF No. 23-9.  "In a letter dated October 15, 2014, [the] OIP informed [the p]laintiff" that "it was closing his administrative appeal" because his "letter attempting to appeal was received by [the] OIP on August 31, 2014, one day after the regulatory deadline."  Id. ¶ 130; id., Ex. VVVV (OIP's Determination Letter Dated October 15, 2014, ("OIP Oct. 15, 2014, Letter")), ECF No. 23-9.

On "November 4, 2014, [the p]laintiff filed a[n identical] request[.]"  Id. ¶ 131 (footnote omitted); id., Ex. SS (Pl.'s November 4, 2014, Letter).  "By letter dated November 17, 2014, the FBI advised [the p]laintiff [that] his request dated November 4, 2014[,] was duplicate to requests made in FOIPA Request N[os.] 1272657-000, 1272543-000 and 1272610-000" and, "by separate letters dated July 1, 2014, the FBI [had] previously responded to [the p]laintiff regarding these subjects and considered these requests fulfilled."  Id. ¶ 132; id., Ex. WWWW (FBI's Response Letter Dated November 17, 2014, (Duplicate Request) ("FBI Nov. 17, 2014, Letter")), ECF No. 23-9.  "By letter dated January 16, 2015, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's November 17, 2014[,] response[.]"  Id. ¶ 133; id., Ex. XXXX (Plaintiff's Administrative Appeal Letter to OIP Dated January 16, 2015, ("Pl.'s Jan. 16, 2015, Letter")), ECF No. 23-9.  "In a letter dated May 4, 2015, [the] OIP informed [the p]laintiff [that,] as a result of discussions between FBI and OIP personnel, his appeal[] [ ] was remanded to the FBI for processing."  Id. ¶ 137; id., Ex. BBBBB (OIP's Determination Letter Dated May 4, 2015, ("OIP May 4, 2015, Letter")), ECF No. 23-9.  Prior to notifying the plaintiff of its resolution of his appeal on May 5, 2015, the "OIP notified the FBI . . . that [the p]laintiff's

request . . . would be remanded for further handling[,]" and thus "[t]he FBI began handling [the

p]laintiff's request prior to the official receipt of the" OIP's May 4, 2015, disposition of the

plaintiff's appeal.  Id. ¶ 135 n.42.  "By letter dated April 21, 2015, the FBI" informed the

plaintiff that it had "assigned [his remanded request,] FOIPA Request N[o.] 1272610-001[,]" and

indicated that it "was searching the indices to the [CRS] . . . for information responsive to his

request."  Id. ¶ 135; id., Ex. ZZZZ (FBI's Acknowledgement Letter Dated April 21, 2015, ("FBI

Apr. 21, 2015, Letter")), ECF No. 23-9.  After the "[p]laintiff requested a public interest fee

waiver[,]" the FBI "informed h[im that he] would be advised of the decision at a later date."  Id.

¶ 135; id., Ex. ZZZZ (FBI Apr. 21, 2015, Letter).

"By letter dated April 28, 2015, the FBI advised [the p]laintiff [that] his request was

administratively closed" because "[t]he FBI [had] determined [that] the FBI FOIA fee waiver

policy [wa]s governed by [the] OIP and the regulations are promulgated in 28 C.F.R. § 16.11[,]"

and that "[t]he fee waiver policy [was] . . . located at

www.justic[e].gov/sites/default/files/oip/legacy/2014/07/23/fees-feewaivers.pdf."  Id. ¶ 136; id.,

Ex. AAAAA (FBI's Response Letter Dated April 28, 2015, ("FBI Apr. 28, 2015, Letter")), ECF

No. 23-9.  "By letter dated June 9, 2015, [the p]laintiff filed an administrative appeal with [the]

OIP regarding the FBI's April 28, 2015[,] response[.]"  Id. ¶ 138; id., Ex. CCCCC (Plaintiff's

Administrative Appeal Letter To OIP Dated June 9, 2015, ("Pl.'s June 9, 2015, Letter")), ECF

No. 23-9.  "In a letter dated September 2, 2015, [the] OIP informed [the p]laintiff [that,] as a

result of discussions between FBI and OIP personnel, his appeal[] [ ] was [again] remanded to

the FBI for [further] processing."  Id. ¶ 140; id., Ex. EEEEE (OIP's Determination Letter Dated

September 2, 2015, ("OIP Sept. 2, 2015, Letter")), ECF No. 23-9.  "By letter dated September

23, 2015, the FBI advised [the p]laintiff [that] his request was being administratively closed[]"

because "[t]he material responsive to his request [wa]s located in FOIPA Request N[o.] 1319790-000[,] as they [encompass] the same information." Id. ¶ 141; id., Ex. FFFFF (FBI's Response Letter Dated September 23, 2015, ("FBI Sept. 23, 2015, Letter")), ECF No. 23-9. "By letter dated October 27, 2015, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's September 23, 2015[,] response[.]" Id. ¶ 142; id., Ex. GGGGG (Plaintiff's Administrative Appeal Letter To OIP Dated October 27, 2015, ("Pl.'s Oct. 27, 2015, Letter")), ECF No. 23-9. "By letter dated February 3, 2016, [the] OIP affirmed the FBI's September 23, 2015[,] determination that the FBI's response was correct and it conducted an adequate, reasonable search for records." Id. ¶ 144; id., Ex. IIIII (OIP's Determination Letter Dated February 3, 2016, ("OIP Feb. 3, 2016, Letter")), ECF No. 23-9. The "OIP further stated [that,] since records responsive to [the p]laintiff's request are responsive to another of [the p]laintiff's pending requests, FBI Request No. 1319790, the FBI [had] properly closed [the p]laintiff's FBI Request No. 1272610-001 as a duplicate." Id. ¶ 144; id., Ex. IIIII (OIP Feb. 3, 2016, Letter).

## 2. Requests Classified by the FBI as Non-FOIA Requests

The plaintiff also submitted several requests that the FBI categorized as "Non-FOIPA" requests. Def.'s Facts ¶¶ 7–9, 11–12, 14, 16; see Pl.'s Resp. to Def.'s Facts ¶¶ 7–9, 11–12, 14, 16. According to the defendant, "[t]he FBI assigns [non-FOIPA] numbers when it deems a request as not a proper FOIA or Privacy Act request[]" for "a variety of reasons to include, but not limited to, the request being too vague, too broad, or not reasonably described to trigger a search of the FBI's [CRS.]" 2d Hardy Decl. ¶ 24 n.24.

### a. Non-FOIPA Request No. 56398

In Non-FOIPA Request No. 56398, which was submitted "[b]y letter dated May 2, 2016," the plaintiff requested (1) "any and all other records mentioning or referring to a request for news media fee category status in each and any of [the p]laintiff's FOIPA requests submitted

to the FBI from January 1, 2014, to the date of [the] first substantive search for records
responsive to the instant FOIPA request;" and (2) "any and all other records mentioning or
referring to FOIPA news media fee category matters mentioning or referring to [the p]laintiff."
Id. ¶ 7; see Pl.'s Resp. to Def.'s Facts ¶ 7. "By letter dated May 26, 2016, the FBI acknowledged
[the p]laintiff's request and informed him of the 'unusual circumstances' delaying
[its] . . . response to his request[ which were the same unusual circumstances already conveyed
to the plaintiff in regards to his other FOIA requests]." 2d Hardy Decl. ¶ 66; id., Ex. AAA (FBI
May 26, 2016, Letter). By further "letter[,] dated June 20, 2016, the FBI advised [the p]laintiff
[that] his request . . . was administratively closed[]" because "the FOIA does not require federal
agencies to answer inquiries, create records, conduct research, or draw conclusions concerning
queried data" and "the FOIA provides for access to [g]overnment records where the records
sought are 'reasonably describe[d].'" Id. ¶ 67 (quoting 5 U.S.C. § 552(a)(3)(A)); id., Ex. FFF
(FBI's Response Letter Dated June 20, 2016, ("FBI June 20, 2016, Letter")), ECF No. 23-7. "By
letter dated June 29, 2016, [the p]laintiff filed an administrative appeal with [the] OIP regarding
the FBI's June 20, 2016[,] response[.]" Id. ¶ 68; id., Ex. GGG (Pl.'s June 29, 2016, Letter). "In
a letter dated November 22, 2016, [the] OIP informed [the p]laintiff [that,] as a result of
discussions between FBI and OIP personnel, his appeal was remanded to the FBI for a search of
responsive records." Id. ¶ 70; id., Ex. III (OIP's Determination Letter Dated November 22,
2016, ("OIP Nov. 22, 2016, Letter")), ECF No. 23-7.

**b. Non-FOIPA Request No. 56343**

In Non-FOIPA Request No. 56343, which was submitted "[b]y letter dated May 2,
2016," the plaintiff requested (1) "any and all other records mentioning or referring to a request
for a waiver or reduction in fees in each and any of [the p]laintiff's FOIPA requests submitted to

the FBI from January 1, 2010, to the date of [the] first substantive search for records responsive to the instant FOIPA request;" and (2) "any and all other records mentioning or referring to FOIPA fee waiver matters mentioning or referring to [the p]laintiff."  Def.'s Facts. ¶ 8; see also Pl.'s Resp. to Def.'s Facts ¶ 8.  "By letter dated May 26, 2016, the FBI acknowledged receipt of [the p]laintiff's request and informed him of the 'unusual circumstances' delaying the FBI's response to his request."  2d Hardy Decl. ¶ 72 (quoting id., Ex. AAA (FBI May 26, 2016, Letter)).  "By letter dated June 20, 2016, the FBI advised [the p]laintiff [that] his request . . . was administratively closed[,]" reiterating again that "the FOIA does not require federal agencies to answer inquiries, create records, conduct research, or draw conclusions concerning queried data[]" and also because "the FOIA provides for access to [g]overnment records where the records sought are 'reasonably described.'"  Id. ¶ 73 (quoting 5 U.S.C. § 552(a)(3)(A)); id., Ex. JJJ (FBI's Response Letter Dated June 20, 2016, ("FBI June 20, 2016, Letter")), ECF No. 23-8.  "By letter dated June 29, 2016, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's June 20, 2016[,] response[.]"  Id. ¶ 74; id., Ex. GGG (Pl.'s June 29, 2016, Letter).  "In a letter dated November 22, 2016, [the] OIP informed [the p]laintiff [that,] as a result of discussions between FBI and OIP personnel, his appeal was remanded to the FBI for a search of responsive records."  Id. ¶ 76; id., Ex. III (OIP Nov. 22, 2016, Letter).

### c.  Non-FOIPA Request No. 56344

In Non-FOIPA Request No. 56344, which was submitted "[b]y letter dated May 2, 2016," the plaintiff requested (1) "any and all other records constituting, mentioning, or referring to FBI news media fee category denials that were remanded on appeal by [the] OIP and in which news media fee category status was subsequently granted by the FBI;" (2) "any and all other records constituting, mentioning, or referring to FBI news media fee category denials that

were remanded on appeal by the OIP and in which news media fee category status was not subsequently granted by the FBI;" and (3) "any and all other records constituting, mentioning, or referring to FBI news media fee category denials that were remanded on appeal by [the] OIP." Def.'s Facts ¶ 9; <u>see</u> Pl.'s Resp. to Def.'s Facts ¶ 9.  The plaintiff specified that he sought records "from January 1, 1986, to the date of the first substantive search for records responsive to this FOIPA request."  Def.'s Facts ¶ 9; <u>see</u> Pl.'s Resp. to Def.'s Facts ¶ 9.  "By letter dated May 26, 2016, the FBI acknowledged [the p]laintiff's request and informed him of the 'unusual circumstances' delaying the FBI's response to his request[, which were the same unusual circumstances previously conveyed to the plaintiff in responses to several of his prior FOIA requests]."  2d Hardy Decl. ¶ 78 (quoting <u>id.</u>, Ex. AAA (FBI May 26, 2016, Letter).  "By letter dated June 20, 2016, the FBI advised [the p]laintiff [that] his request . . . was administratively closed[]" because "the FOIA does not require federal agencies to answer inquiries, create records, conduct research, or draw conclusions concerning queried data[]" and "the FOIA provides for access to [g]overnment records [only] where the records sought are 'reasonably describe[d].'"  <u>Id.</u> ¶ 79 (quoting 5 U.S.C. § 552(a)(3)(A)); <u>id.</u>, Ex. LLL (FBI's Response Letter Dated June 20, 2016, ("FBI June 20, 2016, Letter")), ECF No. 23-7.  "By letter dated June 29, 2016, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's June 20, 2016[,] response[.]"  <u>Id.</u> ¶ 80; <u>id.</u>, Ex. GGG (Pl.'s June 29, 2016, Letter).  "By letter dated January 5, 2017, [the] OIP affirmed the FBI's June 20, 2016[,] determination[]" and again "advised [the p]laintiff [that] the FOIA does not require agencies to answer questions or to conduct research."  <u>Id.</u> ¶ 82; <u>id.</u>, Ex. NNN (OIP's Determination Letter Dated June 29, 2016, ("OIP June 29, 2016, Letter")), ECF No. 23-8.

### d. Non-FOIPA Request No. 56397

In Non-FOIPA Request No. 56397, which was submitted "[b]y letter dated May 2, 2016," the plaintiff requested "any and all records mentioning or referring to www.sparrowmedia.net, from January 1, 2009[,] to present."  Def.'s Facts ¶ 11; see Pl.'s Resp. to Def.'s Facts ¶ 11.  "By letter dated May 26, 2016, the FBI acknowledged receipt of [the p]laintiff's request and informed him of the 'unusual circumstances' delaying the FBI's response to his request[ which were the same unusual circumstances previously conveyed to the plaintiff in response to his prior FOIA requests]."  2d Hardy Decl. ¶ 94 (quoting id., Ex. PPP (FBI May 26, 2016, Letter)).  "By letter dated June 20, 2016, the FBI advised [the p]laintiff [that] his request for www.sparrowmedia.net[] . . . was administratively closed[]" because it "was not searchable in the FBI's indices[,]" as "[t]he CRS is not arranged in a manner that allows for the retrieval of information by individual Uniform Resource Locator ("URL")[,]" but rather "[i]tems are indexed according to individual investigatory interest[s;]" and "the FOIA does not require federal agencies to answer inquir[i]es, create records, conduct research, or draw conclusions concerning queried data[,]" but rather only "provide access to reasonably described, nonexempt records."  Id. ¶ 95; id., Ex. WWW (FBI's Response Letter Dated June 20, 2016, ("FBI June 20, 2016, Letter")), ECF No. 23-8.  "By letter dated June 29, 2016, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's June 20, 2016[,] response[.]"  Id. ¶ 96; id., Ex. GGG (Pl.'s June 29, 2016, Letter).  "By letter dated August 1, 2016, [the] OIP affirmed the FBI's June 20, 2016[,] determination[]" and "advised [the p]laintiff [that] the FBI's automated and manual indices are not indexed in such a way that would allow for a search of investigations by [i]nternet website URLs."  Id. ¶ 98; id., Ex. YYY (OIP's Determination Letter Dated August 1, 2016, ("OIP Aug. 1, 2016, Letter")), ECF No. 23-8.

### e.   Non-FOIPA Request No. 56401

In Non-FOIPA Request No. 56401, which was submitted "[b]y letter dated May 2, 2016," the plaintiff requested "any and all records mentioning or referring to andy@fitzgibbonmedia.com, from January 1, 2009[,] to present."  Def.'s Facts ¶ 16; see Pl.'s Resp. to Def.'s Facts ¶ 16.  "By letter dated May 26, 2016, the FBI acknowledged [receipt of the p]laintiff's request and informed him of the 'unusual circumstances' delaying the FBI's response to his request[ which were the same unusual circumstances previously conveyed to the plaintiff in his prior FOIA requests]."  2d Hardy Decl. ¶ 120; id., Ex. PPP (FBI May 26, 2016, Letter).  "By letter dated June 20, 2016, the FBI advised [the p]laintiff [that] his request for andy@fitzgibbonmedia.com[] . . . was administratively closed[]" because it "was not searchable in the FBI's indices[,]" which are "indexed according to individual investigatory interest[s]" and "not arranged in a manner that allows for the retrieval of information by individual electronic mail address."  Id. ¶ 121; id., Ex. NNNN (FBI's Response Letter Dated June 20, 2016, ("FBI June 20, 2016, Letter")), ECF No. 23-9.  The FBI further "advised [the plaintiff again that] the FOIA does not require federal agencies to answer inquir[i]es, create records, conduct research, or draw conclusions concerning queried data."  Id. ¶ 121; id., Ex. NNNN (FBI June 20, 2016, Letter).  "By letter dated June 29, 2016, [the p]laintiff filed an administrative appeal with [the] OIP regarding the FBI's June 20, 2016[,] response[.]"  Id. ¶ 122; id., Ex. GGG (Pl.'s June 29, 2016, Letter).  "By letter dated July 24, 2016, [the] OIP remanded [the p]laintiff's June 29, 2016[,] appeal to the FBI for further processing[,]" "advis[ing] the FBI to conduct a search for responsive records, and send any and all releasable records directly to [the p]laintiff, subject to any applicable fees."  Id. ¶ 124; id., Ex. PPPP (OIP's Determination Letter Dated July 24, 2014, ("OIP July 24, 2014, Letter")), ECF No. 23-9.

**B.      Requests Submitted to the OIP**

The plaintiff also submitted several FOIA requests to the OIP.  Def.'s Facts ¶¶ 19–20; see Pl.'s Resp. to Def.'s Facts ¶¶ 19–20.  "On May 3, 2016, [the] plaintiff submitted multiple FOIA requests to [the] OIP seeking" (1) "records on [the] OIP's policy and training material related to determining which FOIA requesters qualify for treatment as a representative of the news media for FOIA fee category purposes," (2) "records relating to certain individual FOIA requests relevant to the news media fee category and fee issues[,]" and (3) "records relating to Sparrow Media."  Def.'s Facts ¶ 19; Brinkmann Decl. ¶ 25; see Pl.'s Resp. to Def.'s Facts ¶ 19.  "On June 24, 2016[, the] plaintiff submitted two additional FOIA requests to [the] OIP[,] seeking" (1) "records pertaining to [his] May 3, 2016[,] 'Sparrow Media' request, and" (2) "records pertaining to the Department's policies and training on FOI[]PA fee waivers."  Def.'s Facts ¶ 20; see Pl.'s Resp. to Def.'s Facts ¶ 20.

"By email dated March 10, 2017, [the] OIP referred to the FBI, for direct response to [the p]laintiff, approximately 2,226 pages responsive to the FOIA requests underlying this action." 2d Hardy Decl. ¶ 145 (footnote omitted); id., Ex. JJJJJ (OIP's Referral Letter Dated March 10, 2017, ("OIP Mar. 10, 2017, Letter")), ECF No. 23-10.  "By letter dated September 1, 2017, as its first interim release of material referred by [the] OIP, the FBI reviewed 528 pages and released 113 pages in full or in part[,]" and withheld material pursuant to Exemptions 5, 6, 7(A), 7(C), 7(D), and 7(E).  Id. ¶ 146; id., Ex. KKKKK (FBI's First Interim Release Letter Dated September 1, 2017, ("FBI Sept. 1, 2017, 1st Interim Release Letter")), ECF No. 23-10.  "By letter dated October 2, 2017, as its second interim release of material referred by [the] OIP, the FBI reviewed 501 pages and released 87 pages in full or in part[,]" and withheld material pursuant to

Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E).[6]  Id. ¶ 147; id., Ex. LLLLL (FBI's Second

Interim Release Letter Dated October 2, 2017, ("FBI Oct. 2, 2017, 2d Interim Release Letter")),

ECF No. 23-10.  "By letter dated November 1, 2017, as its third interim release of material

referred by [the] OIP, the FBI reviewed 500 pages and released 206 pages in full or in part[,]"

and withheld material pursuant to Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E).  Id. ¶ 149;

id., Ex. NNNNN (FBI's Third Interim Release Letter Dated November 1, 2017, ("FBI Nov. 1,

2017, 3d Interim Release Letter")), ECF No. 23-10.  "By letter dated December 1, 2017, as its

fourth interim release of material referred by [the] OIP, the FBI reviewed 559 pages and released

422 pages in full or in part[,]" and withheld material pursuant to Exemptions 5, 6, 7(A), 7(C),

7(D), and 7(E).  Id. ¶ 150; id., Ex. OOOOO (FBI's Fourth Interim Release Letter Dated

December 1, 2017, ("FBI Dec. 1, 2017, 4th Interim Release Letter")), ECF No. 23-10.  "By letter

dated January 2, 2018, as its fifth and final release of material referred by [the] OIP, the FBI

reviewed 101 pages and released 31 pages in full or in part[,]" and withheld other material

pursuant to Exemptions 1, 3, 5, 6, 7(A), 7(C), and 7(E).  Id. ¶ 151; id., Ex. PPPPP (FBI's Final

Release Letter Dated January 2, 2018, ("FBI Jan. 2, 2018, Final Release Letter")), ECF No. 23-

10.

## II.    STANDARD OF REVIEW

"FOIA cases typically are resolved on a motion for summary judgment."  Ortiz v. U.S.

Dep't of Just., 67 F. Supp. 3d 109, 116 (D.D.C. 2014).  The "FOIA requires federal agencies to

disclose, upon request, broad classes of agency records unless the records are covered by the

---

[6] "By letter dated November 1, 2017, [t]he FBI advised [the p]laintiff [that] its second interim release of material referred by [the] OIP was inadvertently released without Bates Stamps[,]" and that "[t]he FBI [had] re-released this information containing Bates Stamp N[os.] OIP Referral-529 through OIP Referral-1029."  2d Hardy Decl. ¶ 148; id., Ex. MMMMM (FBI's Second Interim Release Letter (Bates Stamped Documents) Dated November 1, 2017, ("FBI Nov. 1, 2017, Bates Stamped Letter")), ECF No. 23-10.  "[T]he FBI [further] advised [the plaintiff that] no other information within the release had changed."  Id. ¶ 148; id., Ex. MMMMM (FBI Nov. 1, 2017, Bates Stamped Letter).

statute's exemptions."  Students Against Genocide v. U.S. Dep't of State, 257 F.3d 828, 833

(D.C. Cir. 2001) (citing 5 U.S.C. § 552(a)(3)(A), (b)); see also Wash. Post Co. v. U.S. Dep't of

Just., 863 F.2d 96, 101 (D.C. Cir. 1988) ("[The] FOIA is to be interpreted with a presumption

favoring disclosure and exemptions are to be construed narrowly.").  In a FOIA action, the

defendant agency has "the[] burden of demonstrating that the withheld documents are exempt

from disclosure[.]"  Boyd v. Crim. Div. of U.S. Dep't of Just., 475 F.3d 381, 385 (D.C. Cir.

2007).  This burden "cannot be met by mere conclusory statements[.]"  Wash. Post Co., 863 F.2d

at 101.  Instead, "[t]he agency may meet this burden by filing affidavits describing the material

withheld and the manner in which it falls within the exemption claimed[,]"  King v. U.S. Dep't of

Just., 830 F.2d 210, 217 (D.C. Cir. 1987), and by "show[ing] how release of the particular

material would have the adverse consequence that the [FOIA] seeks to guard against[,]"  Wash.

Post Co., 863 F.2d at 101.

 Moreover, courts will grant summary judgment to the government in a FOIA case only if

the agency can prove "that it has fully discharged its obligations under the FOIA, after the

underlying facts and the inferences to be drawn from them are construed in the light most

favorable to the FOIA requester."  Friends of Blackwater v. U.S. Dep't of Interior, 391 F. Supp.

2d 115, 119 (D.D.C. 2005) (quoting Greenberg v. U.S. Dep't of Treasury, 10 F. Supp. 2d 3, 11

(D.D.C. 1998)) (internal quotation marks omitted).  Thus, in a lawsuit brought to compel the

production of documents under the FOIA, "an agency is entitled to summary judgment if no

material facts are in dispute and if it demonstrates 'that each document that falls within the class

requested either has been produced . . . or is wholly[, or partially,] exempt from [disclosure.]'"

Students Against Genocide, 257 F.3d at 833 (omission in original) (quoting Goland v. Cent.

Intel. Agency, 607 F.2d 339, 352 (D.C. Cir. 1978)).  However, "[t]he burden upon the requester

is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin., 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting Nat'l Ass'n of Gov't Emps. v. Campbell, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

## III.     ANALYSIS

### A.     Improper FOIA Requests

The Court begins its analysis by addressing the defendant's determination that several of the plaintiff's requests were improper FOIA requests.  In the Second Hardy Declaration, the defendant states that it "determined [that] it was not obligated to search for records responsive to [the p]laintiff's May 2, 2016[,] FOIA request as [the request] d[id] not comply with the FOIA and its regulations."  2d Hardy Decl. ¶ 175.  In response, the plaintiff argues that "[r]equests NFP-56398/56343 and 1350391-000 are valid FOIA requests[,]" Pl.'s Mem. at 1, the defendant has misrepresented the scope of the plaintiff's requests, and "complying with his actual request would not require an unreasonable amount of effort[,]" id. at 2.  The Court will first address Request No. 1350391-000, before addressing whether Request No. 1350753-000 is unduly burdensome.

### 1.     Request No. 1350391-000

Request No. 1350391-000 sought, from January 1, 1921, "to the date of [the] first substantive search for records responsive to the instant FOIPA request[,]" 2d Hardy Decl., Ex. DD (Pl.'s May 2, 2016, FOIA Request) at 3, (1) "any and all records that constitute, mention, or refer to any and all FBI Headquarters Classification 66 '00' files[,]" and (2) "any and all records that constitute, mention, or refer to any and all FBI Headquarters Classification 66F '0' files[,]" id., Ex. DD (Pl.'s May 2, 2016 FOIA Request) at 1.  According to the Second and Third Hardy

Declarations, the defendant determined that these requests were improper because (1) "[t]his request [wa]s unduly burdensome in two of the three respects mentioned in the FBI's July 21, 2016[,] letter[,]" id. ¶ 181, and (2) "[t]he request is overly broad in scope" because the "[p]laintiff not only requested an entire administrative control file classification[,] but also requested any and all records constituting, mentioning[,] or referencing the file classification[,]" 3d Hardy Decl. ¶ 8.

According to the Second Hardy Declaration, "[t]he 66 file classification encompasses . . . administrative matters" and is divided into eight sub-categories: (1) FBI "automobile accidents[,]" (2) "[n]ight, weekend, holiday supervisor and duty agents[,]" (3) "[p]hysical exams[,]" (4) "[p]hysical [f]itness [p]rogram[,]" (5) "[e]mployee [a]ssistance [p]rogram [ ] activities[,]" (6) "[e]vidence [r]esponse [t]eam[,]" (7) "B[ackground ]I[nvestigation ]C[ontract ]S[ervice] matters[,]" and (8) "[o]ther administrative matters[.]" 2d Hardy Decl. ¶ 181. The Hardy Declaration states that "[t]he documentation [in the 66 file classification] is voluminous and varied," with approximately "34,001 sections[,]" and, "thus[,] the classifications are very heterogeneous in topics and significance." Id.

As the plaintiff correctly notes in his memorandum, see Pl.'s Mem. at 2, the Second Hardy Declaration misstates the content of the plaintiff's request, erroneously representing that the plaintiff had requested "any and all records that constitute[,] mention, or refer to any and all FBI Headquarters Classification 66 '00' and '0' files[,]" 2d Hardy Decl. ¶ 181 (internal quotation marks omitted), rather than "FBI Headquarters Classification 66 '00'" and "66F '0' files[,]" id., Ex. DD (Pl.'s May 2, 2016, FOIA Request) at 1, as actually requested.

Hardy states that

[i]f [the FBI] were to attempt to search for "any and all records that constitute, mention, or refer to any and all FBI Headquarters Classification 66 '00' and '0'

> files from 1921 to [the] date of [the] first substantive search for records
> responsive to the instant FOIPA request," it would spend approximately 185,873
> hours or approximately 89 years searching for, retrieving, transporting, scoping,
> importing for processing, and returning files to their original location.

Id. ¶ 182.  Regarding the production phase, using an estimate of "approximately 250 pages per

section, which is the equivalent to a total approximate page count of 8,500,250 pages[,]" the

defendant determined that "processing would take approximately 21,251 weeks[,] which is the

equivalent to approximately 409 years."  Id. ¶ 183(A).

Following the plaintiff's notification that Hardy had misstated the plaintiff's request in

his First and Second Declarations, Hardy further clarified in his Third Declaration that "the

rationale for denying this request remains the same[,]" as "[b]oth portions of this request remain

unduly burdensome[,]" and "[t]he request is overly broad" because the "[p]laintiff not only

requested an entire administrative control file classification[,] but also requested any and all

records constituting, mentioning[,] or referencing the file classification[,]" which "indicates a

search outside of just the 66-HQ-00 main control file and the 66F-HQ-0 main control file[.]"  3d

Hardy Decl. ¶ 8.  In Hardy's Third Declaration, he clarified that his second declaration

"described what [the] search would entail if the FBI was to search the 66 files series only" and

that it did not address the "search [of] the millions of file sections currently in its possession" in

order to comply with the portions of the request that sought files "mentioning the files."  Id. ¶ 9.

"Although an agency need not comply with unreasonably burdensome FOIA requests, it

'bears the burden to provide [a] sufficient explanation as to why such a search would be

unreasonably burdensome.'"  Shapiro v. Cent. Intel. Agency, 170 F. Supp. 3d 147, 155–56

(D.D.C. 2016) (alteration in original) (internal quotation marks omitted) (quoting Ayuda, Inc. v.

Fed. Trade Comm'n, 70 F. Supp. 3d 247, 275 (D.D.C. 2014)).  "[E]ven assuming [that] the size

of a FOIA request could provide grounds for denial, the burden of demonstrating overbreadth is

substantial." <u>Tereshchuk v. Bureau of Prisons</u>, 67 F. Supp. 3d 441, 455 (D.D.C. 2014), <u>aff'd sub</u>

<u>nom. Tereshchuk v. Bureau of Prisons, Dir.</u>, No. 14-5278, 2015 WL 4072055 (D.C. Cir. June 29,

2015) (per curiam).  "[A]n agency must articulate its reasons for nondisclosure 'with reasonably

specific detail[,]'" <u>Shapiro</u>, 170 F. Supp. 3d at 156 (quoting <u>People for the Am. Way v. U.S.</u>

<u>Dep't of Just.</u>, 451 F. Supp. 2d 6, 12–13 (D.D.C. 2006)), which normally requires "a detailed

explanation by the agency regarding the time and expense of a proposed search in order to assess

its reasonableness[,]" <u>Wolf v. Cent. Intel. Agency</u>, 569 F. Supp. 2d 1, 9 (D.D.C. 2008) (citing

<u>Goland</u>, 607 F.2d at 353).

  Neither the Second nor the Third Hardy Declaration provides an accurate "detailed

explanation . . . regarding the time and expense of [the] proposed search[.]"  <u>Id.</u>  As detailed

above, the Second Hardy Declaration provides an estimated number of hours to complete the

"search [of] the 66 files series[,]" 3d Hardy Decl. ¶ 9, based on the mistaken understanding that

the plaintiff was requesting "records that constitute, mention, or refer to any and all FBI

Headquarters Classification 66 '00' and '0' files[,]" 2d Hardy Decl. ¶ 182 (internal quotation

marks omitted), rather than the 66 "00" and 66F "0" files, <u>see</u> 2d Hardy Decl. ¶¶ 181–83.  And,

although the Third Hardy Declaration acknowledges this mistake, <u>see</u> 3d Hardy Decl. ¶ 8, it does

not clarify how its initial analysis of the time required to conduct the search for, and processing

of, responsive files would change with the request accurately described, <u>see generally</u> <u>id.</u> ¶¶ 8–9.

Accordingly, the defendant has not provided the Court with the type of "detailed explanation by

the agency regarding the time and expense of a proposed search" that allows the Court "to assess

its reasonableness[,]" <u>Wolf</u>, 569 F. Supp. 2d at 9 (citing <u>Goland</u>, 607 F.2d at 353).

For these reasons, the Court will direct the defendant to submit an additional declaration

regarding "the time and expense of [the] proposed search[,]" id., for records responsive to

Request No. 1350391-000.[7]

### 2.    Request No. 1350753-000

In FOIPA Request No. 1350753-000, which was submitted "[b]y letter dated May 2,

2016," the plaintiff requested "any and all records mentioning or referring to certain FBI and

[Department] FOIPA requests."  Def.'s Facts ¶ 6; see Pl.'s Resp. to Def.'s Facts ¶ 6; see also 2d

Hardy Decl. ¶ 57 (listing the specific "FBI and [Department] FOIPA requests" referred to in the

plaintiff's FOIA request).  According to the Third Hardy Declaration, the defendant determined

that this request "was not a valid FOIA request[,] as it required" a "multi-layered[] research in

order to locate responsive records[;]" "portions of the request were overly broad[ or] too

vague[;]" and it "required unduly burdensome searches."  3d Hardy Decl. ¶ 16.  Specifically,

Hardy stated that, because the plaintiff sought not only "the administrative documents within his

own FOIA requests[,]" but also any records that "mention[ed] [ ] or reference[d] [ ] each of the

71 FOIA Request Numbers and each of the 71 subjects made by him or any other requester[,]"

"[a] search of this magnitude" did "not satisfy the statutory and regulatory requirements for a

proper FOIA request[]" because it "[wa]s nearly impossible."  3d Hardy Decl. ¶ 17.

According to the Third Hardy Declaration, "[t]he FOIA Document Processing System

('FDPS') is the internal repository and application utilized by [the FBI] to process, track[,] and

---

[7] In his reply, the plaintiff argues that "[t]he FBI now concedes that[,] to the extent the request sought the 66F-HQ-0 and 66-HQ-00 files themselves, the request seeks specific files easily located[,]" Pl.'s Reply at 1 (internal quotation marks omitted), and therefore the defendant should be directed to "process the request for the files themselves, to include[,] at a minimum[,] main and cross-reference index searches in Sentinel," id. at 2.  However, the defendant did not make such a concession in its briefing or in the Third Hardy Declaration.  See generally id.  Rather, the defendant argued that, in addition to the description in the Second Hardy Declaration of the time and effort required to respond to the plaintiff's request, the plaintiff's request was also unreasonable because it sought records that "mention[ed] or refer[red] to" these files.  Id. ¶ 9 (internal quotation marks omitted).

respond to FOIA and Privacy Act requests received by the FBI[.]"  Id.  However, the FDPS was

"not designed to locate every mention of a FOIA Request Number or [a] subject mentioned or

referenced within requests by [the p]laintiff or other requesters[.]"  Id.  Accordingly, to respond

to the plaintiff's request, the defendant "would have to search each FOIA Request Number, any

appeal reference, and re-opened FOIA request to satisfy even one part of [the p]laintiff's

request" and "would have to search each FOIA Request [N]umber as a subject and each subject

requested by any other requester[,]" which "would take [the FBI] approximately 114 hours or

. . . 3 weeks[.]"[8]  Id. ¶ 18.

     In response, the plaintiff argues that "[a]s shown in the FBI's own training slides, an

analyst can search all 'OCR'd[[9]] documents within FDPS' for an exact word or phrase, with an

optional date restriction, from a single screen[,]" Pl.'s Reply at 2–3 (quoting Pl.'s Reply, Ex. 3

(FBI Critical Content Search Training PowerPoint Slides ("FBI Training Slides"))), and, "[t]hus,

an FBI analyst c[ould] enter into the [FDPS] . . . each of the enumerated FOIPA tracking

numbers in [the plaintiff's] . . . request and quickly locate all responsive records[,]" id. at 3.

     The Court again concludes that the defendant has not met its burden to demonstrate that

Request No. 1350753-000 is unduly burdensome.  As the plaintiff correctly argues, see Pl.'s

Reply at 3, the Third Hardy Declaration acknowledges that the defendant can search the FDPS

"for all requests, re-opened requests, and appeals submitted by specific requesters, and allows the

search to be narrowed to a specific timeframe[,]" 3d Hardy Decl. ¶ 17.  Moreover, such a search

would take the defendant only "approximately 114 hours or equivalent to 3 weeks[,]" id. ¶ 18,

which is significantly fewer than the time frames that other members of this Court have found

---

[8] The Third Hardy Declaration further represented that "[i]t [wa]s unknown if the search would require additional time due to appeal references and re-opened FOIA requests."  3d Hardy Decl. ¶ 18.

[9] Neither the plaintiff nor the defendant defines the acronym "OCR."

reasonable, see, e.g., <u>Kwoka v. Internal Revenue Serv.</u>, No. 17-cv-1157 (DLF), 2018 WL 4681000, at *5 (D.D.C. Sept. 28, 2018) (concluding that "where the [agency] already ha[d] all the requested records in its possession, the Court w[ould] not allow it to withhold the documents wholesale simply because it w[ould] (potentially) take 2,200 hours to review them"); <u>Pub. Citizen, Inc. v. Dep't of Educ.</u>, 292 F. Supp. 2d 1, 6 (D.D.C. 2003) (concluding that the agency had not shown that searching 25,000 paper files "would be unduly burdensome").  <u>But see</u> <u>Wolf</u>, 569 F. Supp. 2d at 9 (concluding that a review of film "reels on a frame-by-frame basis[]" that "would take approximately 3675 hours and cost about $147,000" was unduly burdensome); <u>People for the Am. Way Found.</u>, 451 F. Supp. 2d at 13 (concluding that "a manual search of [ ] 44,000 files would be unduly burdensome" where it "would [ ] require 25,000 hours of labor"). Accordingly, the Court will direct the defendant to proceed with the search requested in the plaintiff's Request No. 1350753-000.

### B.      Adequacy of the Searches

The Court will next address the adequacy of the searches conducted by the defendant and its agency-components.  "An agency fulfills its obligations under [the] FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  <u>Valencia-Lucena v. U.S. Coast Guard</u>, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting <u>Truitt v. Dep't of State</u>, 897 F.2d 540, 542 (D.C. Cir. 1990)).  "[C]ourt[s] appl[y] a 'reasonableness' test to determine the 'adequacy' of a search methodology, consistent with congressional intent tilting the scale in favor of disclosure[.]"  <u>Morley v. Cent. Intel. Agency</u>, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting <u>Campbell v. U.S. Dep't of Just.</u>, 164 F.3d 20, 27 (D.C. Cir. 1998)) (internal quotation marks omitted).  "This 'reasonableness' inquiry is necessarily 'dependent upon the circumstances of the case.'"  <u>Swick v. U.S. Dep't of the Army</u>,

471 F. Supp. 3d 246, 251 (D.D.C. 2020) (quoting Davis v. Dep't of Just., 460 F.3d 92, 103 (D.C.

Cir. 2006)).  "The question is not 'whether there might exist any other documents possibly

responsive to the request, but rather whether the search for those documents was adequate.'"

Steinberg v. Dep't of Just., 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting Weisberg v. Dep't of

Just., 745 F.2d 1476, 1485 (D.C. Cir. 1984)).  "[T]he agency must show that it made a good faith

effort to conduct a search for the requested records, using methods which can be reasonably

expected to produce the information requested."  Valencia-Lucena, 180 F.3d at 326 (quoting

Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990)) (internal quotation marks

omitted).  "The agency 'cannot limit its search' to only one or more places if there are additional

sources 'that are likely to turn up the information requested.'"  Id. (quoting Oglesby, 920 F.2d at

68).

> In a suit seeking agency documents . . . "'[a]t the summary judgment stage, where
> the agency has the burden to show that it acted in accordance with the statute, the
> court may rely on a reasonably detailed affidavit, setting forth the search terms
> and the type of search performed, and averring that all files likely to contain
> responsive materials (if such records exist) were searched.'"

Chambers v. U.S. Dep't of Interior, 568 F.3d 998, 1003 (D.C. Cir. 2009) (alteration in original)

(quoting McCready v. Nicholson, 465 F.3d 1, 14 (D.C. Cir. 2006)).

### 1.  The FBI's Searches

The Court begins its assessment by reviewing the adequacy of the FBI's searches.[10]

---

[10] In his cross-motion for summary judgment, the plaintiff raises a challenge to the adequacy of the FBI's search in response to Request No. NFP-56397.  See Pl.' Mem. at 4–6.  In this Request, the plaintiff sought "disclosure of any and all records mentioning or referring to[] . . . www.sparrowmedia.net[.]"  2d Hardy Decl., Ex. OOO at 3, ECF No. 23-8.  On June 20, 2016, the FBI informed the plaintiff that this Request "[wa]s not searchable in [the FBI's] indices" because the CRS is "indexed according to individual investigatory interests and not by individual Uniform Resource Locator" ("URL") and thus "is not arranged in a manner that allows for the retrieval of information in the form" by URL.  Id., Ex. WWW (FBI June 26, 2016, Letter) at 1.  The FBI further added that "[t]he FOIA does not require federal agencies to answer inquiries, create records, conduct research, or draw conclusions concerning queried data[,]" but rather only "to provide access to reasonably described, nonexempt records."  Id., Ex. WWW (FBI June 26, 2016, Letter) at 1.  After the plaintiff filed an appeal with the OIP, see id., Ex. XXX (OIP's Acknowledgement Letter Dated July 6, 2016, ("OIP July 6, 2016, Letter")) at 1, ECF No. 23-8, the OIP affirmed the

(continued . . .)

### a. Request Regarding 66F-HQ-1328110 in Request No. 1196229-000

The plaintiff argues that the defendant's search in response to his request for "any and all records . . . relating or referring to investigation 66F-HQ-1328110[,]" 2d Hardy Decl., Ex. B (Plaintiff's Request Letter Dated July 31, 2012, ("Pl.'s July 31, 2012, Request")) at 18, ECF No. 23-3, and "records constituting, mentioning, or referring to FBI file 66-HQ-1328110[,]" id., Ex. I (Plaintiff's Request Letter Dated July 21, 2015, ("Pl.'s July 21, 2015, Request")) at 2, ECF No. 23-4, was insufficient because the defendant did not "conduct an [Electronic Case File ('ECF')] text search for mentions of the 66-HQ-1328110 file[,]" Pl.'s Mem. at 7.  In response, the defendant states that it "deemed a text search in this instance unduly burdensome and not reasonably calculated to locate responsive records."  3d Hardy Decl. ¶ 15.  For the following

---

(. . . continued)
FBI's decision, "not[ing] that the FBI's automated and manual indices are not indexed in such a way that would allow for a search for investigations by Internet website URLs."  Id., Ex. YYY (OIP Aug. 1, 2016, Letter) at 1.

In his cross-motion for summary judgment, the plaintiff argues that "[t]he statements by [the] FBI and [the] OIP are inaccurate" because, "[a]ccording to internal FBI training material, the CRS is indexed in a way that allows it to be searched by URL."  Pl.'s Mem. at 4 (citing id., Ex. 2 at 3).  In the Third Hardy Declaration, the FBI states that it "took it upon itself to conduct a search [for documents responsive to Request No. NFP-56397] utilizing the most up-to-date searching procedures."  3d Hardy Decl. ¶ 10.  Specifically, the FBI asserts that, "[i]n accordance with [its] Indexing User Guide dated January 10, 2012," which reflects the current indexing policies at the FBI, it "conducted a search of ACS and Sentinel utilizing the search terms 'URL sparrowmedia,' 'SOCIALNETWORK sparrowmedia,' [ ] 'EMAIL andy@sparrowmedia.net[,]' and 'EMAIL andy@fitzgibbonmedia.com.'"  Id.  The FBI states that "[t]hese searches identified no records responsive to [the p]laintiff's request" and, although "the Indexing User Guide does allow for use of the miscellaneous field for further narrowing of results, [ ] with the initial no records result, the FBI had nothing to narrow."  Id.  The FBI further asserts that it also "conducted searches in Sentinel and within the ACS search function in Sentinel using the outdated guidance provided by [the p]laintiff[,]" and it "did not locate any responsive records through any of these search efforts."  Id.

Because the plaintiff raises no challenge in his reply to these additional searches conducted by the FBI, see generally Pl.'s Reply, the Court concludes that the defendant is entitled to summary judgment regarding the adequacy of its search for records responsive to Request No. NFP-56397.  See Montgomery v. Internal Revenue Serv., 514 F. Supp. 3d 125, 131 (D.D.C. 2021) ("Absent contrary evidence, [good faith] affidavits or declarations are generally sufficient to show that an agency complied with the FOIA.") (citing Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982)).

reasons, the Court concludes that the defendant's search was inadequate because it did not include a full-text search.[11]

The defendant states that "[t]o locate CRS information, [it] employs an index search methodology" using "the automated UNI application of ACS" and, "[i]f a request seeks records that may have been generated on or after July 1, 2012, an overlapping search of ACS via the UNI application and a Sentinel index search are performed at the litigation stage to ensure adequacy of the CRS index search."  2d Hardy Decl. ¶ 163.  "The CRS is structured in a way that information important to an investigation, or that may be important to the FBI in the future is indexed so that it can be easily retrieved."  Id. ¶ 167.  According to the defendant, "[i]ndex searches of the CRS are reasonably expected to locate responsive material within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate retrieval based on operational necessity."  Id. ¶ 163.  "[I]n most cases, [the FBI] relies on index searches when conducting reasonable FOIA searches because all subjects of importance to the FBI can reasonably be expected to be located through an index search."  Id. ¶ 167.  "The Electronic Case

---

[11] The Third Hardy Declaration repeatedly states that the plaintiff "narrowed this request in his July 21, 2015[,] letter to 'any and all records responsive to a search of the [UNI] for FBI file 66-HQ-1328110[.]'"  3d Hardy Decl. ¶ 11; see also id. ¶¶ 13–14 (stating that the "[p]laintiff explicitly narrowed his request to 'any and all records responsive to a search of the [UNI] . . . for FBI file 66-HQ-1328110'"); id. (stating that the "[p]laintiff reduced his request to an index search of the file alone[]").  However, the Second Hardy Declaration states that the plaintiff's July 21, 2015, letter requested:

- Disclosure of any and all records to a search of the following systems for FBI file 66-HQ-1328110:
    - Universal Index ("UNI")
    - Investigative Case Management ("ICM")
    - Electronic Case File ("ECF")
    - Sentinel
    - Data Integration and Visualization System ("DIVS")
- Any and all other records constituting, mentioning, or referring to FBI file 66-HQ-1328110.

2d Hardy Decl. ¶ 13 (emphasis added); see also id., Ex. I (Pl.'s July 21, 2015, Request).  The Court cannot locate another July 21, 2015, letter from the plaintiff among the attachments to either the Second or Third Hardy Declarations.  Accordingly, the Court finds that it cannot conclude, contrary to the representation made in the Third Hardy Declaration, that the plaintiff narrowed his request in his July 21, 2015, letter to "any and all records responsive to a search of the [UNI] for FBI file 66-HQ-1328110[.]"  3d Hardy Decl. ¶ 11 (internal quotation marks omitted).

File ("[ECF")[,] . . . another of ACS's automated applications[,]" "serve[s] as the central electronic repository for the FBI's official text-based documents." 3d Hardy Decl. ¶ 12.

Here, "[u]pon receipt of [the p]laintiff's request[]," the defendant "conducted a CRS index search for responsive records employing the UNI application of ACS and a Sentinel index search[.]" 2d Hardy Decl. ¶ 164. This search "encompassed records maintained in [the FBI Headquarters] as well as all FBI[] field offices." Id. ¶ 165. In response to a "search[ for] the specific file[] number[,]" id., the defendant "identified one responsive file section for requested file number 66F-HQ-1328110[,]" id., "reviewed 124 pages [of the file section,] and released 68 pages in part or full" to the plaintiff," id. ¶ 165 n.52. According to the defendant, the "[p]laintiff's request[] for information about [file 66F-HQ-1328110] . . . would reasonably be expected to be maintained and indexed in the CRS and located using the ACS and Sentinel index search methodology[.]" Id. ¶ 168. The defendant did not conduct an ECF search because it "deemed a text search in this instance unduly burdensome and not reasonably calculated to locate responsive records." 3d Hardy Decl. ¶ 15. Specifically, according to the defendant, "a text search is not reasonably calculated to locate all responsive records because not all files are searchable through a full-text search and not all file serials have been converted to an electronic format[,]" and therefore, "the net result of a full-text search is typically a significant use of time and resources that may yield no additional responsive information." Id.

The Court concludes that the defendant has failed to show that it conducted an adequate search in response to the plaintiff's request. The plaintiff requested not only "records constituting[] . . . FBI file 66-HQ-1328110[,]" 2d Hardy Decl., Ex. I (Pl.'s July 21, 2015, Request) at 2 (emphasis added), but also "any and all records . . . relating or referring to [ ] 66F-HQ-1328110[,]" id., Ex. B (Pl.'s July 31, 2012, Request) at 1 (emphasis added), or

"mentioning[] or referring to FBI file 66-HQ-1328110[,]" id., Ex. I (Pl.'s July 21, 2015, Request) at 2 (emphasis added).  The plaintiff's request thus casts a broader net than just the substance of the file itself, i.e., the records "constituting" the file.  Id., Ex. I (Pl.'s July 21, 2015, Request) at 1. To justify its position that its search was adequate despite not using the ECF to search the text of the defendant's records for "mention[s] or refer[ences] to the file," id., Ex. I (Pl.'s July 21, 2015, Request) at 1, the defendant asserts that "a text search in this instance" was (1) "unduly burdensome[,]" and (2) "not reasonably calculated to locate responsive records[,]" 3d Hardy Decl. ¶ 15.  The Court is not convinced by either justification.

First, the defendant has not "provide[d] [a] sufficient explanation as to why such a search would be unduly burdensome."  Shapiro, 170 F. Supp. 3d at 155–56 (second alteration in original) (quoting Ayuda, Inc. v. Federal Trade Comm'n, 70 F. Supp. 3d 247, 275 (D.D.C. 2014)) (internal quotation marks omitted).  The defendant asserts that a "text search in this instance [would have been] unduly burdensome[,]" 3d Hardy Decl. ¶ 15, because a "search for 'any and all records relating or referring to' a file number implicates expansive, exhaustive text and manual searching of all FBI holdings to locate any piece of information mentioning the file[,]" id. ¶ 13, and "[t]he net result of a full-text search is typically a significant use of time and resources that may yield no additional responsive information[,]" id. ¶ 15, because "[t]ext searches[,] even when filtered, generally return a significant number of hits that are random and incomplete references[,]" id.  In support of the defendant's position, it states that, "[i]n order to search text in the ECF search function, analysts ha[ve] to input a date range of at most a one-year span to complete the search[,]" which here, in light of the plaintiff's request for records from "October 1, 2000[,]" through "July 29, 2015[,]" would require the defendant to "enter the file number . . . a total of 30 times, followed by a comparison of any hits located to what [the

p]laintiff [had] already received through this request."  Id. ¶ 13.  The defendant avers that this

would entail "a significant use of time and resources[,]" id. ¶ 15, however, the defendant fails to

provide any further detail "regarding the time and expense of [this] proposed search[,]" Wolf,

569 F. Supp. 2d at 9 (citing Goland, 607 F.2d at 353); see also id. (describing the requisite

"detailed explanation by the agency regarding the time and expense of [this] proposed search" in

order to allow the Court "to assess its reasonableness").  Absent such information, the Court is

unable "to assess [the] reasonableness[,]" id., of the defendant's decision, and thus concludes

that the defendant has failed to demonstrate that a full text search would be unduly burdensome.

Second, the defendant has also failed to demonstrate that a text search was "not

reasonably calculated to locate responsive records."  3d Hardy Decl. ¶ 15.  The defendant states

that "a text search [wa]s not reasonably calculated to locate all responsive records because not all

files are searchable through a full-text search and not all file serials have been converted to an

electronic format."  Id.  This may be a valid reason why solely using an ECF search in this

instance would not be adequate because an ECF search alone would not retrieve non-electronic

or nonsearchable records.  See id.  However, the defendant fails to address why an ECF search

would not be reasonable in this case, see id., when combined with the index search that the

defendant has already conducted, see 2d Hardy Decl. ¶ 164 (stating that the FBI "conducted a

CRS index search for responsive records employing the UNI application of ACS and a Sentinel

index search" for Requests Nos. 1196229-000 and 1333446-001).  Accordingly, the Court

concludes that the defendant has failed to demonstrate why specifically in this case a text search

would not be "reasonably calculated to locate responsive records."  3d Hardy Decl. ¶ 15; see also

Valencia-Lucena, 180 F.3d at 326 ("The agency 'cannot limit its search' to only one or more

places if there are additional sources 'that are likely to turn up the information requested.'"

(quoting <u>Oglesby</u>, 920 F.2d at 68)).[12]

The Court therefore concludes that the defendant has failed to demonstrate that its search in response to Request No. 1196229-000 was adequate. Accordingly, the Court directs the defendant to either provide a supplemental declaration regarding why a text search would be unreasonable if there is a basis to do so, or conduct a text search in response to the plaintiff's request.

### b. Missing Serialized Documents

Next, the plaintiff argues that the defendant's <u>Vaughn</u> index fails to account for "approximately 117 records serialized to file 66F-HQ-1328110 that the FBI has not yet processed." Pl.'s Reply at 4. According to the defendant, "[t]he CRS consists of a numerical sequence of files, called FBI 'classifications,' which are organized according to designated subject categories[,]" such as "types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters." 2d Hardy Decl. ¶ 153.

> For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number [ ] consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin [ ] initiating the file, and (c) the assigned individual case file number for that particular subject matter.

---

[12] The defendant also states that "[t]ext searches[,] even when filtered, generally return a significant number of hits that are random and incomplete references." 3d Hardy Decl. ¶ 15. The "significant number" of "random and incomplete references[,]" <u>id.</u>, may impact the "time and expense of [the] proposed search[,]" <u>Wolf</u>, 569 F. Supp. 2d at 9 (citing <u>Goland</u>, 627 F.2d at 353), and, as a result, is burden upon the defendant. However, the fact that a search may locate additional unresponsive records does not impact the Court's determination of whether the search may also locate responsive records, which is what it is charged to do here. Because the plaintiff requested records that "mention[] or refer[]" to the file, 2d Hardy Decl., Ex. I (Pl.'s July 21, 2015, Request) at 1, rather than just the file itself, the Court concludes that a text search for that file to locate mentions of or references to that file, is seemingly also "likely to turn up the information requested[,]" <u>Valencia-Lucena</u>, 180 F.3d at 326 (internal quotation marks omitted).

Id.  "Within each case file, pertinent documents of interest are 'serialized,' or assigned a document number in the order [in] which the document is added to the file, typically in chronological order."  Id.

Here, after the plaintiff asserted in his cross-motion for summary judgment that "[t]he [defendant's] Vaughn index does not account for all of the serialized documents" within Case File 66-HQ-1328110, Pl.'s Mem. at 9, the defendant "determined that 524 pages were inadvertently pulled from the processed records because they were cross-serialized into pending files."[13] 3d Hardy Decl. ¶ 19.  "[U]pon additional review [of these pages], the FBI found that several of these pages are no longer associated with pending investigations and can be processed for release."  Id.  Consequently, "[t]he FBI reviewed these 524 pages and released approximately 252 additional pages either in full or [in] part."  Id.  "Following this re-review, [the p]laintiff advised [the FBI that] there were still approximately 141 missing serials[,]" and the defendant "again re-reviewed all records [that it had] processed . . . and determined that 17 of the 141 missing serials were processed and produced to [the p]laintiff[,]" "there were many documents that were not serialized at all[,]" and "some of the missing serials located [by the FBI] appear to have been serialized twice."  Id. ¶ 20.  Despite these additional reviews, the plaintiff maintains that "[t]here are approximately 117 records serialized to file 66F-HQ-1328110 that the FBI has not yet processed[,]" Pl.'s Reply at 4, and proposes that, "for specifically enumerated serials which are not in their expected location[s], the FBI should search the case files where these enumerated serials may have been cross-filed[,]" by, inter alia, "conduct[ing] a full-text search for the case number[,]" id. at 5.

---

[13] According to the defendant, "these pages were not originally numerically accounted for" as "[t]he FBI often does not provide page counts for pending records due to the dangers of indicating the volume of records associated with specific pending matters[,]" specifically, "the potential to show the extent of the FBI investigative efforts and [the] risk [of] allowing investigative subjects to predict the FBI's investigative strategies."  Id. ¶ 19.

"If an agency has made a <u>prima facie</u> showing of the adequacy of its search, [a] FOIA requester bears the burden of overcoming this presumption of good faith by 'provid[ing] countervailing evidence as to the adequacy of the agency's search.'" <u>DaVita Inc. v. U.S. Dep't of Health & Hum. Servs.</u>, No. 20-cv-1798 (BAH), 2021 WL 980895, at *5 (D.D.C. Mar. 16, 2021) (quoting <u>Iturralde v. Comptroller of Currency</u>, 315 F.3d 311, 314 (D.C. Cir. 2003)). "If the plaintiff provides 'sufficient evidence to raise "substantial doubt" concerning the adequacy of the agency's search,' particularly when there are 'well[-]defined requests and positive indications of overlooked materials,' summary judgment is inappropriate." <u>Cooper</u>, 890 F. Supp. 2d at 61–62 (quoting <u>Iturralde</u>, 315 F.3d at 314) (alterations omitted). Moreover, when "a FOIA requester points to 'evidence that would indicate that at the time the agency searched its files there was reason to believe that the missing documents were in those files[,]'" <u>DaVita Inc.</u>, 2021 WL 980895, at *6 (quoting <u>Ctr. for Biological Diversity v. Bureau of Land Mgmt.</u>, No. 17-cv-208 (BAH), 2021 WL 918204, at *7 (D.D.C. Mar. 9, 2021)) (alterations omitted), "the agency must explain those holes in the record, such that the Court is able to ascertain if the agency has explained the absence of the responsive records from the results of the search," <u>id.</u> (citations and alterations omitted). However, "in the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA." <u>Perry v. Block</u>, 684 F.2d 121, 127 (D.C. Cir. 1982). And, because "particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them[,]" when an agency "fails to find an identified record or set of records through an otherwise-adequate search[,]" it need only explain "'why the record systems that it queried were the only ones likely to contain' the requested records and 'why it

was unlikely that there were additional files' or locations 'that could contain' the records."

DaVita Inc., 2021 WL 980895, at *7 (quoting Aguiar v. Drug Enf't Admin., 865 F.3d 730, 739–

40 (D.C. Cir. 2017)) (alterations omitted).

The Second and Third Hardy Declarations are entitled to the "presumption of good faith"

generally accorded to agency declarations.  SafeCard Servs., Inc. v. Sec. & Exch. Comm'n, 926

F.2d 1197, 1200 (D.C. Cir. 1991).  And, the defendant has "provided a reasonably detailed and

non-conclusory declaration describing the contents and organization of the" defendant's record

systems, Spurling v. U.S. Dep't of Just., 425 F. Supp. 3d 1, 12 (D.D.C. 2019) (Walton, J.), as

well as the methods that the defendant used in conducting its search, see 2d Hardy Decl. ¶¶ 164–

65.  Moreover, the defendant represents that it searched "all locations likely to contain

responsive records[,]" Heffernan v. Azar, 317 F. Supp. 3d 94, 113 (D.D.C. 2018) (Walton, J.),

because it searched the CRS and "[t]he CRS is the FBI system where records responsive to [the

plaintiff's] request would reasonably be found[,]" 2d Hardy Decl. ¶ 168.  However, in light of

the fact that the plaintiff has provided "'sufficient evidence to raise substantial doubt concerning

the adequacy of the agency's search,'" Cooper, 890 F. Supp. 2d at 61 (quoting Iturralde, 315

F.3d at 314), "the agency must explain those holes in the record, such that the Court is able to

ascertain if the agency has explained the absence of the responsive records from the results of the

search," DaVita Inc., 2021 WL 980895, at *6 (citations and alterations omitted).  The Court

concludes that the defendant has failed to do so.

Although the Third Hardy Declaration provides reasons why it should not have to search

for these missing serialized documents, see 3d Hardy Decl. ¶ 21 (arguing that "[i]f [the FBI]

were to [search for records within cross-filed cases], searching would never end as the FBI

would be forced to chase down endless leads to verify it has located all instances of serials where

they have been carbon-copied in multiple files"), it provides no information as to why those

documents were not found by its initial search, see generally id.  Thus, with such "'holes in the

record,'" DaVita Inc., 2021 WL 980895, at *7 (quoting Ctr. for Biological Diversity, 2021 WL

918204, at *8), the Court is unable to "'ascertain if [the agency] has [adequately] explained

the . . . absence' of the responsive records from the results of the search," id. at *7 (quoting

Morley, 508 F.3d at 1121).[14]

      Moreover, the defendant's argument that "[i]t is neither the practice nor the policy of [the

FBI] to search for records within cross-filed cases mentioned within the responsive records being

processed" because it "would be forced to chase down endless leads to verify [that] it ha[d]

located all instances of serials where they have been carbon-copied in multiple files" is

unpersuasive.  3d Hardy Decl. ¶ 21.  Although searching cross-filed cases may not be the

defendant's "practice [ ] or [ ] policy[,]" it fails to address why doing so in this case regarding the

specific serialized documents that were missing from the documents responsive to the plaintiff's

request would require "chas[ing] down endless leads[,]" rather than checking a limited number

of cross-filed cases into which the missing serialized documents could have been filed.  Id.

      For these reasons, the Court concludes that the defendant's search for the missing

serialized documents was inadequate.  Therefore, it will direct the defendant to either provide

supplemental Vaughn information explaining "the absence of the responsive records from the

---

[14] Additionally, the defendant argues that, "[i]f [the p]laintiff already has these 'missing serials' from other main files for which they were cross-referenced into, then [the FBI] conducting unreasonable searches into all cross-filed cases is unnecessary and unduly burdensome."  3d Hardy Decl. ¶ 21.  However, the fact that the plaintiff may already have these records is irrelevant to the Court's determination of whether the defendant has complied with its FOIA obligations in response to the plaintiff's request in this case.  As the plaintiff correctly notes, see Pl.'s Reply at 6, "[t]he Supreme Court has [ ] rejected the proposition that requested information was properly withheld under the FOIA because the information was already publicly available[,]" Schladetsch v. U.S. Dep't of Hous. & Urb. Dev., No. 99-cv-175, 2000 WL 33372125, at *4 (D.D.C. Apr. 4, 2000), or as is the case here, possibly already in the plaintiff's possession.

results of the search," DaVita Inc., 2021 WL 980895, at *7 (internal quotation marks omitted), if there is a basis to do so, or conduct additional searches for the missing documents.

####    c.   The Missing Attachments on Pages 890, 1091, 1094, 1533, 1624, 1662, 2099, 2170, 2285, and 2343 of FOIA Request No. 1333446-1

The plaintiff also argues that certain pages released in response to FOIA Request No. 1333446-1, see generally Pl.'s Mot., Ex. 5 (Pages Relating to FBI's Failure To Process Attachments ("FBI Processing Pages")), ECF No. 27-4, which requested "any and all other records constituting, mentioning, or referring to FBI file 66-HQ-1328110[,]" Def.'s Facts ¶ 2; see Pl.'s Resp. to Def.'s Facts ¶ 2, "reference various attachments that do not appear to have been processed for release[,]" Pl.'s Mem. at 10, and that "the FBI should be required to locate the[se] documents and release any non-exempt documents or portions thereof[,]" id.  In response, the defendant asserts that, "[i]f attachments to the administrative documents contained investigatory information, then it is likely [that] the FBI [special agents] indexed the attachments into the corresponding investigatory file and did not consistently cross-serialize the attachments to the 66 file."  3d Hardy Decl. ¶ 22.  According to the defendant, because "it is not [its] policy or practice . . . to search all files mentioned as cross-filed cases to see if additional information concerning a subject or topic exists[,]" it did not search any cross-filed cases to determine whether the attachments referenced on the released documents were located in other files.  Id.

The Court concludes that based on the current record the defendant's search was insufficient.  Although it may not be the defendant's general "policy or practice . . . to search all files mentioned as cross-filed cases to see if additional information concerning a subject or topic exists[,]" id., here, the existence and plausible location of these attachments is known to the defendant, see id.  Furthermore, there is an apparent relationship between these attachments and the plaintiff's request because each of the pages refers both to FBI file 66-HQ-1328110 and to

enclosed attachments.  <u>See, e.g.</u>, Pl.'s Mot., Ex. 5 at 29,[15] ECF No. 27-4 (referring to "enclosed work exemplars"); <u>id.</u>, Ex. 5 (FBI Processing Pages) at 30 (referring to enclosed "[c]opies of a report"); <u>id.</u>, Ex. 5 (FBI Processing Pages) at 31 (referring to "[t]hree [enclosed] copies of a report").  Thus, without further explanation, the defendant has failed to demonstrate "'why it was unlikely that there were additional files' or locations 'that could contain' the [ ] records.'" <u>DaVita, Inc.</u>, 2021 WL 980895, at *7 (quoting <u>Aguiar</u>, 865 F.3d at 739–40).  Consequently, the Court concludes that the defendant's search was inadequate, to the extent that it did not search the investigatory files in which these attachments are likely to be found.

## 2.  The OIP's Searches

The Court now turns to the plaintiff's challenge to the adequacy of the OIP's search in response to his request "for records relating to Sparrow Media, The Sparrow Project, twitter.com/sparrowmedia, andy@sparrowmedia.net, and andy@fitzgibbonmedia.com[.]"  Pl.'s Mem. at 44.  The plaintiff argues that "[t]he only search conducted in response to this request was by the Departmental Executive Secretariat[ ("DES"),]" <u>id.</u> (citing Brinkmann Decl. ¶ 25), and that the "OIP never explains why the DES is the only location likely to contain records responsive to this request[,]" <u>id.</u>  According to the plaintiff, because "the FBI and [the] OIP have repeatedly denied his requests for news media fee category status, . . . it is logical to expect that the staff at [the] OIP who made decisions pertaining to whether or not Sparrow Media was a news outlet for purposes of assessing fees under [the] FOIA would possess responsive records." <u>Id.</u> at 44–45.

---

[15] The exhibits attached to the plaintiff's cross-motion for summary judgment do not contain page numbers.  <u>See, e.g.</u>, Pl.'s Mot., Ex. 5.  Accordingly, for ease of reference, the Court will refer to these exhibits using the page numbers automatically generated by the Court's ECF system.

In response, the OIP states that it "reviewed [the p]laintiff's requests collectively to determine a combination of search methods and repositories that was reasonably calculated to yield records responsive to the requests while minimizing duplicative searches." 2d Brinkmann Decl. ¶ 12.  Specifically, the "OIP conducted broad searches of [its] Administrative Appeal files, emails and electronic documents of OIP staff, OIP guidance and training materials, OIP advice logs, and the DES, specifically for records regarding fee status and fee waiver policies, procedures, and appeals[—]including records specifically related to [the p]laintiff[.]"  Id.  Based on these efforts, the OIP declares that "any records regarding Sparrow Media's fee-related FOIA appeals, including Sparrow Media's news media fee category status, are reasonably likely to have been captured by these broad searches of OIP files and the DES."  Id.; see id. ¶ 16 (stating that the "OIP's searches of its own files were broadly tailored and would have encompassed records regarding Sparrow Media's fee status for FOIA purposes[,]" and the OIP "further concluded that any other potentially responsive records for the Sparrow Media Request were reasonably likely to be located in the DES" (emphasis in original)).

The Court concludes that the OIP has demonstrated that "all files likely to contain responsive materials . . . were searched[,]" Chambers, 568 F.3d at 1003, and thus the OIP's search for responsive records was adequate.  Accordingly, the Court will grant the defendant's motion and deny the plaintiff's cross-motion as to the adequacy of the OIP's search for responsive records.

**C.      Withholdings**

The Court now turns to the plaintiff's challenges to the defendant's withholdings based on Exemptions 3, 5, 7(D), and 7(E).[16]  The Court will address each exemption in turn.[17]

**1.  Exemption 3**

The Court begins with the defendant's assertion of Exemption 3.  Exemption 3 excludes from compelled disclosure matters that are "specifically exempted from disclosure by statute . . . ."  5 U.S.C. § 552(b)(3).  Under this exemption, the defendant need only show that the statute asserted by the agency qualifies as a withholding statute and "that the withheld material falls within the statute."  Larson v. Dep't of State, 565 F.3d 857, 865 (D.C. Cir. 2009).  A statute falls under the purview of Exemption 3 only if it "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," "establishes particular criteria for [the] withholding[,] or refers to particular types of matters to be withheld."  Morley, 508 F.3d at 1125.  Here, the defendant asserts that "the FBI, the Coast Guard[,] and the [Defense Intelligence Agency or] [('DIA')] each withheld information pursuant to Exemption 3[,]" Def.'s Mem. at 6, under the Pen Register Act, see 2d Hardy Decl. ¶ 199, and the National Security Act of 1947, see id. ¶ 200.[18]  The plaintiff's Exemption 3 challenge asserts that the defendant offers only (1) an

---

[16] The plaintiff does not challenge the defendant's asserted applicability of Exemptions 1, 6, and 7(C).  See Def.'s Reply at 1.  Accordingly, "[t]he Court concludes that the [defendant] has met its burden [in] regard to the[se] [ ] withholdings."  Block v. U.S. Dep't of Just., No. 19-cv-3073 (CJN), 2022 WL 683569, at *4 (D.D.C. Mar. 8, 2022).

[17] However, the plaintiff's challenge to the defendant's asserted applicability of Exemption 4 is mooted by the defendant's notice.  See Def.'s Notice at 1 (noting that the defendant "intends to mail to [the] plaintiff the Rand Corporation report, the only record that the FBI withheld based on Exemption 4 of the [FOIA.]"); Perry, 684 F.2d at 125 ("Once the records are produced[,] the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made.") (quoting Crooker v. U.S. State Dep't, 628 F.2d 9, 10 (D.C. Cir. 1980)).

[18] The defendant also asserts that the "DIA requested [that] the FBI withhold on its behalf its office affiliations, as well as information that would reveal [the] DIA's organizational structure and sensitive functions pursuant to Exemption [3]" and 10 U.S.C. § 424.  2d Hardy Decl. ¶ 272.  However, the plaintiff only challenges the withholding of information under Exemption 3 pursuant to the Pen Register Act and the National Security Act, not 10 U.S.C.

(continued . . .)

"attenuated connection to the Pen Register statute[,]" Pl.'s Mem. at 11; (2) a conclusory assertion that the information "pertains to intelligence activities[,]" which is "insufficient to support the invocation of a FOIA exemption[,]" id. at 11–12; and (3) no "connection between the documents at issue and any proceedings before a grand jury[,]" Pl.'s Reply at 9. The Court will address each set of the withholdings in turn.

### d. Pen Register Act

First, the defendant asserts that it properly withheld information pursuant to Exemption 3 based on the Pen Register Act. "Because the Pen Register Act is a qualifying statute under Exemption 3," Labow v. U.S. Dep't of Just., 831 F.3d 523, 528 (D.C. Cir. 2016), the Court's focus is on whether the Pen Register Act authorizes the withholding of the particular information withheld in this case, see Larson, 565 F.3d at 865. The defendant states that "[t]he FBI asserted Exemption [3] to protect . . . information" from "pen register[s,]" which are "device[s] that record[] phone numbers dialed to or from a target telephone." 2d Hardy Decl. ¶ 199. The Pen Register Act sets forth a procedure by which an attorney for the government may seek "an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States[.]" 18 U.S.C. § 3123(a)(1) (underline added). Pursuant to the Act,

> [a]n[y] order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that[] (1) the order be sealed until otherwise ordered by the court; and (2) the person owning or leasing the line or other facility to which the pen register or [] trap and trace device is attached[] or applied[] . . . not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court.

---

(. . . continued)
§ 424, which is an exemption applicable only to the disclosure of information held by certain intelligence agencies. See Pl.'s Mem. at 10–12; 10 U.S.C. § 424. Accordingly, the Court need not consider the defendant's withholdings pursuant to 10 U.S.C. § 424.

Id. § 3123(d).  These prohibitions resulted in the District of Columbia Circuit concluding that "the statute provides for [the] sealing of a pen register order itself, not sealing of any and all information the order may contain even if appearing in other documents."  Labow, 831 F.3d at 528.

Here, according to the defendant, "the FBI withheld information that[,] if disclosed, would reveal the existence or use of a pen register or trap and trace device, or reveal the existence of an investigation involving a pen register or trap and trace device."  2d Hardy Decl. ¶ 199.  Specifically, it contends that "[t]he information protected by the FBI within Exemption [3] reveals the targets and [the] dates [on which] information was collected during the employment of a specific pen register device."  3d Hardy Decl. ¶ 33.  Because "[t]he FBI determined [that] this information was at the crux of the pen register order itself, and revealing this information would undoubtedly compromise the order[,] [ ] it asserted Exemption [3] to withhold this information."  Id.

The Court concludes that the defendant appropriately withheld information pursuant to the Pen Register Act.  As another member of this Court has noted, "[i]nformation at the crux of a pen register order that, as here, happens to appear in a document outside of the order itself and would necessarily compromise the order, is [ ] information that falls within the scope of Exemption 3's protection as triggered by the Pen Register Act."  Labow v. U.S. Dep't of Just., 278 F. Supp. 3d 431, 441 (D.D.C. 2017); see also id. (noting that "[t]his Court and other courts in this district have accordingly and consistently held that 'information regarding the target of pen registers, and reports generated as a result of the pen registers' is information that 'falls squarely under' the Pen Register Act" (quoting Brown v. Fed. Bureau of Investigation, 873 F. Supp. 2d 388, 401 (D.D.C. 2012)).  Because the information withheld by the defendant "reveals

the targets and [the] dates [on which] information was collected during the employment of a specific pen register device" and, if produced, would "undoubtedly compromise the order[,]" 3d Hardy Decl. ¶ 33, it "falls within the statute[,]" Larson, 565 F.3d at 865, and is thus properly withheld pursuant to Exemption 3.

The plaintiff argues that "the FBI has [ ] failed to explain how disclosure would reveal the targets and [the] dates [on which] information was collected[,]" and that, unless the withheld information "consists entirely of dates and identities of targets[,]" it is not properly withheld. Pl.'s Reply at 8 (emphasis in original). However, he fails to cite any case law in support of this argument. See generally id. Moreover, in light of the statement contained in the Third Hardy Declaration that "[t]he information protected by the FBI within Exemption [3] reveals the targets and [the] dates [on which] information was collected during the employment of a specific pen register device[,]" 3d Hardy Decl. ¶ 33, the Court agrees with the defendant that "revealing this information would undoubtedly compromise the order[,]" id. The withheld information is therefore protected from disclosure by Exemption 3.

### e. National Security Act

Second, the defendant asserts that it properly withheld information pursuant to Exemption 3 under the National Security Act. See Def.'s Mem. at 6. Because the National Security Act is "a valid Exemption 3 statute[,]" DiBacco v. U.S. Army, 795 F.3d 178, 182, 197 (D.C. Cir. 2015), the Court focuses on whether the National Security Act authorizes the withholding of the information in this case, see Larson, 565 F.3d at 865. Under the National Security Act, "[t]he Director of National Intelligence shall protect . . . intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).

As the plaintiff correctly notes, see Pl.'s Mem. at 11–12, "[a]n agency invoking Exemption 3 must demonstrate its applicability in a nonconclusory and detailed fashion and must provide the kind of detailed, scrupulous description of the withheld documents that enables a District Court judge to perform a searching de novo review." Gellman v. Dep't of Homeland Sec., 613 F. Supp. 3d 124, 140 (D.D.C. 2020) (internal quotation marks and alterations omitted). Accordingly, "affidavits [do] not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." Hayden v. Nat'l Sec. Agency, 608 F.2d 1381, 1387 (D.C. Cir. 1979). Here, the defendant states that it "determined that [its] intelligence sources and methods would be revealed if any of the withheld information is disclosed to [the p]laintiff[.]" 2d Hardy Decl. ¶ 201; see also id. ("The information pertains to intelligence activities[,] source[s,] and methods and is prohibited from disclosure as prescribed by the National Security Act[.]"). These "conclusory" statements that "merely recit[e the] statutory standards[,]" are "[in]sufficient to place the [defendant's] documents within the [FOIA] exemption[.]" Hayden, 608 F.2d at 1387; cf. Gellman, 613 F. Supp. 3d at 144 (finding an agency declaration insufficient to support an assertion of Exemption 3 where the declaration "avers, without any further detail, that methods for responding to the media 'concern[ed] an intelligence method'" because "that justification merely restate[d] the standard [and] d[id] not explain how revealing a method for responding to the media would in fact concern or reveal intelligence methods"). Despite this conclusion, as the defendant correctly notes in its reply, "the FBI asserted FOIA Exemptions [1 and 6] in addition to Exemption 3 to protect some of the information that [the p]laintiff has challenged[,]" but the "[p]laintiff has not challenged the FBI's assertion of FOIA Exemptions 1 and 6." Def.'s Reply at 3. Accordingly, the Court will deny without prejudice the defendant's motion for summary judgment as to the defendant's assertion

of Exemption 3 for information covered by the National Security Act that is not also covered by

Exemption 1 and/or 6, and the defendant will be permitted to renew its motion for summary

judgment based on Exemption 3, providing information that "explain[s] how [the withheld

information] would in fact concern or reveal[,]" <u>Gellman</u>, 613 F. Supp. 3d at 144, information

protected by the National Security Act.[19]

### f.   Grand Jury Information

Third and finally, the defendant asserts that certain information in the December 21,

2018, supplemental release is protected by Exemption 3 through Federal Rule of Criminal

Procedure 6(e).  <u>See</u> <u>Def.</u>'s Reply at 3.  Federal Rule of Criminal Procedure 6(e) precludes the

disclosure of any "matter occurring before a grand jury."  Fed. R. Crim. P. 6(e)(5)–(6).  Because

Rule "6(e) is a qualifying statute under Exemption 3[,]" <u>Labow</u>, 831 F.3d at 529, the Court's

focus is on whether the information withheld by the defendant falls under Rule 6(e), <u>see</u> <u>Larson</u>,

565 F.3d at 865.  "Rule 6(e) does not 'draw a veil of secrecy . . . over all matters occurring in the

world that happen to be investigated by a grand jury[.]'"  <u>Id.</u> (first alteration in original) (quoting

<u>Senate of P.R. v. U.S. Dep't of Just.</u>, 823 F.2d 574, 582 (D.C. Cir. 1987)).  Instead, "Rule 6(e)

protects information that would tend to reveal some secret aspect of the grand jury's

investigation, including the identities of witnesses or jurors, the substance of testimony, the

strategy or direction of the investigation, or the deliberations or questions of jurors."  <u>Bartko v.</u>

<u>U.S. Dep't of Just.</u>, 898 F.3d 51, 73 (D.C. Cir. 2018) (internal quotation marks omitted).

---

[19] The defendant also states, without further explanation, that, "as evident by the markings on 25 pages, the information withheld pursuant to [ ] Exemption [3] . . . was classified at the Secret level."  2d Hardy Decl. ¶ 201.  In response, the plaintiff argues that "there are only 24 pages at issue, and at least two of the pages (2332 and 2417) do not have evident markings of the documents being classified at the Secret level (or higher)."  Pl.'s Mem. at 12 n.7.  The defendant does not respond to this argument in its reply.  <u>See generally</u> <u>Def.</u>'s Reply.  Nonetheless, for the reasons stated above, the information provided by the defendant was insufficient, and the Court need not resolve the parties' dispute on this issue, as the Court will permit the defendant to renew its motion for summary judgment on this issue.

Here, the defendant states that

> [t]he records responsive to [the p]laintiff's request reflects that one or more
> federal grand juries were empaneled in relation to the investigation(s) at issue,
> and information in the documents responsive to [the p]laintiff's request reveals
> matters occurring before the grand jury/juries. Specifically, the investigative
> information contains information about the names of [g]rand [j]ury witnesses and
> detailed testimony they provided.

3d Hardy Decl. ¶ 34.  According to the defendant, "[a]ny disclosure of this information would

clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of a

federal grand jury, and thus, [it] is precluded from disclosing [the information]."  Id.

The plaintiff argues in response that

> [t]he FBI has invoked Exemption 3 in connection with Fed[eral] R[ule of]
> Crim[inal] P[rocedure] 6(e) as to two records: an [internal electronic
> communication] dated August 26, 2003[,] concerning Stop Huntingdon Animal
> Cruelty, and an [internal electronic communication] dated October 2, 2003[,]
> concerning the FOXFIRE investigation[,] . . . [h]owever, the FBI has failed to
> show any connection between the documents at issue and any proceedings before
> a grand jury.

Pl.'s Reply at 9.

The Court disagrees with the plaintiff.  The defendant's declarant explicitly states that the

withheld information "contains information about the names of [g]rand [j]ury witnesses and

detailed testimony they provided[,]" 3d Hardy Decl. ¶ 34, which is precisely the type of

information that is protected by Rule 6(e), i.e., "information that would tend to reveal some

secret aspect of the grand jury's investigation, including the identities of witnesses or . . . the

substance of testimony," Bartko, 898 F.3d at 73 (internal quotation marks omitted).

Accordingly, the Court concludes that this information was properly withheld by the defendant

pursuant to Exemption 3 and Rule 6(e).

## 2.   Exemption 5

The Court now turns to the defendant's invocation of Exemption 5.[20]  Exemption 5 of the

FOIA protects "inter-agency or intra-agency memorandums or letters that would not be available

by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "To

be covered by Exemption 5, a document's 'source must be a [g]overnment agency, and it must

fall within the ambit of a privilege against discovery under judicial standards that would govern

litigation against the agency that holds it.'"  Leopold v. U.S. Dep't of Just., 487 F. Supp. 3d 1, 10

(D.D.C. 2020) (Walton, J.) (alteration in original) (quoting Dep't of Interior & Bureau of Indian

Affs. v. Klamath Water Users Prot. Ass'n, 532 U.S. 1, 8 (2001)).  "[I]f material [would not be]

'available' in discovery, it may be withheld from FOIA requesters."  Burka v. Dep't of Health &

Hum. Servs., 87 F.3d 508, 516 (D.C. Cir. 1996).  "Thus, courts have incorporated three

traditional civil discovery privileges into Exemption 5: (1) the deliberative process privilege; (2)

the attorney-client privilege; and (3) the attorney work-product privilege."  Ctr. for Medicare

Advoc., Inc. v. U.S. Dep't of Health & Hum. Servs., 577 F. Supp. 2d 221, 234 (D.D.C. 2008)

(Walton, J.).  Here, the defendant asserts all three privileges, see 2d Hardy Decl. ¶¶ 207–15;

however, the plaintiff only challenges the defendant's reliance on the deliberative process

privilege regarding Page 956, which "is a letter referring to then-upcoming testimony to

Congress" and an "attachment to the [letter,]" Pl.'s Mem. at 14–15.

---

[20] Although the FBI, the OIP, the Bureau of Prisons ("BOP"), and the Executive Office for United States Attorneys ("EOUSA") all withheld information pursuant to Exemption 5, see 2d Hardy Decl. ¶¶ 205–15; Brinkmann Decl. ¶¶ 49–75; Scarantino Decl. ¶ 5; Kornmeier Decl., Ex. 1 (EOUSA Vaughn Index) at 2–3, the plaintiff only challenges the FBI's invocation of Exemption 5 as to page 956, see Pl.'s Mem. at 14–15.  Accordingly, the Court finds that the OIP's, the BOP's, and the EOUSA's application of Exemption 5, as well as the FBI's application of Exemption 5 regarding all other pages, are conceded by the plaintiff.  See Fisher v. DOJ, 723 F. Supp. 2d 104, 111 (D.D.C. 2010) (explaining that the Court will "accept[] [] unchallenged exemptions as conceded, . . . [and] need not address their applicability").

"The deliberative process privilege protects not only communications that are deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency." Leopold v. Off. of Dir. of Nat'l Intel., 442 F. Supp. 3d 266, 274 (D.D.C. 2020).  This privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." Klamath Water Users Prot. Ass'n, 532 U.S. at 8–9.  "To be exempt from disclosure under the deliberative process privilege, the agency must show that the information is both (a) predecisional and (2) deliberative." Heffernan, 317 F. Supp. 3d at 118 (internal quotation marks omitted).  "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his [or her] decision,' rather than to support a decision already made." Petrol. Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992).  "And a document is deliberative if it is a part of the agency give-and-take—of the deliberative process—by which the decision itself is made." Abtew v. U.S. Dep't of Homeland Sec., 808 F.3d 895, 899 (D.C. Cir. 2015) (internal quotation marks omitted).  "The 'key question' in determining whether the material is deliberative in nature 'is whether disclosure of the information would 'discourage candid discussion within the agency.'" Pub. Emps. for Env't Resp. v. Env't Prot. Agency, 213 F. Supp. 3d 1, 11 (D.D.C. 2016) (quoting Access Reports v. Dep't of Just., 926 F.2d 1192, 1195 (D.C. Cir. 1991)).  To establish that information is protected by the deliberative process, an agency "must establish what deliberative process [wa]s involved, and the role played by the documents in issue in the course of that process." Senate of P.R., 823 F.2d at 585–86.

### a.   Whether Page 956 is Protected by the Deliberative Process Privilege

First, the Court considers the defendant's application of the deliberative process privilege as to the "letter referring to then-upcoming testimony to Congress[,]" Pl.'s Mem. at 14–15, and the letter's attachment, id. at 15—which the plaintiff refers to as Page 956.  The plaintiff argues that, "[g]iven that the document was in a format that was to be presented as part of the public record, it has lost any predecisional status it may have once had" and "the fact that the author . . . indicated that the document was suitable for filing on the public record undermines the FBI's claims that Exemption[] 5 . . . require[s] withholding of the document from the public." Pl.'s Mem. at 15.  In response, the defendant argues that the withheld information is "deliberative because 'the final version of the statement is not included, only drafts and revisions[,]'" and "the communication itself describes the attachments as 'an exact copy of the draft submitted for inclusion' and 'the revisions requested by the [REDACTED] personnel.'" Def.'s Reply at 5 (quoting 3d Hardy Decl. ¶ 37).  For the following reasons, the Court agrees with the plaintiff that the defendant has not adequately justified its withholding of the information.

The defendant states that, in general, the "information [that it] withheld [pursuant to Exemption 5] consists of preliminary opinions, evaluations, and comments of various Headquarters and Field Office Special Agents pertaining to the criminal proceedings against investigative subjects" and "include[s] intermediary discussions leading to final decisions."  2d Hardy Decl. ¶ 210.  Specifically, according to the defendant, "the discussions resulting from these efforts consist of FBI staff providing advice, asking questions within the agency, and/or deliberating to determine a final decision and/or course of action."  Id.  Regarding, page 956 in particular, the defendant states that the

> [p]laintiff incorrectly surmises [that] the two statements attached to the [letter] are in a format appropriate for release on the public record. The information attached to the [letter] is deliberative as the final version of the statement is not included, only drafts and revisions. It is clearly stated within the body of the [letter] that "two copies of the statement are attached to the communication. The first is an exact copy of the draft submitted for inclusion. The second includes the revisions requested by the [REDACTED] personnel."

3d Hardy Decl. ¶ 37.

As the plaintiff correctly notes, "[t]he FBI has not provided the three key pieces of information needed by the Court for each document: '(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient.'" Pl.'s Reply at 13 (quoting Nat'l Sec. Couns. v. CIA, 960 F. Supp. 2d 101, 189 (D.D.C. 2013)). Although the defendant provides general statements that all withheld information pursuant to Exemption 5 "consist[ed] of preliminary opinions, evaluations, and comments . . . pertaining to the criminal proceedings against investigative subjects[,]" 2d Hardy Decl. ¶ 210, it provides no further information as to "the specific deliberative process [in which Page 956 was] involved[,]" "the function and significance of [Page 956] in that process," or "the nature of the decisionmaking authority vested in the [ ] author and recipient[,]" Nat'l Sec. Couns., 960 F. Supp. 2d at 189. In addition, although the defendant states that "[t]he information attached to [Page 956] is deliberative" since it only included "drafts and revisions[,]" and not "the final version of the statement[,]" 3d Hardy Decl. ¶ 37, the D.C. "Circuit has made clear that simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege[,]" Wilderness Soc. V. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 14 (D.D.C. 2004) (Walton, J.) (citing Arthur Andersen & Co. v. Internal Revenue Serv., 679 F.2d 254, 257 (D.C. Cir. 1982)), and an agency "must . . . identify the function and significance

in [its] decision[–]making process of all redacted and withheld documents to qualify them as exempt under the deliberative process privilege[,]" Mayer, Brown, Rowe & Maw LLP v. Internal Revenue Serv., 537 F. Supp. 2d 128, 139 (D.D.C. 2008) (citation and internal quotation marks omitted), aff'd, 562 F.3d 1190 (D.C. Cir. 2009).  Here, the defendant has failed to do so.  See generally 2d Hardy Decl.; 3d Hardy Decl.

Accordingly, the Court will deny without prejudice both parties' motions for summary judgment as to the defendant's assertion of Exemption 5 as to Page 956 and will permit the defendant to renew its motions with additional information regarding the basis for the assertion of Exemption 5, if there is a basis to do so.

**b.  FBI Report Regarding a Former Inmate's Bureau of Prison Correspondence**

Second, the Court considers the defendant's assertion of Exemption 5 as the basis for withholding "an analytical report concerning the review of Rodney Coronado's Bureau of Prisons ("BOP") correspondence."  3d Hardy Decl. ¶ 38.  The defendant states that it "withheld information on 12 pages pursuant to the deliberative process privilege" because the "material is clearly marked as a Draft and contains [an] analyst's notes and suggestions for further analysis and investigation."  Id.  In response, the plaintiff argues that (1) "[t]he fact that a document is marked 'draft,' [ ] does not mean that the deliberative process privilege automatically attaches" and "[t]he FBI must still demonstrate that the document is deliberative[;]" (2) "[a]lthough the FBI asserts that the document contains [an] analyst's notes[,] . . . the term 'notes' is so vague that it is impossible to tell from this descriptor whether deliberations are involved, much less whether any deliberations involved pertain[ed] to the author's judgment on policy issues[;]" and (3) the defendant only asserts that the report "contains [an] analyst's notes and suggestions[,]" and "if the government can segregate and disclose non-privileged factual information within a

document, it must."  Pl.'s Reply at 14–15 (internal quotation marks omitted) (emphasis in original).

As the Court concluded above in regards to the "letter referring to then-upcoming testimony to Congress[,]" Pl.'s Mem. at 14–15, and the letter's attachment, id. at 15—which the plaintiff refers to as "page 956," see supra Section III.C.2.a, it concludes that the defendant has failed to adequately support its withholding of this report under Exemption 5.  As the plaintiff correctly notes, see Pl.'s Reply at 14–15, "simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege[,]" Wilderness Soc., 344 F. Supp. 2d at 14.  And, again, the defendant provides no information regarding "the specific deliberative process [in which the report was] involved[,]" "the function and significance of the [report] in that process," or "the nature of the decisionmaking authority vested in the [ ] author and recipient" of the report.  Nat'l Sec. Couns., 960 F. Supp. 2d at 189.  Accordingly, the Court will deny without prejudice both parties' motions for summary judgment as to the defendant's assertion of Exemption 5 over the "analytical report concerning the review of Rodney Coronado's . . . []BOP[] correspondence[,]" 3d Hardy Decl. ¶ 38, and the defendant can renew its motion, if appropriate, with additional information, if it exists, regarding the basis for its assertion of Exemption 5 over the report concerning the review of Rodney Coronado's BOP correspondence.  Likewise, the plaintiff may renew its cross-motion regarding this report in response to the defendant's renewed motion, if doing so is warranted.

Moreover, in light of the defendant's statement that the report is subject to withholding under Exemption 5 because it "contains [an] analyst's notes and suggestions for further analysis and investigation[,]" id., the Court finds that the plaintiff's contention is correct that "the deliberative process privilege does not protect documents in their entirety" and, "if the

government can segregate and disclose non-privileged factual information within a document, it must[,]" Pl.'s Reply at 14–15 (citing Loving v. Dep't of Def., 550 F.3d 32, 38 (D.C. Cir. 2008)). Therefore, prior to renewing its motion, the defendant shall first review the report to determine whether any portion of the report that is not an "analyst's notes and suggestions[,]" 3d Hardy Decl. ¶ 38, is not subject to withholding under any exemption and may be released.

### 3. Exemption 7

The Court now turns to the defendant's withholdings pursuant to Exemption 7. Exemption 7 prohibits the disclosure of

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual[.]

5 U.S.C. § 552(b)(7). Therefore, "Exemption 7 protects from disclosure 'records or information compiled for law enforcement purposes,' but only to the extent that disclosure of such records would cause [one of Exemption 7's] enumerated harm[s.]" Lewis v. U.S. Dep't of Just., 867 F. Supp. 2d 1, 18 (D.D.C. 2011) (Walton, J.) (quoting 5 U.S.C. § 552(b)(7)).

### a. Whether the Records Were "Compiled for Law Enforcement Purposes"

"To fall within FOIA Exemption 7, 'documents must first meet a threshold requirement: that the records were compiled for law enforcement purposes.'" Elec. Priv. Info. Ctr. ("EPIC") v. U.S. Dep't of Homeland Sec., 777 F.3d 518, 522 (D.C. Cir. 2015) (internal quotations

omitted) (quoting <u>Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n</u>, 740 F.3d 195, 202–03 (D.C. Cir. 2014)).  "[T]he term 'compiled' in Exemption 7 requires that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption."  <u>Pub. Emps. for Env't Resp.</u>, 740 F.3d at 203. Furthermore, "[l]aw enforcement entails more than just investigating and prosecuting individuals <u>after</u> a violation of the law," <u>id.</u> (emphasis in original), but also "fairly includes . . . the detection and <u>punishment</u> of violations of law[,]" <u>Mittleman v. Off. of Pers. Mgmt.</u>, 76 F.3d 1240, 1243 (D.C. Cir. 1993) (per curiam) (emphasis added), as well as proactive steps taken to "prevent criminal activity and to maintain security[,]" <u>100Reporters v. U.S. Dep't of State</u>, 602 F. Supp. 3d 41, 77 (D.D.C. 2022) (quoting <u>Sack v. U.S. Dep't of Def.</u>, 823 F.3d 687, 694 (D.C. Cir. 2016)).  And,

> [w]ith respect to the threshold requirement of showing that the disputed records were compiled for law enforcement purposes, courts "are more deferential to the agency's claimed purpose for the particular records" when "the agency's principal function is law enforcement," and will "scrutinize with some skepticism the particular purpose claimed" when "the agency has mixed law enforcement and administrative functions."

<u>Codrea v. Bureau of Alcohol, Tobacco, Firearms & Explosives</u>, 239 F. Supp. 3d 128, 132 (D.D.C. 2017) (quoting <u>Pub. Emps. for Env't Resp.</u>, 740 F.3d at 203).

As just noted, "[a]gencies classified as law enforcement agencies receive a special deference in their claims of law enforcement purpose."  <u>Pinson v. Dep't of Just.</u>, 236 F. Supp. 3d 338, 364 (D.D.C. 2017).  While "[n]ot every document compiled by a law enforcement agency satisfies the law enforcement purpose inquiry[,]" <u>id.</u>, "[t]o show that [ ] disputed documents were 'compiled for law enforcement purposes,' the defendant need only 'establish a rational nexus between [an] investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law[,]'"

66

Blackwell v. Fed. Bureau of Investigation, 646 F.3d 37, 40 (D.C. Cir. 2011) (quoting Campbell v. Dep't of Just., 164 F.3d 20, 32 (D.C. Cir. 1998)).  Furthermore, "[w]here there is no ongoing investigation, materials may still meet the threshold requirement of Exemption 7 if they are akin to 'guidelines, techniques, and procedures for law enforcement investigations and prosecutions outside of the context of a specific investigation.'"  Pinson, 236 F. Supp. 3d at 365 (quoting Tax Analysts v. Internal Revenue Serv., 294 F.3d 71, 78 (D.C. Cir. 2002)).

Here, the plaintiff has not contested that the records at issue were compiled for law enforcement purposes, see generally Pl.'s Mem.; Pl.'s Reply, except for his argument specific to the defendant's Exemption 7(E)-8 withholdings regarding "FBI file numbers for administrative matters[,]" Pl.'s Mem. at 34, which will be addressed infra Section III.C.3.d.vi.  Additionally, separate from the plaintiff's apparent concession regarding the records at issue being generally compiled for law enforcement purposes, the Court concludes that the defendant's records at issue in this case were compiled for law enforcement purposes.  "There can be no dispute . . . that the FBI is a law enforcement agency[,]" Amuso v. U.S. Dep't of Just., 600 F. Supp. 2d 78, 94 (D.D.C. 2009), and therefore, is entitled to "special deference in [its] claims of law enforcement purpose[,]" Pinson, 236 F. Supp. 3d at 364.  Furthermore, the records in this case withheld under Exemption 7, which "consist of or reference investigative information compiled during multiple FBI criminal investigations of threats made against organizations and/or investigations of third parties involved in these crimes[,]" 2d Hardy Decl. ¶ 217, clearly "establish a rational 'nexus between [ ] investigation[s] and one of the agency's law enforcement duties' and a connection between an 'individual or incident and a possible security risk or violation of federal law[,]'" Campbell, 164 F.3d at 32 (internal citation omitted) (quoting Pratt v. Webster, 673 F.2d 48, 420–21 (D.C. Cir. 1982)).  And, at the very least, these records "are akin to 'guidelines, techniques,

and procedures for law enforcement investigations and prosecutions outside of the context of a specific investigation.'" Pinson, 236 F. Supp. 3d at 365 (quoting Tax Analysts, 294 F.3d at 78).

Therefore, the Court concludes that the records withheld under Exemption 7 were compiled for law enforcement purposes. Having concluded that the withheld records were "compiled for law enforcement purposes[,]" 5 U.S.C. § 552(b)(7), the Court will next turn to the specific exemptions claimed by the defendant under Exemption 7.

**b.    Whether the FBI Properly Withheld Information Pursuant to Exemption 7(A)**

The defendant asserts that it withheld information on 338 pages of its total response pursuant to Exemption 7(A) in order "to protect the names, personal identifying information, file numbers, and activities of third-party subjects of pending FBI investigations[.]" 2d Hardy Decl. ¶ 234. According to the defendant, "release of the names, identifying information, file numbers, and activities of third parties of on-going FBI investigations could result not only in the acknowledgement of the existence of the investigations, but also expose the identity of the suspects, thereby jeopardizing the investigations." Id. The plaintiff challenges the defendant's assertion of Exemption 7(A) on two grounds:  (1) "[t]he information provided by the FBI is too sparse to enable the [p]laintiff to meaningfully rebut the FBI's invocation of this exemption[,]" Pl.'s Mem. at 15; and (2) "the FBI [ ] invoked Exemption 7(A) improperly as to [the letter or email on Bates] page OIP-85[21], given that the page itself states the 'investigation is complete' and '[t]here are no other pending investigations related to this file[,]'" id. (quoting id., Ex. 24) (second alteration in original). The Court will address each of the plaintiff's arguments in turn.

"Exemption 7 [of the FOIA] protects from disclosure 'records or information compiled for law enforcement purposes,' but only to the extent that disclosure of such records would cause

---

[21] Bates page OIP consists of a letter or email sent on November 24, 2014, from a special agent in the FBI's Seattle office.  See Pl.'s Mem., Ex. 24 (Page OIP-85) at 1.

[one of Exemption 7's] enumerated harm[s.]" Lewis, 867 F. Supp. 2d at 18 (quoting 5 U.S.C.
§ 552(b)(7)). To justify the withholding of information pursuant to Exemption 7(A), an agency
must show that "disclosure (1) could reasonably be expected to interfere with (2) enforcement
proceedings that are (3) pending or reasonably anticipated." Citizens for Resp. & Ethics in
Wash. v. U.S. Dep't of Just., 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting Mapother v. Dep't
of Just., 3 F.3d 1533, 1540 (D.C. Cir. 1993)). In crafting this exemption, "Congress recognized
that law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest
the agencies be hindered in their investigations or placed at a disadvantage when it came time to
present their cases." Alyeska Pipeline Serv. Co. v. Env't Prot. Agency, 856 F.2d 309, 313 (D.C.
Cir. 1988) (quoting Nat'l Lab. Rels. Bd. v. Robbins Tire & Rubber Co., 437 U.S. 214, 224
(1978)); see also Maydak v. U.S. Dep't of Just., 218 F.3d 760, 762 (D.C. Cir. 2000) ("The
principal purpose of Exemption 7(A) is to prevent disclosures [that] might prematurely reveal the
government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus
of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to
destroy or alter evidence."). Nevertheless, this exemption is not intended to be a "blanket
exemption" for any files or records that are relevant to an investigation—their disclosure must be
reasonably expected to interfere in a "palpable, particular way" with the investigation. North v.
Walsh, 881 F.2d 1088, 1100 (D.C. Cir. 1989).

### i. The FBI's Invocation of Exemption 7(A) in General

First, the plaintiff argues that the defendant's explanation included in the Third
Declaration of David M. Hardy is insufficient because it (1) "sheds no light on whether the
investigations are in fact still pending[,]" Pl.'s Reply at 15; (2) "fails to explain how disclosure of
the withheld information would result in 'acknowledgement of the existence of certain

investigations' or 'expos[ure of] the identity of suspects[,]'" <u>id.</u> at 16 (quoting 3d Hardy Decl.

¶ 42) (alteration in original); and (3) "does not explain how 'acknowledgement of the existence

of certain investigations' and 'expos[ure of] the identity of suspects' would interfere with any

investigation[,]" <u>id.</u> at 17 (quoting 3d Hardy Decl. ¶ 42).

As the plaintiff correctly argues, <u>see id.</u> at 15–18, the defendant fails to provide adequate

information to support its invocation of Exemption 7(A).  In both the Second and Third Hardy

Declarations, the defendant states that it

> asserted Exemption []7(A) in a limited fashion to protect the names, personal
> identifying information, file numbers, activities of third-party subjects[,] and
> information gathered during the course of the pending FBI investigations among
> the responsive documents.  The release of the names, identifying information, file
> numbers, and activities of third parties, in addition to the investigative
> information gathered during on-going FBI investigations could result not only in
> the acknowledgement of the existence of certain investigations, but also expose
> the identity of suspects, thereby jeopardizing the investigations.

3d Hardy Decl. ¶ 42; <u>see</u> 2d Hardy Decl. ¶ 234 (same).  However, the defendant never explains

"<u>how</u> disclosure [of this information] would reveal[,]" <u>Sussman v. U.S. Marshals Serv.</u>, 494 F.3d

1106, 1114 (D.C. Cir. 2007) (emphasis in original), the "existence of certain investigations" or

the "identity of suspects[,]" 3d Hardy Decl. ¶ 42.  Moreover, as the plaintiff correctly notes, <u>see</u>

Pl.'s Reply at 15, the defendant's declarations are unclear as to whether the withheld "names,

personal identifying information, [and] file numbers" are only those of "third-party

subjects . . . of [ ] investigations[,]" 3d Hardy Decl. ¶ 42.  <u>See generally id.</u>; 2d Hardy Decl.

¶ 234.  And, finally, apart from a cursory statement that the investigations are "pending" and

"on-going[,]" 2d Hardy Decl. ¶ 234, the defendant provides no "specificity as to the status of the

investigation[s]" or any "explanation as to why the investigation is of long-term duration[,]" and

thus still pending, <u>Elec. Priv. Info. Ctr. v. Dep't of Just. Crim. Div.</u>, 82 F. Supp. 3d 307, 322

(D.D.C. 2015).  "[T]o prevail under Exemption 7(A), the government must show, by more than

conclusory statement, how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding[,]" <u>North</u>, 881 F.2d at 1097 (internal quotation marks omitted), and the defendant's cursory explanation "leaves open too many questions to make that showing[,]" <u>Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation</u>, 548 F. Supp. 3d 185, 208 (D.D.C. 2021).

Accordingly, the Court will deny without prejudice the defendant's motion as to the defendant's assertion of Exemption 7(A) and the defendant can renew its motion with additional information as to the status of the investigations, and the reason(s) why disclosing the withheld information pursuant to Exemption 7(A), <u>i.e.</u> the impact of the disclosures, would have on any investigations that are still pending.

### ii.    The FBI's Invocation of Exemption 7(A) Over the Document on Bates Page OIP-85

Although the Court's above conclusion applies to the entirety of the information withheld by the defendant pursuant to Exemption 7(A), the parties also present specific arguments relating to the letter or email located at Bates page OIP-85, and therefore, the Court also specifically addresses this page.

Bates page OIP-85 consists of a letter or email sent on November 24, 2014, from a special agent in the FBI's Seattle office.  <u>See</u> Pl.'s Mem., Ex. 24 (Page OIP-85) at 1.  The names of the author and the recipient, as well as the author's contact information are redacted.  <u>See id.</u>, Ex. 24 (Page OIP-85) at 1.  The letter states: "In regards to [REDACTED.]  The investigation is complete.  [REDACTED].  There are no other pending investigations related to this file.  Please let me know if you have any questions."  <u>Id.</u>, Ex. 24 (Page OIP-85) at 1.

In his motion, the plaintiff argued that "the FBI blatantly invoked Exemption 7(A) improperly as to Bates page OIP-85, given that the page itself states [that] the 'investigation is

complete' and '[t]here are not other pending investigations related to this file.'" Pl.'s Mem. at 15 (quoting id., Ex. 24 (Page OIP-85) at 1) (second alteration in original). In response, the defendant stated that the information withheld in the middle of the letter—i.e., the information between (1) "[t]he investigation is complete" and (2) "[t]here are no other pending investigations related to this file[,]" id., Ex. 24 (Page OIP-85) at 1—"is unrelated to the preceding statement [that] 'the investigation is complete.'" 3d Hardy Decl. ¶ 43. According to the defendant, this information, which was "withheld pursuant to Exemption 7(A)[,] is directed toward a[n] [ ] investigative file[,]" and, it "conducted research and determined [that] the withheld investigative file is still pending[.]" Id.

The plaintiff argues that "Exemption 7(A) 'does not authorize an agency to refuse to disclose any record compiled in anticipation of enforcement action merely because the record has found its way into an investigative file[,]'" Pl.'s Reply at 18 (quoting Campbell, 682 F.2d at 263) (emphasis in original), and the defendant has not explained "what [its] research consisted of or how it reached its determination based on the agency's research[,]" Id. The Court agrees with the plaintiff. As the Court concluded above in regards to the defendant's invocation of Exemption 7(A) in general, see supra Section III.C.3.b.i, the defendant's explanation of its assertion of Exemption 7(A) regarding the information on Page OIP-85 is insufficient. The defendant's statement that the information "is directed toward a[n] investigative file[,]" 3d Hardy Decl. ¶ 43, does not necessarily "demonstrate that disclosure of [the] withheld [information] would interfere with the related proceeding[,]" Reps. Comm. for Freedom of the Press, 548 F. Supp. 3d at 207. Accordingly, in its renewed motion for summary judgment, if submitting one is warranted, the defendant shall also specifically address how in particular the information

withheld on Bates page OIP-85 pursuant to Exemption 7(A) would interfere with enforcement proceedings.

    **c.    Exemption 7(D)**

    The Court now turns to the defendant's withholdings pursuant to Exemption 7(D).[22] Exemption 7(D) protects from disclosure information in law enforcement records

> that could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source[.]

5 U.S.C. § 552(b)(7)(D).  In other words, "Exemption 7(D) protects records or information compiled by criminal law enforcement authorities in the course of criminal investigations if their release could reasonably be expected to disclose the identity of, as well as information provided by, a confidential source."  Comput. Pros. for Soc. Resp. v. U.S. Secret Serv., 72 F.3d 897, 905 (D.C. Cir. 1996) (citing 5 U.S.C. § 552(b)(7)(D)).  "Where, as here, the records at issue were compiled by criminal law enforcement authorit[ies] in the course of a criminal investigation, they are covered by Exemption 7(D) if producing the records could reasonably be expected to disclose the identity of a confidential source or information furnished by such a source."  Roth v. Dep't of Just., 642 F.3d 1161, 1184 (D.C. Cir. 2011) (internal quotation marks omitted) (alteration in the original) (citing 5 U.S.C. § 552(b)(7)(D)).  "The applicability of [ ] [Exemption 7(D)] in each case depends upon whether the particular source who furnished the information at issue was granted confidentiality, either expressly or by implication."  Mays v. Drug Enf't

---

[22] Although the Drug Enforcement Agency ("DEA") also withheld information pursuant to Exemption 7(D), see Myrick Decl. ¶¶ 17–19, the plaintiff only challenges the defendant's asserted applicability of Exemption 7(D), see Pl.'s Mem. at 15–19.  Accordingly, the Court will only address the FBI's reliance on Exemption 7(D).

Admin., 234 F.3d 1324, 1328 (D.C. Cir. 2000) (citing U.S. Dep't of Just. v. Landano, 508 U.S. 165, 172 (1993)).

The plaintiff challenges the defendant's assertion of Exemption 7(D) on the bases of both the defendant's failure to show the existence of either implied and explicit assurances of confidentiality.  See Pl.'s Mem. at 15–18 (challenging implied assurances of confidentiality); id. at 18–19 (challenging express assurances of confidentiality).  In response, the defendant argues that it "asserted Exemption 7(D) to protect the identity of confidential sources, one of [its] most important means of collecting information."  See Def.'s Mem. at 14.  The Court will first address the defendant's assertion of Exemption 7(D) as to information pertaining to sources who the defendant contends were given implied assurances of confidentiality, before turning to information from sources who the defendant contends were given express assurances of confidentiality.

### i.       Implied Assurances of Confidentiality

"Implied confidentiality exists when 'the source furnished information with the understanding that the [agency] would not divulge the communication except to the extent [that] the [agency] thought necessary for law enforcement purposes.'"  Miller v. U.S. Dep't of Just., 872 F. Supp. 2d 12, 26 (D.D.C. 2012) (quoting Landano, 508 U.S. at 174).  "An implied assurance may be inferred from evidence showing the circumstances surrounding the imparting of the information," Ford v. Dep't of Just., 208 F. Supp. 3d 237, 251 (D.D.C. 2016) (internal quotation marks omitted), including "'the character of the crime at issue,' 'the source's relation to the crime,' whether the source received payment, and whether the source has an 'ongoing relationship' with the law enforcement agency and typically communicates with the agency 'only at locations and under conditions which assure the contact will not be noticed[,]'" Roth, 642 F.3d

at 1184 (quoting <u>Landano</u>, 508 U.S. at 179).  "The nature of the crime investigated and [the] informant's relation to it are the most important factors in determining whether implied confidentiality exists."  <u>Amuso</u>, 600 F. Supp. 2d at 100.

Here, the plaintiff challenges "the FBI's application of Exemption 7(D)-2, 5, and 6 to withhold information under an implied assurance of confidentiality by foreign governments, individuals, and local law enforcement agencies, respectively."  Pl.'s Reply at 18.  The Court will examine each instance in turn.

### A.  Exemption 7(D):  Foreign Government Agencies

First, the Court addresses the plaintiff's challenge to the defendant's assertion of Exemption 7(D) as to foreign governments who were allegedly given implied assurances of confidentiality.[23]  The defendant states that it "asserted Exemption [7(D)] to protect information provided to [it] by a foreign government agency that obtained the information from confidential sources."  2d Hardy Decl. ¶ 241 (referring to this specific 7(D) Exemption as "Exemption (b)(7)(D)").  Specifically, "the FBI is withholding this information to protect the confidential relationship it has with these foreign agencies," and "the fact [that] the FBI worked with these agencies on domestic-terrorism[-]related investigations."  3d Hardy Decl. ¶ 50.  According to the defendant, "[t]he [foreign government agencies] sources were in positions to have ready access to and/or knowledge about targets and others involved in extremist activities (<u>i.e.</u>, animal rights, ecological, and/or domestic terrorism)" and "[s]uch access exposed them to potential significant harms should their association and cooperation with the foreign government agenc[ies—]and[,] by extension, the FBI[—]be publicly disclosed."  2d Hardy Decl. ¶ 241 (underline added).  In addition, the defendant states that "[p]ublicity, adverse or otherwise, concerning these

---

[23] Also referenced as an Exemption 7(D)-2.

individuals' cooperation with the foreign government and the information they supplied in any particular criminal investigation . . . would seriously impair their effectiveness in assisting with or participating in future investigations[,]" id., and "would place these agencies' confidential sources at risk as it would indicate to domestic terrorists which countries have obtained source information, and therefore where there exist confidential sources providing law enforcement agencies information on their overseas actions[,]" 3d Hardy Decl. ¶ 50.  Moreover, the defendant represents, that the disclosures "would endanger the FBI's ability to obtain valuable information from these agencies and their confidential sources in the future."  Id.

Additionally, the defendant states that "any information provided to/from these countries that would reveal their identities in the context of domestic-terrorism investigations should be considered confidential, based on the agencies' own interests."  Id. ¶ 51.  According to the defendant, "[r]evealing these agencies in the context of these records could result in backlash[] within their own country due to their cooperation with the FBI[,]" due to "citizens [who] may see their cooperation and sharing of information on their countries' citizens [as] a betrayal in trust[,]" or "violent reprisal, considering [that] those involved in domestic terrorism often resort to violence in pursuing their political objectives."  Id.

The Court concludes that the defendant has demonstrated that it appropriately applied Exemption 7(D) to the information provided by foreign government agencies.  First, "the character of the crime is indeed severe[,]" Kendrick v. Fed. Bureau of Investigation, No. 20-cv-2900 (TNM), 2022 WL 4534627, at *7 (D.D.C. Sept. 28, 2022), as the defendant has asserted that the underlying crime constitutes "domestic terrorism[,]" 3d Hardy Decl. ¶ 51, and "extremist activities[,]" 2d Hardy Decl. ¶ 241.  Second, the defendant has stated that the foreign government agency's "sources were in positions to have ready access to and/or knowledge about targets and

others involved in extremist activities (i.e., animal rights, ecological, and/or domestic

terrorism)."  Id. (underline added).  Therefore, the sources' "relation to the crime" was

sufficiently close to support an implication of implied confidentiality.  See Kendrick, 2022 WL

4534627, at *7 (concluding that the FBI "properly invoked Exemption 7(D)" in part because it

"attest[ed] that the sources for which it claims implied confidentiality have proximity to the

investigative subject and events they described").  Third, the defendant's declaration

demonstrates that both the confidential sources who reported information to the foreign agencies

and the agencies themselves "would not have provided information, assisted the FBI, and[/]or

cooperated with the FBI on domestic terrorism investigations without an expectation [that] the

FBI would withhold their agencies' identities and the information they provided

confidential[ly]."  3d Hardy Decl. ¶ 51.  Finally, the defendant has also demonstrated that "the

violence and risk of retaliation that attend th[e] type of crime [at issue in this case] warrant an

implied grant of confidentiality[.]"  Mays, 234 F.3d at 1329; see 3d Hardy Decl. ¶ 51 (stating

that "revealing these foreign agencies within the context of these records could result in them

being targeted for violent reprisal by those involved in domestic terrorism or those sympathetic

to these criminals' cases"); see also Shapiro v. Dep't of Just., No. 12-cv-313 (BAH), 2020 WL

3615511, at *44 (D.D.C. July 2, 2020) (concluding that "domestic terrorism" was "certainly [a]

serious or violent crime[] that weigh[ed] in favor of a finding of confidentiality" (internal

quotation marks omitted), aff'd in relevant part, 40 F.4th 609, 616 (D.C. Cir. 2022).

        The plaintiff argues that the defendant has not adequately supported its assertion of

Exemption 7(D) because (1) "it is not enough for the FBI to assert that it 'worked with these

agencies' because the statute requires a showing that the agencies 'furnished information' to the

FBI[,]" and (2) "the relevant inquiry in terms of the source's expectation [is] the confidentiality

of a particular communication, an analysis which would be meaningless if Exemption 7(D)

encompassed the mere <u>fact</u> of the FBI's working relationship with a foreign agency."  Pl.'s

Reply at 19 (quoting 3d Hardy Decl. ¶ 50) (emphasis in original).  Neither argument is

convincing.  First, the information withheld under Exemption 7(D) is information that was

"furnished" by foreign government agencies to the defendant.  <u>Id.</u>  As the defendant stated in its

declaration, it "asserted Exemption [7(D)] to protect information provided to [it] <u>by a foreign

government agency</u> that obtained the information from confidential sources."  2d Hardy Decl.

¶ 241 (emphasis added).  Therefore, the information over which the defendant has asserted

Exemption 7(D) is information that came from foreign government agencies.  Second, the

defendant has stated that these agencies "would not have provided [the] information . . . without

an expectation [that] the FBI would [treat] their [ ] identities and the information [that] they

provided [as] confidential[.]"  3d Hardy Decl. ¶ 51.  This demonstrates that the agencies

"furnished information with the understanding that the FBI would not divulge the

communication except to the extent . . . thought necessary for law enforcement purposes."

<u>Landano</u>, 508 U.S. at 174.  Accordingly, the Court concludes that the defendant appropriately

asserted Exemption 7(D) regarding the information it received from foreign government

agencies under an implied assurance of confidentiality.

## B.  Exemption 7(D):  Third Party Individuals

Next, the Court addresses the plaintiff's challenge to the defendant's assertion of

Exemption 7(D) as to the information it received from third-party individuals.[24]  The defendant

states that it asserted Exemption 7(D) "to protect information provided to the FBI by third

parties[,]" with whom the defendant worked "during criminal investigations to obtain

---

[24] Also referenced as an Exemption 7(D)-5.

information and data." 2d Hardy Decl. ¶ 249. Here, the defendant represents that "individuals closely tied to the investigation provided information to the FBI identifying additional third parties of investigative interest[,]" and "considering the violent nature of the subject's crimes, the FBI determined these individuals provided information to [it] with probable fear [that] their cooperation with law enforcement could lead to violent reprisal." Id. The defendant further states that "[p]ublicity, adverse or otherwise, concerning information [that] these third parties provided to the FBI could dissuade them from cooperating with the FBI in the future" and would "degrade these and other sources' trust in the FBI[,]" thereby "impair[ing] the FBI's ability to obtain similar assistance from sources in future FBI investigations." Id.

The plaintiff argues that "the FBI does not describe the nature of the crimes at all beyond the conclusory assertion that they are 'violent' crimes[,]" Pl.'s Mem. at 16 (quoting 2d Hardy Decl. ¶¶ 249–50), and (2) "there is a complete lack of factual support describing the connection between the individuals and the crime[,]" id. at 17. The Court disagrees. First, the Second Hardy Declaration states that "[t]he investigative and FOIA processing [of the] records at issue concern [a]nimal [r]ights, [e]co-terrorism[,] and/or [d]omestic terrorism crimes[,]" 2d Hardy Decl. ¶ 217, which directly addresses "the character of the crime at issue," Roth, 642 F.3d at 1184. See Shapiro, 2020 WL 3615511, at *44 (concluding that "domestic terrorism" was "certainly [a] serious or violent crime[] that weigh[ed] in favor of a finding of confidentiality" (internal quotation marks omitted)). Second, the defendant also states that the individuals who provided the withheld information were "closely tied to the investigation[,]" 2d Hardy Decl. ¶ 249, which addresses "the source[s'] relation to the crime[,]" Roth, 642 F.3d at 1184. Although the plaintiff argues that "[a] close tie to the 'investigation[]' [ ] is not necessarily a close tie to the crime," Pl.'s Mem. at 17, the purpose of the inquiry into whether a source

operated with an implied assurance of confidentiality is to "determine whether the source [ ] spoke with an understanding that the communication would remain confidential[,]" Roth, 642 F.3d at 1184 (internal quotation marks omitted).  Here, the sources had a sufficiently "close[] tie to the investigation[,]" 2d Hardy Decl. ¶ 249, and that the defendant determined that they "would not share information without an expectation of confidentiality[,]" id. ¶ 250, due to the potential of "violent reprisal," id. ¶ 249.

Accordingly, the Court concludes that the individuals' relationship to the investigation provided a sufficient basis to conclude that they "spoke with an understanding that the communication would remain confidential[,]" Roth, 642 F.3d at 1184.[25]

## C. Exemption 7(D):  Local Law Enforcement Agencies

Third and finally, the Court addresses the plaintiff's challenge to the defendant's assertion of Exemption 7(D) to the information it received from local law enforcement agencies.[26]  The defendant states that it asserted Exemption 7(D) "to protect information . . . directly related to a local law enforcement agency's technique used to glean specific investigative information, and the investigative information [that] the agency gathered through this technique."  2d Hardy Decl. ¶ 251.  According to the defendant, "when these agencies provide sensitive law enforcement information, [they] expect [that] the FBI will not disclose the information they provide in order to not publicly disclose their capabilities, investigative strategies, and confidential sources of investigative data."  Id.  The defendant avers that "[d]isclosure of this information could directly provide information [that] the local law

_____

[25] As support for his argument, the plaintiff cites Sennett v. Department of Justice, 962 F. Supp. 2d 270 (D.D.C. 2013), see Pl.'s Mem. at 17, where another member of this Court determined that the Department had failed to adequately support its assertion of Exemption 7(D) when its declaration did not contain "some mention of the source's relation to the crime[,]" Sennett, 962 F. Supp. 2d at 286.  Because, here, the defendant's declaration does address "the source's relation to the crime[,]" id., Sennett is inapposite.

[26] Also referenced as Exemption 7(D)-6.

enforcement agency provided to the FBI in confidence and compromise the usefulness of the investigative information and/or the agency's ability to use their valuable investigative technique in the future." Id. According to the defendant, public disclosure of this information would "likely degrade the [ ] agency's trust in the FBI" and "seriously impair the FBI's effectiveness by making local [law enforcement] agencies less willing to share valuable law enforcement information with the FBI in the future." Id.

The plaintiff argues that, "on page OIP-Referral-590, a FOIA analyst at [the] FBI notes that the law enforcement agency involved requested confidentiality expressly[,]" whereas "the FBI's declaration claims only withholding . . . on the grounds of implied assurance[s] of confidentiality from law enforcement[,]" which "undermines the FBI's assertion that there was an implied assurance of confidentiality." Pl.'s Mem. at 18 (emphases in original). In response, the defendant states that the "[p]laintiff's challenge only proves [that,] while the FBI made a clerical error in not asserting [Exemption] 7(D) under an express assurance of confidentiality, it could have also done so." 3d Hardy Decl. ¶ 52.

As the plaintiff correctly notes, Page OIP Referral-590 states that "[REDACTED] requested confidentiality expressly[.]" Pl.'s Mem., Ex. 10 (OIP Referral-590) at 9. In accordance with the defendant's statement that the local law enforcement agencies who "provide sensitive law enforcement information[] expect [that] the FBI will not disclose the information they provide in order to not publicly disclose their capabilities, investigative strategies, and confidential sources of investigative data[,]" 2d Hardy Decl. ¶ 251, the statement on Page OIP Referral-590 demonstrates that this "particular source spoke with an understanding that the communication would remain confidential," Landano, 508 U.S. at 172. Therefore, the Court

concludes that the defendant has adequately supported its withholding of information from local law enforcement agencies under Exemption 7(D).

### ii. Express Assurances of Confidentiality

The Court now turns to the defendant's assertion of Exemption 7(D) for information from sources who received express assurances of confidentiality. When an agency "asserts that a source received an express assurance of confidentiality, it must present 'sufficient evidence that such an assurance was in fact given.'" Callimachi v. Fed. Bureau of Investigation, 583 F. Supp. 3d 70, 88 (D.D.C. 2022) (quoting Roth, 642 F.3d at 1184). "Such evidence can take a wide variety of forms, including notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources." Campbell, 164 F.3d at 34. However, "[n]o matter which method the agency adopts to meet its burden of proof, its declarations must permit meaningful judicial review by providing a sufficiently detailed explanation of the basis for the agency's conclusion." Id.

The plaintiff argues that the defendant's "conclusory statements are insufficient to support a claim of express assurance of confidentiality." Pl.'s Mem. at 18. The Court disagrees. First, in the Second Hardy Declaration, the defendant states that it asserted Exemption 7(D) to withhold the "names, identifying information about, and information provided by third parties . . . under express grants of confidentiality[.]" 2d Hardy Decl. ¶ 246. The defendant states that it "asserted Exemption [7(D)], in conjunction with Exemptions [6] and [7(C)]," regarding this information. 2d Hardy Decl. ¶ 246. Because, as noted above, see supra n.16, the plaintiff does not challenge the defendant's withholdings pursuant to Exemptions 6 and 7(C), "[t]he Court concludes that the [defendant] has met its burden [in] regard to the" information

withheld pursuant to both Exemption 7(D) and either Exemption 6 or Exemption 7(C). Block, 2022 WL 683569, at *4.

Second, in the Third Hardy Declaration, the defendant states that it also "asserted Exemption [7(D)] on 145 pages within the processing of the 'missing serials' to protect the identity of and the information provided by foreign law enforcement authorities to the FBI under an 'express' assurance of confidentiality." 3d Hardy Decl. ¶ 54. Regarding this information, and to the extent that any of the information discussed in the Second Hardy Declaration is not also withheld pursuant to Exemptions 6 or 7, see 2d Hardy Decl. ¶¶ 246–47, the Court concludes that the defendant has failed to demonstrate that the sources received express assurances of confidentiality.

The defendant states that the "individuals, who provided specific and detailed information that is singular in nature, specifically requested [that] their identities not be revealed due to fear of reprisal" and "[t]he FBI and/or law enforcement officials expressly promised these third parties that their identities and the information [that] they provided would not be disclosed." 2d Hardy Decl. ¶ 246. Moreover, according to the defendant, "releasing this information would have a lasting negative impact on the FBI's information program[,]" id. ¶ 247; "would greatly hinder the FBI's ability to recruit and maintain [confidential human sources] willing to provide accurate and relevant information pertaining to criminal activities[,]" id.; and "would endanger these [sources,]" id. ¶ 248. In addition, specifically regarding the "identity and information provided by foreign law enforcement authorities to the FBI under an 'express' assurance of confidentiality[,]" the defendant states that

> [i]t is only with the understanding of complete confidentiality that the aid of such sources can be enlisted and only through this confidence that a foreign government agency can be persuaded to continue providing valuable assistance in the future. To identify these sources could subject them to unofficial inquiries not

anticipated by their contact with the FBI. The FBI's ability to obtain information quickly and discretely in future law enforcement investigations would be negatively impacted.

3d Hardy Decl. ¶ 54.

However, as the plaintiff correctly notes, see Pl.'s Mem. at 18, "the FBI must present probative evidence that the source did in fact receive an express grant of confidentiality[,]" Campbell, 164 F.3d at 34 (internal quotations omitted), and "bald assertion[s] that express assurances were given amount[] to little more than recitation of the statutory standard, which . . . is insufficient[,]" Billington v. U.S. Dep't of Just., 233 F.3d 581, 584 (D.C. Cir. 2000). Neither the Second nor Third Hardy Declarations provide "a sufficiently detailed explanation of the basis for the agency's conclusion[,]" Kolbusz v. Fed. Bureau of Investigation, No. 17-cv-319 (EGS/GMH), 2021 WL 1845352, at *22 (D.D.C. Feb. 17, 2021), that these individuals were offered express assurances of confidentiality.  See Campbell, 164 F.3d at 34 ("Such evidence can take a wide variety of forms, including notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources.").  Rather, the Court is left with "bald assertion[s,]" Kolbusz, 2021 WL 1845352, at *22, that "[t]he FBI and/or law enforcement officials expressly promised these third parties that their identities and the information [that] they provided would not be disclosed[,]" 2d Hardy Decl. ¶ 246.  Without any evidence of these express assurances, the Court cannot award summary judgment to the defendant as to its assertion of Exemption 7(D). Accordingly, the Court will deny the defendant's motion without prejudice to the extent that it asserts Exemption 7(D) as the basis for withholding information from sources who received

express assurances of confidentiality, when that information was not also withheld pursuant to

Exemptions 6 or 7.

### d. Exemption 7(E)

The Court now turns to the defendant's withholdings pursuant to Exemption 7(E).[27]

"Exemption 7(E) permits withholding of 'records or information compiled for law enforcement

purposes, but only to the extent that the production of such law enforcement records or

information . . . would disclose techniques and procedures for law enforcement investigations or

prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if

such disclosure could reasonably be expected to risk circumvention of the law.'" Blackwell, 646

F.3d at 40 (omission in original) (quoting 5 U.S.C. § 552(b)(7)(E)).  This "exemption looks not

just for circumvention of the law, but for a risk of circumvention; . . . not just for an undeniably

or universally expected risk, but for a reasonably expected risk; and not just for a certitude of a

reasonably expected risk, but for the chance of a reasonably expected risk."  Mayer Brown LLP

v. Internal Revenue Serv., 562 F.3d 1190, 1193 (D.C. Cir. 2009).  This "sets a relatively low bar

for [an] agency to justify withholding: [r]ather than requiring a highly specific burden of

showing how the law will be circumvented, [E]xemption 7(E) only requires that the agency

demonstrate logically how the release of the requested information might create a risk of

circumvention of the law."  Blackwell, 646 F.3d at 42 (internal quotation marks and alteration

omitted).

Here, the plaintiff challenges the defendant's assertion of Exemption 7(E) as to ten

categories of withheld information:  (i) Computer Analysis Response Team ("CART") reports

---

[27] Although the Secret Service and the DEA also withheld information pursuant to Exemption 7(E), see Campbell Decl. ¶¶ 8–13; Myrick Decl. ¶¶ 20–23, the plaintiff only challenges the defendant's invocation of Exemption 7(E), see Pl.'s Mem. at 19–44.  Accordingly, the Court will only address the defendant's reliance on Exemption 7(E).

and/or data; (ii) database identifiers/printouts; (iii) investigative focus of specific investigations; (iv) identity and/or location of FBI or joint units, squads, and divisions; (v) information regarding targets, dates, and scope of surveillance; (vi) sensitive file numbers and sub-file name; (vii) tactical information contained in operational plans; (viii) undercover operation[s]; (ix) collection/analysis of information; and (x) operational directives.[28]  See 2d Hardy Decl. at 68. The Court will address each of these categories of withholdings in turn.

### i.    Exemption 7(E):  CART Reports and/or Data

First, the Court addresses the plaintiff's challenge to the defendant's withholding of CART Reports and/or Data, pages 2304–07, pursuant to Exemption 7(E). [29]  See Pl.'s Mem. at 19.  Pages 2304–07 include "reports and/or data resulting from the FBI's analysis of computer and other digital media seized pursuant to a search warrant[,]" 2d Hardy Decl. ¶ 255.[30]  Id.  The defendant states that "[the] CART provides support to investigations that are reliant, in whole or in part, upon digital evidence, namely through the acquisition, preservation, examination processing, and presentation of stored digital information in computers or other electronic devices or media[,]" and furthermore, "[the] CART analyzes a variety of digital media, including, but not limited to, desktop and laptop computers, CDs/DVDs, cell phones, digital cameras, digital media players, [and] flash media."  2d Hardy Decl. ¶ 255.  The defendant further

---

[28] Although the plaintiff also challenged the defendant's two other statutory basis for its withholdings—Exemptions 7(E)-3 and 7(E)-9, see Pl.'s Mem. at 23, 37—the defendant has since re-reviewed the pages relevant to these withholdings, ultimately determining that Exemption 7(E)-3 "was inadvertently cited[,]" 3d Hardy Decl. ¶¶ 63–64, and "conced[ing]" that the inclusion of [Exemption 7(E)-9] was in error[,]" id. ¶ 81.  Therefore, these categories of withholding are no longer at issue.  See Pl.'s Reply at 8 n.2.  The plaintiff does not appear to challenge the defendant's withholdings under Exemption 7(E)-7.  See generally Pl.'s Mem.

[29] Also referenced as Exemption 7(E)-1.

[30] Although the defendant initially cited Exemption 7(E) as the withholding category for seven pages—956, 1850, and 2304–08, see Pl.'s Mem. at 19—"[a]fter re-reviewing [ ] the documents at issue, the FBI notes on [ ] pages [ ] []956, 1850 and 2308 that this category was inadvertently cited[,]" 3d Hardy Decl. ¶ 59.  Rather, "[t]he coded category on page 956 and 1850 should have been []7(E)-5 . . . [and] this coded category should not have been cited at all on page 2308, although other categories of Exemption 7(E) apply, as cited by the FBI."  Id.

states that it has withheld information regarding CART reports and data pursuant to Exemption

7(E) because "[p]roviding detailed information about CART software, equipment, techniques,

procedures, and/or types of reports generated by [the] CART during their forensic testing

processes would impede the FBI's effectiveness in investigating crimes where evidence can be

found on computers and other digital media[,]" and "[i]t would also aid in circumvention of the

law by providing criminals the information necessary for them to adjust behavior in order to

avoid detection, develop and/or utilize technology less susceptible to law enforcement detection

or scrutiny, and/or use or develop technology to counteract techniques used by [the] CART."

Id.; see 3d Hardy Decl. ¶ 60 ("The FBI asserted Exemption []7(E) to protect reports and/or data

resulting from the FBI's analysis of computer and other digital media seized pursuant to a search

warrant.  The information withheld either in part or in full on the remaining four pages is detailed

information about the CART software, equipment, techniques, procedures and the types of

reports generated by [the] CART during their forensic testing process.").  The plaintiff argues

that the defendant has not adequately supported its assertion of Exemption 7(E) as grounds for

withholding the CART reports and data because (1) "some of the redactions at issue are small

boxes and are therefore unlikely to contain information that is 'detailed[,]'" and (2) "the FBI has

not demonstrated that the withheld information involves anything more than law enforcement

techniques or procedures that are well-known to the public."  Pl.'s Reply at 20.

     The Court concludes that the defendant has demonstrated that it appropriately applied

Exemption 7(E) to the CART reports and data.  "In order for the government to invoke the

'techniques and procedures' prong of 7(E), it must demonstrate that[,]" Am. Immigr. Council v.

U.S. Dep't of Homeland Sec., 950 F. Supp. 2d 221, 245 (D.D.C. 2013) (quoting 5 U.S.C.

§ 552(b)(7)(E)): (1) "the documents were in fact 'compiled for law enforcement purposes[,]'" id.

(quoting 5 U.S.C. § 552(b)(7)(E)); (2) "the records contain law-enforcement techniques and procedures that are 'generally unknown to the public[,]'" id. (quoting Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs., 849 F. Supp. 2d 13, 36 (D.D.C. 2012)); and (3) "disclosure 'could reasonably be expected to risk circumvention of the law[,]'" id. (quoting Nat'l Whistleblower Ctr., 849 F. Supp. 2d at 36). Having already concluded that the CART reports and data were "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7); see supra Section III.C.3.a, the Court also concludes that the defendant has adequately identified "what procedures are at stake[,]" CREW, 746 F.3d at 1102, sufficient to "deduce something of the nature of the techniques in question[,]" Clemente v. Fed. Bureau of Investigation, 741 F. Supp. 2d 64, 88 (D.D.C. 2010). Namely, the defendant has specified that "reports and/or data resulting from the FBI's analysis of computer and other digital media seized pursuant to a search warrant[,]" 3d Hardy Decl. ¶ 60, and specifically, "[t]he information withheld either in part or in full on [pages 2304–07, which] is detailed information about the CART software, equipment, techniques, procedures and the types of reports generated by [the] CART during their forensic testing process[,]" id., would reveal information regarding the defendant's process for forensic analysis of digital evidence, see 2d Hardy Decl. ¶ 255. And, the defendant's processes and methods used in forensic analysis of digital evidence, which "are undoubtedly 'techniques' or 'procedures' used for 'law enforcement investigations[,]'" see Blackwell, 646 F.3d at 42 (quoting 5 U.S.C. § 552(b)(7)(E)) (referring to "[f]orensic examination procedures"), are also "generally unknown to the public[,]" Nat'l Whistleblower Ctr., 849 F. Supp. 2d at 36 (quoting Albuquerque Publ'g Co. v. U.S. Dep't of Just., 726 F. Supp. 851, 857 (D.D.C. 1989). Compare 3d Hardy Decl. ¶ 60 ("The FBI asserted Exemption []7(E) to protect reports and/or data resulting from the FBI's analysis of computer and other digital media seized pursuant to a search warrant"), with

Blackwell, 646 F.3d at 42 (concluding that Exemption 7(E) was properly applied to "'details about procedures used during the forensic examination of a computer' by an FBI forensic examiner[,]" as well as associated data collection procedures, which are "not known to the public").

Furthermore, "disclosure 'could reasonably be expected to risk circumvention of the law[,]'" Am. Immigr. Council, 950 F. Supp. 2d at 245 (quoting Nat'l Whistleblower Ctr., 849 F. Supp. 2d at 36), "by providing criminals the information necessary for them to adjust behavior in order to avoid detection, develop and/or utilize technology less susceptible to law enforcement detection or scrutiny, and/or use or develop technology to counteract techniques used by [the] CART[,]" 2d Hardy Decl. ¶ 255.  Compare id., with Blackwell, 646 F.3d at 42 (concluding that Exemption 7(E) was properly applied to withholdings where, by releasing "details about procedures used during the forensic examination of a computer[,]" "the FBI would be exposing computer forensic vulnerabilities to potential criminals").  Accordingly, because the CART reports and data "contain law-enforcement techniques and procedures that are 'generally unknown to the public[,]'" Am. Immigr. Council, 950 F. Supp. 2d at 245 (quoting Nat'l Whistleblower Ctr., 849 F. Supp. 2d at 36); and "disclosure 'could reasonably be expected to risk circumvention of the law[,]'" id. (quoting Nat'l Whistleblower Ctr., 849 F. Supp. 2d at 36), the Court concludes that the defendant properly withheld these records pursuant to Exemption 7(E).

**ii.    Exemption 7(E):  Database Information and/or Printouts**

The Court next addresses the plaintiff's challenge to the defendant's withholding of "database search results located through non-public databases used for official law enforcement purposes by the FBI and/or other law enforcement personnel[,]" 2d Hardy Decl. ¶ 256, based on

Exemption 7(E).[31]  See Pl.'s Mem. at 20–22.  The defendant states that "[t]hese non-public databases serve as repositories for counterterrorism and investigative data" and "are essentially 'one-stop' shops that allow law enforcement to query information and develop investigative leads from a variety of source data using state-of-the-art analytical tools."  2d Hardy Decl. ¶ 256. As a basis for this category of withholding, the defendant further states that

> [d]isclosure of the printouts or information compiled from these search results would provide criminals with an understanding as to what information is being gathered, analyzed, and utilized by the FBI in the investigation at issue and similar investigations. Release of this information could enable criminals to employ countermeasures to avoid providing the FBI with key investigative data and/or allow them to predict how the FBI utilizes certain data to further its investigations. In addition, revealing the data stored within the databases could jeopardize the FBI's investigative mission by revealing exactly where the FBI is housing specific investigative data. This would make these databases attractive targets for compromise.  Criminals who could gain access to FBI systems would know where to go to corrupt or delete this type of data to deprive the FBI of its use and/or discover when and what the FBI has discovered about their criminal activities. Release of this type of information in the form of printouts or information compiled from these search results would provide criminals with an understanding as to what information is being gathered, the type of information the FBI gathers, the analysis of the information and the methodology of the FBI in utilizing these databases.

Id.  In response, the plaintiff argues that "[m]any of the pages [withheld by the FBI] contain only the name of the database, which the FBI does not contend can be properly withheld[,]" Pl.'s Mem. at 20, and because many of its withholdings consist of "the names, not the search results, of databases[,]" id. at 21, "[the p]laintiff requests that the Court permit the FBI to withhold only what it claims to be justified in withholding under Exemption 7(E)-2, which is the actual printouts or information generated by databases as to which the manner of use is not generally known to the public[,]" id. at 22.

---

[31] Also referenced as Exemption 7(E)-2.

"Courts have indicated that the withholding of database names may, in some instances, be inappropriate but have provided little guidance as to the circumstances in which that would be true."  Shapiro v. Dep't of Just., 393 F. Supp. 3d 111, 120 (D.D.C. 2019) (internal citation omitted).  However, "[i]n this Circuit, [E]xemption 7(E) applies if the disclosure of information related to even 'commonly known procedures' could 'reduce or nullify their effectiveness[,]'" Elec. Frontier Found. v. Dep't of Just., 384 F. Supp. 3d 1, 10 (D.D.C. 2019) (quoting Vazquez v. Dep't of Just., 887 F. Supp. 2d 114, 116 (D.D.C. 2012), aff'd, No. 13-5197, 2013 WL 6818207 (D.C. Cir. Dec. 18, 2013) (per curiam)), and "courts have permitted the withholding of database names when they appear within a context in the withheld documents[—]that is, contextualized by additional information[—]such that disclosure could lead to circumvention of the law, as the government argues here[,]" Shapiro, 393 F. Supp. 3d at 121 (internal quotation marks omitted). See Shapiro v. U.S. Dep't of Just., 239 F. Supp. 3d 100, 115 (D.D.C. 2017) ("This 'mosaic' theory finds support in both Supreme Court and D.C. Circuit precedent recognizing that 'bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.'" (internal quotation marks omitted) (quoting Cent. Intel. Agency v. Sims, 471 U.S. 159, 178 (1985)).  Thus, where "the government indicates[] [that] disclosure of the information withheld . . . would forever associate the database name to the information . . . not withheld[—]namely, the type of information stored in the database and the type of investigation in which the database would be utilized[,]" the government "has met its low burden under Exemption 7(E)."  Shapiro, 393 F. Supp. 3d at 121; see Wolf v. Cent. Intel. Agency, 473 F.3d 370, 377 (D.C. Cir. 2007) ("[W]e must take into account . . . that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in

piecing together other bits of information[.]" (quoting <u>Fitzgibbon v. Cent. Intel. Agency</u>, 911 F.2d 755, 763 (D.C. Cir. 1990)) (second alteration in original)).

Furthermore, "[c]ourts have repeatedly 'recognized the risk of a cyber-attack . . . as valid grounds for withholding under Exemption 7(E).'" <u>Prechtel v. Fed. Commc'ns Comm'n</u>, 330 F. Supp. 3d 320, 335 (D.D.C. 2018) (quoting <u>Long v. Immigr. & Customs Enf't</u>, 149 F. Supp. 3d 39, 51 (D.D.C. 2015)). Thus, the government's indication that "the disclosure of [a] database name could jeopardize the FBI's investigative mission by revealing exactly where the FBI is storing and obtaining valuable investigative data by making it a more attractive target for compromise" suffices as a basis for withholding database names under Exemption 7(E). <u>Shapiro</u>, 393 F. Supp. 3d at 122 (internal quotation marks omitted); <u>see</u> <u>Long</u> 149 F. Supp. 3d at 53 (D.D.C. 2015) ("Judges are not cyber specialists, and it would be the height of judicial irresponsibility for a court to blithely disregard such a claimed risk.").

Here, the defendant's asserted basis for withholding database information under Exemption 7(E) falls squarely within the type of rational basis considered sufficient by courts in this Circuit. In response to the plaintiff's counterarguments, the defendant states that it "asserted Exemption 7(E) to protect . . . []search results and the names of sensitive databases[] because, placed in the context of the records, this information would reveal information about the suite of analytical tools available to the FBI when conducting research and pursuing investigative leads." 3d Hardy Decl. ¶ 62. Furthermore, the defendant argues that

> [e]ven if the databases are publicly available tools, release would lay bare the types of information the FBI searches for and compiles from these databases . . . because the database would be placed in the context of investigative records and thus associated with an example of their investigative utility to the FBI.

Id.  And the defendant further argues that "[r]elease would also reveal specifics about when and why certain information is pulled from or stored within certain databases[,]" which "would enable criminals to piece together an understanding as to what the FBI's investigative focus or strategy may be, should it be seeking or storing information from/within specific databases during particular investigative activities."  Id.  Moreover, as to the effect disclosure would have on cyber security, the defendant states that release of the information withheld "would make these databases attractive targets for compromise" because "[c]riminals who could gain access to FBI systems would know where to go to corrupt or delete this type of data to deprive the FBI of its use and/or discover when and what the FBI has discovered about their criminal activities."  2d Hardy Decl. ¶ 256.  Therefore, because the defendant has asserted that the database names "appear within a context in the withheld documents[—]that is, contextualized by additional information[—]such that disclosure could lead to circumvention of law," Shapiro, 393 F. Supp. 3d at 121 (internal quotation marks omitted); see 3d Hardy Decl. ¶ 62, and that release would "mak[e] [these databases] more attractive target[s] for compromise" in the form of cyber breaches, Shapiro, 393 F. Supp. 3d at 122 (internal quotations marks omitted); see 2d Hardy Decl. ¶ 256, the Court concludes that the defendant has "met its low burden under Exemption 7(E)[,]" Shapiro, 393 F. Supp. 3d at 121.  Compare id. (finding that the FBI had met its burden for withholding under Exemption 7(E) where it stated that "the disclosure of the information withheld . . . would forever associate the database name to the information . . . not withheld[—]namely, the type of information stored in the database and the type of investigation in which the database would be utilized"), with 3d Hardy Decl. ¶ 62 ("[R]elease would lay bare the types of information the FBI searches for and compiles from these databases . . . because the database would be placed in the context of investigative records and thus associated with an example of

their investigative utility to the FBI.").  Accordingly, the Court concludes that the defendant

properly withheld these records under Exemption 7(E):  Database Information and/or Printouts.[32]

### iii.   Exemption 7(E):  Investigative Focus of Specific Investigations

The Court next addresses the plaintiff's challenge to the defendant's withholding of 869

pages in order to "protect the investigative focus of specific FBI investigations[.]" 2d Hardy

Decl. ¶ 258.[33]  See Pl.'s Mem. at 23–25.  As a basis for its withholding of these pages under

Exemption 7(E)-4, the defendant states that "[r]evealing the broader investigative focus as they

relate to interconnected investigations would reveal the scope of the FBI's programs and the

strategies it plans to pursue in preventing and disrupting criminal activity[,]" and "[r]eleasing the

focus of specific FBI investigations would enable criminals to predict the FBI's investigative

strategies, structure their activities in a manner that thwarts the FBI's investigative efforts, and

continue to circumvent the law."  2d Hardy Decl. ¶ 258.  The plaintiff lodges four challenges to a

total of eight specific pages withheld in this category, arguing that disclosure of the redacted

portions of these pages would either not reveal the focus of an investigation at all or that release

would not cause any plausible harm.  See Pl.'s Mem. at 24 (arguing as to the disclosure of

redactions on pages 251, 699, and 817, that "the only specific investigation mentioned in the

document is the investigation into the 9/11 terrorist attacks" and "[n]o plausible harm could arise

from disclosure of the fact that the 9/11 terrorist attacks were investigated as an incident of

---

[32] The plaintiff also argues that "[t]he name of the commercial database withheld, '[REDACTED] Lexis-Nexis' appears to be Accurint, a Lexis-Nexis product used by the FBI" and "[t]he FBI has, in past cases, improperly withheld the name of the Accurint database."  Pl.'s Mem. at 21 (citing Shapiro v. Dep't of Just., 249 F. Supp. 3d 502, 506–07 (D.D.C. 2017), judgment aff'd in part, vacated in part, 893 F.3d 796 (D.C. Cir. 2018)).  However, in that Shapiro case, cited by the plaintiff in support of this contention, another member of this Court did not conclude that the name of this database was improperly withheld, but rather, refrained from ruling on that particular withholding, finding that "[b]ecause the name of the database already ha[d] been disclosed, the dispute is moot." Shapiro, 249 F. Supp. 3d at 506.  Therefore, the Court includes any such specific withholding in its analysis of the defendant's withholdings of database names in general, to the extent that any databases have already been disclosed.

[33] Also referenced as Exemption 7(E)-4.

terrorism"); id. (arguing as to the disclosure of redactions on pages 801, 802, and 814, that "[r]evealing the matter or investigation would not reveal the focus of the investigation; all i[t] would reveal is that an unidentified FBI employee worked extensively on the case"); id. (arguing as to the disclosure of redactions on page 823, that "[d]isclosing the title of the document, even if it pertains to a specific investigation, would not reveal the focus of the investigation, only the fact that unidentified recipients received an unidentified publication"); id. at 24–25 (arguing as to the disclosure of redactions on page 871, that "[d]isclosing the identity of the investigation on page 871 would reveal only that the FBI transferred unspecified information about the investigation from one digital format to another" and "[i]t would not reveal anything substantive about the focus of the investigation").

As already noted, under Exemption 7(E), the "requirement that disclosure risk circumvention of the law 'sets a relatively low bar for the agency to justify [a] withholding.'" Pub. Emps. for Env't Resp., 740 F.3d at 204–05 (quoting Blackwell, 646 F.3d at 42). "Rather than requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E) only requires that the agency demonstrate logically how the release of the requested information might create a risk of circumvention of the law." Blackwell, 646 F.3d at 42 (alteration omitted). And, in the context of a record withheld under Exemption 7(E) on the basis that it would reveal the government's investigative focus "even [a] brief recounting[,]" Poitras v. Dep't of Homeland Sec., 303 F. Supp. 3d 136, 159 (D.D.C. 2018), can satisfy this logical demonstration requirement. See Blackwell, 646 F.3d at 42; Poitras, 303 F. Supp. 3d at 159 (concluding that by asserting that "[r]evealing the amount of money the FBI has paid or plans to pay in order to implement certain investigative techniques would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts," and

revealing "'the investigative focus of specific FBI investigations' would 'reveal the scope of the FBI's programs and the strategies it plans to pursue in preventing and disrupting criminal activity,'" the defendant had met its burden under Exemption 7(E)).

Here, the defendant has "demonstrate[d] logically how the release of the requested information might create a risk of circumvention of the law[,]" Blackwell, 646 F.3d at 42, as to each page referenced by the plaintiff. Specifically, as to page 251, the defendant states that "[t]he information does not pertain to the 9/11 terrorist attacks as [the p]laintiff surmises[,]" but instead "involve[s] and relate[s] to more than just one investigation and the information withheld is interconnected to more than just one investigation." 3d Hardy Decl. ¶ 66. As to pages 699 and 817, the defendant states that "[t]he information does not pertain to the 9/11 terrorist attacks as [the p]laintiff surmises" and "[t]he investigations discussed in these two [redacted] paragraphs, if released, would reveal the scope of the FBI's strategy within the interconnected investigations." Id. As to pages 801, 802, and 804, the defendant states that the release of the redacted portions of these records would "reveal the very nature of the investigative work the employees do, which in turn would reveal the broader investigative focus as it relates to interconnected investigations" and "[a]dditionally, revealing the names or specific information of investigations that one or a few employees work on would reveal the scope of the investigation." Id. Finally, as to pages 823 and 871, the defendant states that "[r]elease of the title of the investigation, as cited on [ ] page 823, would reveal the focus of the investigation and could identify the recipients and/or the nature of the publication which are withheld" and "[w]ithholding the detailed case identification information cited on [ ] page 871[] . . . [would] reveal[] the broader investigative focus and show[] an interconnection between the investigations withheld." Id. Furthermore, the defendant asserts that "[i]n all [of] these instances, as well as

those not specifically cited here, releasing the focus of specific FBI investigations would enable

criminals to predict the FBI's investigative strategies, structure their activities in a manner that

thwarts the FBI's investigative efforts, and continue to circumvent the law." Id. ¶ 67.  And,

"[f]or sophisticated and/or repetitive criminals, even the release of the title of an investigation

can afford them insight into the how, why, where, what and when of the FBI's investigative

focus and strategies." Id.

Based upon the explanations provided by the defendant as to each redaction challenged

by the plaintiff, the Court concludes that the defendant has "demonstrate[d] logically how the

release of the requested information might create a risk of circumvention of the law[,]"

Blackwell, 646 F.3d at 42.  Compare, e.g., 3d Hardy Decl. ¶¶ 66–67, with Poitras, 303 F. Supp.

3d at 159 ("'Revealing the amount of money the FBI has paid or plans to pay in order to

implement certain investigative techniques would reveal the FBI's level of focus on certain types

of law enforcement or intelligence gathering efforts,' while disclosing 'the investigative focus of

specific FBI investigations' would 'reveal the scope of the FBI's programs and the strategies it

plans to pursue in preventing and disrupting criminal activity[.]'" (internal citations omitted)).

Accordingly, the Court concludes that the defendant properly withheld these records under

Exemption 7(E):  Investigative Focus of Specific Investigations.

### iv.    Exemption 7(E):  Identity and/or Locations of FBI or Joint Units, Squads, and Divisions

The Court next addresses the plaintiff's challenge to the defendant's withholding of 1,187

pages in order to "protect methods and techniques involving the location and identity of FBI

units and/or joint units, squads and/or divisions that were involved in the investigations at issue

in this case[,]" 2d Hardy Decl. ¶ 259; see Pl.'s Mem. at 25–31.[34]  As a basis for its withholding

of these pages under Exemption 7(E), the defendant states that "[t]he office location and units are

usually found in the administrative headings of internal FBI documents[,]" which "identify the

locations of the office and unit that originated or received the documents[,]" and "[d]isclosure of

the location of the units conducting the investigation would reveal the targets, the physical areas

of interest in the investigation, and when taken together with the other locations if identified,

could establish a pattern or 'mosaic' that identification of a single location would not."  2d Hardy

Decl. ¶ 259.  The defendant offers two rationales to support these propositions.  First, "[i]f the

locations are clustered in a particular area, it would allow hostile analysts to determine where

geographically the FBI is focusing its investigative resources, and allow them to relocate their

criminal activities elsewhere[,]" which "would disrupt the FBI's investigative process and

deprive the FBI of valuable information."  Id.  And second, "[a]s these specialized units focus on

very specific crimes and/or intelligence gathering activities, once identified within the context of

the records at issue, the units' area of expertise is revealed, and an individual would then be

aware of exactly what the FBI's interest is."  Id.; see id. ("For example, knowing that a unit,

squad and/or division whose focus is on financial crimes is involved in the investigation is quite

different information than knowing that the unit, squad and/or division involved has a focus on

crimes of violence . . . [and t]his knowledge could allow a subject to employ countermeasures

targeted toward concealing particular types of behavior and/or to avoid altogether activities in a

particular location.").

        In response, the plaintiff argues that "Exemption 7(E) protects only 'techniques and

procedures,' and the FBI has failed to establish how disclosure of the name of a unit, squad

_____

[34] Also referenced as Exemption 7(E)-5.

and/or division would reveal any particular law enforcement technique or procedure."  Pl.'s

Mem. at 26 (quoting 5 U.S.C. § 552(b)(7)(E)).  Furthermore, the plaintiff argues that even "if the

FBI had shown that the names of the units, squads, and/or divisions could be linked to a law

enforcement technique or procedure," the application of Exemption 7(E) "is still improper

because the FBI has not shown that the technique or procedure that could be inferred is generally

unknown to the public."  Id.  And, regarding the defendant's argument regarding the

identification of specific units, the plaintiff states that "the FBI never claims that in the

documents at issue here, the units, squads and/or divisions being withheld are in fact such

'specialized units' which focus on specific crimes or intelligence gathering activities."  Id. at 27.

Although Exemption 7(E) "does not ordinarily protect 'routine techniques and procedures

already well known to the public[,]'" Elec. Frontier Found., 384 F. Supp. 3d at 9–10 (quoting

Founding Church of Scientology of Wash., D.C. v. Nat'l Sec. Agency, 610 F.2d 824, 832 n.67

(D.C. Cir. 1979)), it does "protect 'confidential details of . . . program[s]' if only their 'general

contours [are] publicly known[,]'" id. at 10 (alterations in original) (quoting Sussman, 494 F.3d

at 1112).  Furthermore, even "commonly known procedures" may be properly withheld under

Exemption 7(E) "if the[ir] disclosure could reduce or nullify their effectiveness."  Vazquez, 887

F. Supp. 2d at 116.  Therefore, while the defendant has not "stated explicitly that the

investigative technique[s] that would be revealed [in this case] [are] unknown[,]" Shapiro, 393 F.

Supp. 3d at 117–18; see generally 2d Hardy Decl.; 3d Hardy Decl., even assuming arguendo that

they are, the Court "will defer to the FBI's expertise in counterterrorism and in its own law

enforcement operations[,]" Shapiro, 393 F. Supp. 3d at 118 (citing Lardner v. Dep't of Just., 638

F. Supp. 2d 14, 31 (D.D.C. 2009), aff'd, 398 Fed. App'x 609 (D.C. Cir. 2010)), regarding its

assessment that disclosure of these techniques and procedures "could reduce or nullify their effectiveness[,]" Vazquez, 887 F. Supp. 2d at 116.

Moreover, the defendant has sufficiently established how disclosure of "units and/or joint units, squads and/or divisions that were involved in the investigations at issue in this case[,]" 2d Hardy Decl. ¶ 259, at the very least risks circumvention of the law, see Mayer Brown LLP, 562 F.3d at 1193 (stating that Exemption 7(E) "looks not just for circumvention of the law, but for a risk of circumvention; . . . not just for an undeniably or universally expected risk, but for a reasonably expected risk"). The defendant's statement that disclosure of the locations of these offices and units "would allow hostile analysts to determine where geographically the FBI is focusing its investigative resources, and allow them to relocate their criminal activities elsewhere[,]" 2d Hardy Decl. ¶ 259, "logically explain[s] how knowledge of a unit name that features an investigative technique . . . could equip potential criminals with information needed to evade detection[,]" Shapiro, 393 F. Supp. 3d at 118 (concluding that Exemption 7(E) was properly applied where the FBI alleged that "disclosure of [an] FBI unit's name could 'allow criminals to anticipate the use of these techniques' and 'exploit [the FBI's investigative] weaknesses' by avoiding certain areas and targeting others to circumvent the law"). Furthermore, regarding the defendant's statement that disclosure of the names of specialized units "once identified within the context of the records at issue, [would reveal] the units' area of expertise . . . , and an individual would then be aware of exactly what the FBI's interest is[,]" 2d Hardy Decl. ¶ 259,

> [e]ven [if] an investigative technique is not expressly named in the unit's name[,] . . . reference to the unit in the context of other investigations could allow criminals to pinpoint the exact reason for the investigation, and it would alert [them] to the type of, and level of focus on their particular activities[,]

Shapiro, 393 F. Supp. 3d at 118 (internal quotation marks omitted) (second alteration in original), thus resulting in potential circumvention of the law.  Accordingly, the Court concludes that the defendant properly withheld these records pursuant to Exemption 7(E):  Identity and/or Locations of FBI or Joint Units, Squads, and Divisions.

### v.    Exemption 7(E):  Information Regarding Targets, Dates, and Scope of Surveillance

The Court next addresses the plaintiff's challenge to the defendant's withholding of 18 pages because either the redacted or fully withheld information "concern[s] the targets, locations, monitoring, and types of devices utilized in surveillance operations conducted by the FBI described within the records at issue[,]" 2d Hardy Decl. ¶ 260; see Pl.'s Mem. at 31–34.[35]  As a basis for its withholding of these pages under Exemption 7(E), the defendant states that it "utilized these surveillance operations[,]" which "are the same techniques utilized by the FBI in current criminal and national security investigations[,]" 2d Hardy Decl. ¶ 260, "to obtain investigative intelligence relevant to the investigations[,]" id.  And, although "[c]ertainly, it is publicly known that the FBI and other law enforcement agencies engage in different types of surveillance in investigations[,]"

> disclosure of non-public details about when, how, under what circumstances, and on whom the FBI conducts surveillance would allow current and future subjects of FBI investigations and other potential criminals to develop and utilize countermeasures to defeat or avoid different types of surveillance operations, thus rendering the techniques useless to the FBI and other law enforcement agencies.

Id.

In response, the plaintiff challenges specific withholdings, stating that (1) "the FBI has employed Exemption 7(E) on page 736—which includes part of a memo regarding liaison efforts between the FBI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives—to withhold

---

[35] Also referenced as Exemption 7(E)-6.

information about 'developments in the AR/ET movement,' rather than specific targets, locations, or types of devices used in surveillance[,]" Pl.'s Mem. at 32; (2) "what is being withheld [on page OIP-89] is the identity of 'items' and not the name of a target of surveillance or the date or scope of surveillance[,]" id., but "[p]ages 2332 and 2334 do appear to identify the targets of surveillance[,]" id. at 33. Essentially, the plaintiff argues that because "the records do not contain 'detailed, technical analysis' and concern only techniques generally known to the public[,] . . . Exemption 7(E) is not a valid justification for withholding [this information]." Id. at 33–34 (quoting Am. C.L. Union of N. Cal. v. U.S. Dep't of Just., 880 F.3d 473, 492 (9th Cir. 2018)).

There is no question that to the extent withheld information would reveal "identities of surveillance targets[,]" "Exemption 7(E) is properly applied." Shapiro, 2020 WL 3615511, at *40. However, in the context of the withholdings here, the application of Exemption 7(E) is not limited to the identities of surveillance targets. Rather, the exemption is also properly invoked to protect against disclosure of information that would shed light on "non-public details about [physical surveillance] use [. . .] that necessarily must remain non-public in order to retain the utility of this valuable technique." Jud. Watch, Inc. v. U.S. Dep't of State, No. 12-cv-893 (JDB), 2017 WL 3913212, at *4 (D.D.C. Sept. 6, 2017); see, e.g., id. (concluding that surveillance videos were properly withheld because of their depictions of "tradecraft[,]" such as "vantage points[,]" and "concealment techniques"). Thus, although the plaintiff takes issue with the defendant's withholding of information which "concern[s] the targets, locations, monitoring, and types of devices utilized in surveillance operations[,]" Pl.'s Mem. at 32 (quoting 2d Hardy Decl. ¶ 260), presumably because this information is relatively attenuated from the actual surveillance operations, any information which "reveal[s] specific details of surveillance

techniques . . . which could compromise [the FBI's] ability to conduct future investigations[,]" Showing Animals Respect & Kindness v. U.S. Dep't of Interior, 730 F. Supp. 2d 180, 199–200 (D.D.C. 2010), is properly withheld under Exemption 7(E).  See, e.g., Perrone v. Fed. Bureau of Investigation, 908 F. Supp. 24, 28 (D.D.C. 1995) (finding that information concerning the effectiveness of an FBI technique was properly withheld under Exemption 7(E) because "disclosure . . . would help . . . potential criminals predict future investigative actions and consequently employ countermeasures").  Here, the information withheld by the defendant— which concerns "targets, locations, monitoring, and types of devices utilized in surveillance operations[,]" 2d Hardy Decl. ¶ 290—is clearly integral to its surveillance operations and implicates "non-public details about [the surveillance techniques'] use[,]" Jud. Watch, Inc., 2017 WL 3913212, at *4, which creates a reasonable risk that "current and future subjects of FBI investigations and other potential criminals [could] develop and utilize countermeasures to defeat or avoid different types of surveillance operations, thus rendering the techniques useless to the FBI and other law enforcement agencies[,]" 2d Hardy Decl. ¶ 260.  In other words, the combination of the pieces of withheld information could "begin to unveil, in mosaic-like fashion, the FBI's surveillance playbook."  Shapiro, 2020 WL 3615511, at *40.  Accordingly, the Court concludes that the defendant properly withheld these records under Exemption 7(E): Information Regarding Targets, Dates, and Scope Surveillance.

### vi.    Exemption 7(E):  Sensitive File Numbers and Sub-file Names

The Court next addresses the plaintiff's challenge to the defendant's "assert[ion of] Exemption []7(E) to protect sensitive case file numbers."  2d Hardy Decl. ¶ 262; see Pl.'s Mem. at 34–37.[36]  As a basis for its withholding of these pages under Exemption 7(E), the defendant

---

[36] Also referenced as Exemption 7(E)-8.

states that "the release of file numbering convention identifies the investigative interest or priority given to such matters[,]" and "[a]pplying a mosaic analysis, suspects could use these numbers (indicative of investigative priority), in conjunction with other information known about other individuals and/or techniques, to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities, etc."  2d Hardy Decl. ¶ 262.  Furthermore, "[e]xacerbating this harm, releasing these file numbers provides criminals with a tracking mechanism by which they can place particular files/investigations within the context of larger FBI investigative efforts."  Id.  The defendant asserts that

> [t]his would provide criminals with a means of judging where the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when/how they obtained the knowledge, and if there are knowledge-gaps in the FBI's gathered intelligence. Given this data, determined criminals could obtain an exceptional understanding as to how they might structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law.

Id.  In response, the plaintiff argues that:  (1) "[t]he FBI does not aver that the file numbers at issue in this case were compiled as part of an investigation or for a law enforcement . . . purpose" and "FBI file numbers for administrative matters are not 'information compiled for law enforcement purposes[,]'" Pl.'s Mem. at 34 (quoting 5 U.S.C. § 552(b)(7)); (2) "[d]isclosure of the file numbers would not reveal a 'technique or procedure[,]'" id.; and (3) "[d]isclosure of the file numbers would not risk circumvention of the law[,]" id. at 34–35.[37]

First, regarding the plaintiff's argument that the case file numbers withheld by the defendant constitute "administrative matters[, which] are not 'information compiled for law

---

[37] The plaintiff also argues that "[i]f the Court disagrees with [him] and finds that case file numbers fall within the ambit of Exemption 7(E), the FBI should still be ordered to release segregable portions of the case file numbers." Pl.'s Mem. at 35–36.  However, because the Court ultimately concludes that the defendant has failed to meet its burden to establish the risk of circumvention of law posed by the withheld case file numbers, the Court need not address the plaintiff's alternative argument regarding segregability.

enforcement purposes[,]'" id. at 34, the defendant asserts that "[b]etween the administrative file requested by [the p]laintiff and the administrative case notes and search slips referred to the FBI by [the] OIP, there are a multitude of documents within them which contain investigative information." 3d Hardy Decl. ¶ 75.  Furthermore, "[t]he file numbers at issue are created solely because of FBI investigations" and "the FBI has asserted protection for file numbers related to sensitive criminal and national security investigations because those numbers exist solely because of the FBI's exercise of its law enforcement functions." Id. ¶ 76.  The fact that case files "serve an administrative purpose[, i.e.,] permitting the FBI to track and organize documents[,]" does not negate that "the tracking system is based on information collected for law enforcement purposes." Shapiro, 239 F. Supp. 3d at 117.  In this context,

> [a] file number may show—or at least suggest—for example, that the Baltimore field office of the FBI has opened a bank robbery investigation and that over $10,000 was stolen from the bank. As relevant here, moreover, a collection or 'mosaic' of FBI file numbers might show—or at least suggest—whether the FBI devotes a small amount of attention, or a great deal of attention, to animal rights extremism in each relevant region of the country.

Id.  Here, the defendant has withheld case file numbers which "are created solely because of FBI investigations" and "relate[] to sensitive criminal and national security investigations[.]" 3d Hardy Decl. ¶ 76.  "That information is, as a matter of ordinary usage, 'compiled' in the FBI filing system—that is, it is 'collected and assembled from various sources or other documents[,]'" Shapiro, 239 F. Supp. 3d at 117 (quoting John Doe Agency v. John Doe Corp., 493 U.S. 146, 153 (1989)), and "[i]t is not difficult to conclude, moreover, that a 'rational nexus' exists between the compilation of this information and 'one of the agency's law enforcement duties[,]'" id. (quoting Pratt v. Webster, 673 F.2d 408, 421 (D.C. Cir. 1982)).  Therefore, the Court concludes that the case file numbers withheld by the defendant were "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7).

Second, regarding the plaintiff's argument that "[d]isclosure of the file numbers would not reveal a 'technique or procedure[,]'" Pl.'s Mem. at 34, the defendant asserts that "[t]he sum of the parts of a file number does in fact reveal investigative priorities, and by extension may also reveal the techniques and procedures used." 3d Hardy Decl. ¶ 77. Specifically, "if certain sensitive, pending, and/or national security files were released, it would reveal what investigative resources, techniques, and procedures the FBI is or has been devoting to a particular investigative subject or particular area at a specific time." Id. Furthermore, the defendant asserts that "a released file number would forever become a singular tracking number associated with a particular investigative matter" and "[t]his would allow savvy criminals to analyze FBI investigative records and track the FBI's investigative efforts; discover the FBI's strengths, weaknesses, and possible intelligence gaps; and determine what the FBI has discovered, when it was discovered, and how/what technique was used to gather particular evidence/intelligence." Id. As described, the investigative information identified by the defendant qualifies as "techniques and procedures" for purposes of the Exemption 7(E) inquiry. See Shapiro, 239 F. Supp. 3d at 118 (accepting the parties' implicit stipulation that "investigative priorities qualify as techniques . . . for law enforcement for purposes of Exemption 7(E)" (internal quotation marks omitted) (alteration in original)). Thus, "[t]he Court agrees, as have other judges in this district, that file numbers can, at least at times, reveal law enforcement 'techniques or procedures.'" Id. Here, based upon the defendant's representations regarding the potential impact of "these numbers (indicative of investigative priority), [when considered] in conjunction with other information known about other individuals and/or techniques," 2d Hardy Decl. ¶ 262, "[the p]laintiff['s] request must be construed as part of a larger mosaic[,]" Shapiro, 239 F. Supp. 2d at 118. And, "[u]nderstood in that manner, aggregate information about the number of files or

106

documents [in this case] . . . may shed considerable light on the overall resources that a particular office of the FBI has devoted, or is devoting, to investigating related crimes." Id.  Therefore, the Court concludes that the case file numbers withheld by the defendant constitute law enforcement "techniques and procedures[,]" 5 U.S.C. § 552(b)(7)(E).

Third, regarding the plaintiff's argument that "[d]isclosure of the file numbers would not risk circumvention of the law[,]" Pl.'s Mem. at 34–35, the defendant argues that "disclosure of certain file numbers could risk circumvention by showing individuals intent on committing particular types of criminal behavior in the areas where it is more or less risky for them to operate from a law enforcement perspective[,]" 3d Hardy Decl. ¶ 78.[38]  But, "[t]he conclusion that the disclosure of FBI file numbers can—in theory—reveal sensitive law enforcement techniques, . . . does not answer the question whether disclosure of the file numbers at issue here would, in fact, do so."  Shapiro, 239 F. Supp. 3d at 118.  The defendant's declarant details the "case-by-case analysis" it employs "when determining whether to release a file number."  3d Hardy Decl. ¶ 78.  However, another member of this Court has concluded, in a separate case initiated by the plaintiff, that even where the defendant "sets forth the [ ] list of factors that the FBI considered as part of its 'harm analysis' in determining which numbers to release and which to redact[,]" that judge could not grant summary judgment because "[t]he declaration . . . sa[id] nothing about how those factors appl[ied]" in that case.  Shapiro v. U.S. Dep't of Just., 507 F. Supp. 3d 283, 308 (D.D.C. 2020).  Similarly here, although the defendant has articulated a general connection between the case file numbers and potential circumvention of law, compare

_____

[38] The defendant also states that "[w]hen techniques and procedures are being protected, a demonstration of 'risk of circumvention' is not required[.]"  3d Hardy Decl. ¶ 78.  However, "[a]lthough this is an issue that has divided the circuits, . . . the D.C. Circuit applies the 'risk of circumvention' requirement 'both to records containing guidelines and to records containing techniques and procedures[,]'" Shapiro, 239 F. Supp. 3d at 119 (emphasis omitted) (quoting Pub. Emps. for Env't Resp., 740 F.3d at 204 n.4), a position this Court must follow.

2d Hardy Decl. ¶ 262, and 3d Hardy Decl. ¶ 78, with Shapiro, 507 F. Supp. 3d at 306–09, the

Court agrees with the plaintiff that "the Court cannot discern from the existing record[,]"

Shapiro, 239 F. Supp. 3d at 120, the nature and status of the case files at issue, including

"whether the relevant investigations are open, whether they closed in the past few years, or

whether they closed decades ago[,]" id.  Therefore, the Court concludes that the defendant has

not met, based on the current record, its burden to show that release of the withheld case file

numbers risk circumvention of the law.  Accordingly, the Court will deny without prejudice the

defendant's motion to the extent that it asserts Exemption 7(E) as the basis for withholding

sensitive file numbers and sub-file names and will order the defendant to either release the

records without redactions or renew its motion for summary judgment with an explanation

regarding how or why release of the withheld case file numbers would risk circumvention of the

law.  See Shapiro v. Cent. Intel. Agency, 247 F. Supp. 3d 53, 75 (D.D.C. 2017).

> ### vii.    Exemption 7(E):  Tactical Information Contained in Operational Plans

The Court next addresses the plaintiff's challenge to the defendant's "assert[ion of]

Exemption 7(E) to protect a form detailing investigative/coordinating efforts of the FBI and local

law enforcement agencies[,]" 2d Hardy Decl. ¶ 264; see Pl.'s Mem. at 37–38.[39]  As a basis for its

withholding of these pages under Exemption 7(E), the defendant states that "[s]pecifically, the

FBI asserted Exemption [](7)(E) to protect an operational plan for investigating the interstate

transportation of stolen property[,]" which is "an internal tool limited for official use only, and

properly marked as such."  2d Hardy Decl. ¶ 264.  The defendant further states that "[i]t provides

a complete overlay of the case being investigated, contemplated actions and potential techniques

to be used, personnel needed, coordinating efforts, etc.[,]" and essentially "constitutes the

---

[39] Also referenced as Exemption 7(E)-10.

investigative blue print for investigations involving interstate transportation of stolen property."
Id.  The defendant represents that it "will use the same or similar techniques in this investigative
blue print to conduct future investigations involving interstate transportation of stolen property."
Id.  In response, the plaintiff argues that the defendant has mischaracterized the 12 pages
withheld under Exemption 7(E)-10.  See Pl.'s Mem. at 37–38.  Specifically, the plaintiff
contends that "[t]he pages at issue are from six different documents, not from one form" and
"[i]ndeed, it is apparent from both the pages redacted in part and the description of the
documents in the Vaughn index that the documents are not forms at all."  Id.

As a preliminary matter, the Court agrees with the defendant that "[t]he fact that the
documents containing the withheld information are not specific forms does not negate the fact
[that] the information constitutes an operational plan[,]" 3d Hardy Decl. ¶ 83, and the
defendant's Third Hardy Declaration provides additional detail regarding the nature of these
documents and their relevance to the tactical information contained in operational plans.  See id.
¶¶ 82–85.  Appreciating that the government has a "relatively low bar . . . to justify [the]
withholding[,]" Blackwell, 646 F.3d at 42, under Exemption 7(E), the Court concludes that the
defendant has provided sufficient detail which supports its position that these withheld records
constitute operational plans that would risk circumvention of law if disclosed, with the exception
of "[p]age 1625[, which] is part of a document seeking research on the bombing of the 16th
Street Baptist Church in the 1960s," Pl.'s Mem. at 38.  The defendant asserts that the withheld
pages are

> comprised of operational directives that [ ] provide information and instruct FBI
> employees on the proper use of certain sensitive non-public FBI procedures,
> techniques, and guidance for conducting investigations[—]essentially, guidelines
> for how to plan certain investigative actions. Armed with such information,
> criminal[s] could predict how and when the FBI will respond to certain similar

suspicious/criminal activities, and the investigative techniques the FBI is most likely to employ in those situations.

3d Hardy Decl. ¶ 84.  This explanation is sufficient to justify withholdings under Exemption

7(E).  See Cabezas v. Fed. Bureau of Investigation, No. 19-cv-145 (CJN), 2022 WL 898789, at

*10 (D.D.C. Mar. 28, 2022) (concluding that operational plans containing information regarding

"placement of personnel, administrative and equipment information, deadly force authorization

information, targets['] background information, briefing locations, and legal consultations with

the United States Attorney's Office" were properly withheld under Exemption 7(E) where the

defendant alleged that "releasing the operational plan would allow criminals to extrapolate the

[FBI's] methods and priorities to other operations and enterprises" (internal quotation marks

omitted)).

Regarding the plaintiff's specific challenge to the record redacted under the heading "The

total number of employees assigned to the Birmingham office on 9/15/63 (time of bombing)[,]"

Pl.'s Mem. at 38, the defendant argues that

> it is important to note the 1963 bombing of the Sixteenth Street Baptist Church in Birmingham, Alabama[,] was a cold case, unresolved at the time of the original investigation.  Only in 2001 were Thomas Blanton and Bobby Frank Cherry convicted of murder for the bombing.  This means the operation plan described in this document was relevant to modern FBI investigative matters.

3d Hardy Decl. ¶ 85 (internal citation omitted).  However, it is unclear to the Court how this

information, which essentially amounts to "historical staffing information[,]" would "reveal

[current or future] law enforcement techniques and procedures or guidelines protected by

Exemption 7(E)[,]" and thus is properly withheld under Exemption 7(E).  Citizens for Resp. &

Ethics in Wash. ("CREW") v. U.S. Dep't of Homeland Sec., 525 F. Supp. 3d 181, 190 (D.D.C.

2021) ("[The plaintiff] argues that the size of the Secret Service detail in Scotland is mere

'historical staffing information' . . . [and t]here is, of course, a difference between disclosing data

about a single past Secret Service detail and publishing the Secret Service's written policies and guidelines that govern the staffing of protectees' trips."). Here, the defendant has not articulated the effect this information would have on ongoing investigations or FBI investigative techniques, see 3d Hardy Decl. ¶ 85 (stating that, because the Sixteenth Street Baptist Church bombing case "was unresolved at the time of the original investigation"—but no longer unresolved—"the operation plan described in th[e] document was relevant to modern FBI investigative matters" (emphasis added)), nor alleged that this document is "'part of a complex mosaic' that, if pieced together, would reveal law enforcement techniques, procedures, or guidelines[,]" CREW, 525 F. Supp. 3d at 190 (quoting Shapiro, 239 F. Supp. 3d at 116). The Court is therefore without sufficient information to conclude that this document was properly withheld under Exemption 7(E).

Accordingly, the Court concludes that the defendant properly withheld these records under Exemption 7(E), with the exception of page 1625. The Court will therefore deny without prejudice the defendant's motion to the extent that it asserts Exemption 7(E) over page 1625 and will order the defendant to either release this record without redactions or renew its motion for summary judgment with an explanation regarding the risk of circumvention of law posed specifically by the release of this document.

### viii.    Exemption 7(E):  Undercover Operations

The Court next addresses the plaintiff's challenge to the defendant's "assert[ion of] Exemption []7(E) to protect non-public details about an undercover operation conducted by the FBI and described in the records responsive to [the p]laintiff['s] requests[,]" 2d Hardy Decl. ¶ 265; see Pl.'s Mem. at 38–39.[40]  As a basis for its withholding of these pages under Exemption

---

[40] Also referenced as Exemption 7(E)-11.

7(E), the defendant states that "[a]lthough it is public[ly] known [that] the FBI conducts undercover operations, the specific details of particular operations are not known" and "[s]ecrecy and discretion are essential when conducting effective undercover operations; therefore, publicizing details concerning unknown FBI undercover investigative techniques and the FBI's operational security methods during these undercover operations is counterintuitive."  2d Hardy Decl. ¶ 265.  Furthermore, the defendant asserts that

> [i]f [it] were to disclose these non-public details about how it conducts undercover operations and release details of the specific techniques used during this undercover operation, it could have devastating operational consequences and would jeopardize future use of undercover operations by the FBI in similar cases or under similar circumstances; thus, disclosure of these details would hinder the FBI's use of a valuable investigative technique and risk circumvention of the law.

Id.  In response, the plaintiff argues that "[n]othing in the document[,]" Pl.'s Mem. at 38, which is "described in the Vaughn index as a request for an employee to be promoted to GS-14[,]" id., "suggests that the withheld material relates to 'specific details' of an undercover operation[,]" id. at 38–39.

The defendant's position that the withheld records describe "non-public details about an undercover operation conducted by the FBI[,]" 2d Hardy Decl. ¶ 265, and that disclosure of this information "could have devastating operational consequences[,] would jeopardize future use of undercover operations by the FBI in similar cases or under similar circumstances[,]" id., and "would hinder the FBI's use of a valuable investigative technique and risk circumvention of the law[,]" id., "is more than sufficient to 'demonstrate logically how the release of the requested information might create a risk of circumvention of the law[,]'" Shapiro, 2020 WL 3615511, at *37 (quoting Blackwell, 646 F.3d at 42).  Compare 2d Hardy Decl. ¶ 265, with Shapiro, 2020 WL 3615511, at *36–37 (concluding that agency properly withheld "specific details of particular [undercover] operations [that] are not [publicly] known including how it conducts undercover

operations and [. . .] the specific techniques used to avoid possibly devastating operational consequences" (alterations in original) (internal quotation marks omitted)).  Furthermore, regarding the plaintiff's argument as to page 893 that "[t]o the extent that a portion of the paragraph contains any details relating to an undercover operation, the remaining portion of the paragraph may be segregated and released," Pl.'s Mem. at 39, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material[,]" Ecological Rts. Found. v. U.S. Env't Prot. Agency, 541 F. Supp. 3d 34, 66 (D.D.C. 2021) (quoting Sussman, 494 F.3d at 1117).  Here, the defendant's declarant has attested that "all challenged material withheld by the FBI . . . is exempt from disclosure . . . or is so intertwined with protected material that segregation is not reasonably possible[.]"  2d Hardy Decl. ¶ 187. Therefore, the Court will not second-guess this representation, especially as to the redaction of this single paragraph.  Accordingly, the Court concludes that the defendant properly withheld these records under Exemption 7(E):  Undercover Operations.

### ix.    Exemption 7(E):  Collection/Analysis of Information

The Court next addresses the plaintiff's challenge to the defendant's "assert[ion of] Exemption []7(E) to protect methods the FBI uses to collect and analyze information it obtains for investigative purposes[,]" 2d Hardy Decl. ¶ 266; see Pl.'s Mem. at 39–40.[41]  As a basis for these withholdings under Exemption 7(E), the defendant states that "[t]he release of this information would disclose the identity of methods used in the collection and analysis of information, including how and from where the FBI collects information and the methodologies employed to analyze it, once it is collected."  2d Hardy Decl. ¶ 266.  In response, the plaintiff argues that this withholding is improper because of its breadth.  See Pl.'s Mem. at 39–40.

---

[41] Also referenced as Exemption 7(E)-12.

Specifically, the plaintiff argues that the defendant's "Collection/Analysis of Information" category "appears to be a sort of catch-all for withholding documents" and fails to "expla[in] . . . how the mere <u>identity</u> of each and every method to which Exemption 7(E)-12 has been applied could reasonably be expected to risk circumvention of the law." <u>Id.</u> at 39.

Here, again, the defendant has adequately articulated that the release of these records "would disclose the identity of methods used in the collection and analysis of information, <u>including</u> how and from where the FBI collects information and the methodologies employed to analyze it, once it is collected[,]" 2d Hardy Decl. ¶ 266 (emphasis added), and "only insofar as revelation of such information could reasonably be thought to risk circumvention of the law[,]" <u>Shapiro</u>, 2020 WL 3615511, at *39; <u>see</u> 2d Hardy Decl. ¶ 266 (stating that "[r]elease of this type of information . . . would allow these individuals to take countermeasures to circumvent the effectiveness of these techniques, deprive the FBI of key investigative intelligence, and to continue to violate the law and engage in criminal activities").  "Only when the FBI has conducted a careful examination of whether the release of specific materials could risk the circumvention of law and logically demonstrated how that risk might come to fruition, will the Court uphold its withholdings." <u>Shapiro</u>, 2020 WL 3615511, at *39 (rejecting the plaintiff's argument as to an identical category of withholding that "because he cannot imagine anything that an FBI employee might do that [. . .] does <u>not</u> involve either collecting or analyzing information in some form or another, allowing such redactions would threaten to sweep within [the Exemption's] scope nearly all of the FBI's activities" (alterations in original) (internal quotation marks omitted)).  And, mindful of the "relatively low bar for [an] agency to justify withholding[,]" <u>Blackwell</u>, 646 F.3d at 42, the Court concludes that the defendant properly withheld these records under Exemption 7(E):  Collection/Analysis of Information.

x.      **Exemption 7(E):  Operational Directives**

The Court next addresses the plaintiff's challenge to the defendant's "assert[ion of]

Exemption []7(E) to protect certain information contained in operational directives mentioned

within records responsive to [the p]laintiff's request."  2d Hardy Decl. ¶ 267; see Pl.'s Mem. at

40–42.[42]  As a basis for its withholding this information under Exemption 7(E), the defendant

states that "[s]pecifically, the protected information consists of the following sub-types: tactical

instructions contained in FBI operational plans and operational directives concerning sensitive

investigative techniques and strategies."  2d Hardy Decl. ¶ 267.  Furthermore, the defendant

asserts that

> [i]f released, the information would provide individuals and entities with a unique
> look inside the FBI's law enforcement "playbooks." Armed with such
> information, criminals could predict how and when the FBI will respond to
> certain suspicious/criminal activities, and the investigative techniques the FBI is
> most likely to employ in those situations. This would afford criminals the ability
> to preemptively modify their behavior in a manner that avoids detection,
> thwarting the very investigative procedures, techniques, and strategies governed
> by these policy directives. Consequently, the release of this information would
> increase the risk targets of criminal investigations could develop countermeasures
> and avoid detection by interfering with the FBI's ability to effectively use these
> important law enforcement techniques.

Id.  In response, the plaintiff challenges four specific pages included in this category of

withholdings, see Pl.'s Mem. at 40–42, arguing both as to these specific pages and to all of the

withheld pages as a whole, that because "all of the withheld pages are from FOIA/Privacy Act

processing case notes[,]" id. at 42, it is not evident from the defendant's description that they

could constitute "tactical instructions contained in FBI operational plans and operational

directives[,]" 2d Hardy Decl. ¶ 267; see Pl.'s Mem. at 40–42.  Furthermore, the plaintiff argues

that "even if there were some hypothetical scenario in which FOIA processing protocols and

---

[42] Also referenced as Exemption 7(E)-13.

other administrative matters could be considered tactical instructions pertaining to FBI

operations, the FBI would need to provide more specificity so that [the p]laintiff can adequately

challenge the withholding." Id. at 42.  He specifically explains:

> [f]or example, on the current record it is impossible to know whether the FBI is
> relying on a policy document that is already public; a protocol which is
> ministerial in nature and which would not reasonably be expected to risk
> circumvention of the law if disclosed; or the mere mention of a policy document
> as to which the identity of the document is already publicly known[.]

Id.

Although the Court agrees with the plaintiff that even if there were some hypothetical

scenario in which "FOIA processing protocols and other administrative matters could be

considered tactical instructions pertaining to FBI operations," id., the defendant has provided

more specific descriptions of the connection between the redacted portions of these documents

and how the exposure of operational directives or the disclosure of the enclosed information

would lead to a risk of circumvention of the law.  See 3d Hardy Decl. ¶ 88; see also 2d Hardy

Decl. ¶ 267.  Specifically, the defendant has provided that "[i]n all instances cited in [the

p]laintiff's [o]pposition . . . , [ ] personnel utilized operational directives as research tools to

review and process investigative documents."  2d Hardy Decl. ¶ 267.  As an example, the

defendant states that as to the plaintiff's reference to "'one or two words' [being] redacted" on

page 1282, "[t]he information contained in this portion of the note may appear to discuss a [f]ee

[w]aiver, but the redacted details of the note discuss the subject of the request[—]an

investigative matter[—]in further detail and which regulations, policies, and procedures relate to

that subject."  Id.  Thus, in light of the "relatively low bar for the agency to justify [the]

withholding[,]" Blackwell, 646 F.3d at 42, under Exemption 7(E), the Court concludes that the

defendant has explained its withholding under Exemption 7(E)-13 with sufficient specificity for

the Court to determine whether it has been properly withheld.  Moreover, through its elaboration

in its Third Hardy Declaration, the defendant has "demonstrate[d] logically how the release of

the requested information might create a risk of circumvention of the law."  Mayer Brown LLP,

562 F.3d at 1194 (alteration in original omitted).  Accordingly, the Court concludes that that the

defendant properly withheld these records under Exemption 7(E):  Operational Directives.

### xi.    Inconsistent Redactions

In addition to his challenges regarding withholding categories under Exemption 7(E), the

plaintiff also argues that "[i]n other FOIA litigation, the FBI has released some of the same pages

at issue in this case."  Pl.'s Mem. at 42.  Specifically, the plaintiff states that "pages 1329–[]41,

which are described in the Vaughn index in this case as '66F-HQ-1328110-C Serial 27; Animal

Rights Conference information' and withheld in full, were previously released to [the p]laintiff in

connection with other litigation."  Id. at 42–43 (underline added).  Furthermore, he notes "that

the FBI asserted Exemptions 7(E)-4 and 12 to withhold th[at] entire document [in this case], but

in the previous case, . . . released [the document] in its entirety[] without any invocation of

Exemption 7(E) at all."  Id. at 43.  The plaintiff then goes on to challenge the defendant's

application of Exemption 7(E) to specific portions of this document, stating for example that

"[o]ne page consists entirely of a description of the information that is on the publicly available

website[]" and "[a] further page consists entirely of administrative headers, such as the date, 'to,'

and 'from'" field of the memorandum."  Id. (arguing that, because this document was publicly

available and released to the plaintiff as part of prior litigation, Exemptions 7(E)-4 and 7(E)-12

were improperly applied).  The plaintiff also challenges the withholding of "[t]he document

contained at [pages] 1583–[]90 [ ] described in the Vaughn index as '66F-HQ-1328110-C Serial

48; ISD EC to CTD and 9 Field Offices dated 5/29/2001 concerning DT investigation[,]'" id. at

43–44 (underline added), which was "almost entirely withheld, save for some administrative markings on the first and last pages[,]" id. at 44. The plaintiff states that "[t]h[is] document was previously released-in-part to another FOIA requester[]" and

> [a] comparison of the first page of each version of the document reveals that in this case, the FBI is applying the category 7(E)-12 for collection/analysis of information so expansively that the mere words "IMF-2001" (referring to a protest at the International Monetary Fund in 2001) in the title of the document is sensitive information about the collection/analysis of information.

Id. In response, the defendant notes the large number of requests the agency must process on a yearly basis, and states that "[alt]hough its employees communicate about processing decisions, share their decisions, and share common processing guidance, it is impossible for 316 employees working autonomously to process thousands of requests, and millions of pages pursuant to the FOIPA over the course of years, with 100% consistency." 3d Hardy Decl. ¶ 90. Furthermore, the defendant explains that "[t]his means that individual [agent's] processing decisions are logical within the context of [his or her] own interpretations, but may not match the processing decisions o[f] similar information, processed elsewhere by other analysts." Id. Finally, the defendant states that "[i]f [the p]laintiff wishes for the FBI to release additional information which he has already obtained through separate FOIA requests, the FBI [ ] finds this to be a fruitless exercise as the information [the p]laintiff seeks is already public[ly] available and in his possession." Id.

As to the plaintiff's argument that pages 1329–41 were improperly withheld because they were "previously released to [the p]laintiff in connection with other litigation[,]" Pl.'s Mem. at 42–43, the question of whether an agency will release a record under the FOIA is separate from whether the record has been released to the plaintiff in the past or whether the document is in the plaintiff's possession. See NYC Apparel FZE v. U.S. Customs & Border Prot., 484 F. Supp. 2d

77, 94 n.23 (D.D.C. 2007) ("[T]he fact that the plaintiff may already possess certain documents

does not necessarily indicate that release of those documents to the public pursuant to

a FOIA request would be proper.").  In other words, "the identity of the requestor is not material

to the question of disclosure."  Id.  Thus, whether the plaintiff has been provided with the records

at issue in previous litigation, and therefore whether those records are in the plaintiff's

possession, is irrelevant to the question of whether the defendant was required to disclose them

in this case.  However, the Court agrees with the defendant that, as a practical matter, "to release

additional information which [the plaintiff] has already obtained through separate FOIA

requests . . . [would be] a fruitless exercise as the information [the p]laintiff seeks is

already . . . in his possession."  3d Hardy Decl. ¶ 90.

      Next, as to the plaintiff's argument that much of the document consisting of pages 1329–

41 is "on [a] publicly available website," Pl.'s Mem. at 43, this point actually cuts against the

plaintiff's position.  "As this Circuit has made clear, when an agency has provided an alternative

form of access, it has satisfied its requirement under [the] FOIA to make records available to the

public[,]" Shurtleff v. U.S. Env't Prot. Agency, 991 F. Supp. 2d 1, 19 (D.D.C. 2013) (citing

Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 70 (D.C. Cir. 1990)), and therefore, "[u]nder [the]

FOIA, an agency need not [even] search 'for copies of documents where the agency itself has

[already] provided an alternative form of access.'"  Am. Chemistry Council, Inc. v. U.S. Dep't of

Health & Hum. Servs., 922 F. Supp. 2d 56, 64 (D.D.C. 2013) (fourth alteration in original)

(quoting Tax Analysts v. U.S. Dep't of Just., 845 F.2d 1060, 1065 (D.C. Cir. 1988)).  If

requested records are publicly available, the agency "should respond to the FOIA request with

directions on how the requester can access the publicly available [information]."  Id. at 65

(quoting OMB Circular A-110 (Final Revision), 64 Fed. Reg. 54926, 54928 (Oct. 8, 1999)).

However, given that the plaintiff appears fully aware of the method by which he may publicly access the records at issue, the Court concludes that there would be no practical reason to order the agency to now provide the plaintiff with public access to information that he already has or information about which he is already aware.

Further, as to the plaintiff's argument that pages 1583–90 consist of a document that was "previously released-in-part to another FOIA requester[,]" Pl.'s Mem. at 44, the fact that a particular record has been released in response to another FOIA request does not necessarily make that record publicly available, see In Def. of Animals v. Nat'l Insts. of Health, 543 F. Supp. 2d 83, 111 (D.D.C. 2008) (citing Carney v. U.S. Dep't of Just., 19 F.3d 807, 815 (2d Cir. 1994) ("[T]he mere fact that particular records have been released to other requesters does not mean that the information contained in the records is readily available to the public[.]")).  It therefore follows that, even if pages 1583–90 have been previously released in response to another plaintiff's FOIA request, a separate assessment would need to be made in this case to determine whether this record is exempt from disclosure.  And, that assessment has been made here.[43] Accordingly, the Court concludes that the defendant properly withheld pages 1329–41 and 1583–90 under Exemption 7(E).

**D.    Segregability**

Finally, the Court must address whether the defendant provided the plaintiff with all reasonably segregable information.  Under the FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which

---

[43] To the extent that the plaintiff challenges the application of Exemption 7(E)-12 to pages 1583–90 on substantive grounds, see Pl.'s Mem. at 44 ("A comparison of the first page of each version of the document reveals that in this case, the FBI is applying the category 7(E)-12 for collection/analysis of information so expansively that the mere words 'IMF-2001' (referring to a protest at the International Monetary Fund in 2001) in the title of the document is sensitive information about the collection/analysis of information."), the Court incorporates its analysis of the defendant's application of Exemption 7(E)-12 here, see supra III.C.3.d.ix, and concludes that the defendant properly withheld these records under Exemption 7(E)-12.

are exempt under this subsection."  5 U.S.C. § 552(b)(9).  "[I]t has long been the rule in this

Circuit that non-exempt portions of a document must be disclosed unless they are inextricably

intertwined with exempt portions."  <u>Wilderness Soc'y</u>, 344 F. Supp. 2d at 18 (emphasis omitted)

(quoting <u>Mead Data Cent., Inc. v. U.S. Dep't of Air Force</u>, 566 F.2d 242, 260 (D.C. Cir. 1977)).

Therefore, because "[t]he focus of the FOIA is information, not documents, [ ] an agency cannot

justify withholding an entire document simply by showing that it contains some exempt

material."  <u>Mead Data</u>, 566 F.2d at 260.  "A district court's determination that agency records are

exempt from disclosure under the FOIA is subject to remand if the court does not also make

specific findings on the question of segregability[,]" <u>Jud. Watch, Inc. v. U.S. Dep't of Def.</u>, 245

F. Supp. 3d 19, 36 (D.D.C. 2017) (Walton, J.), <u>aff'd</u> 913 F.3d 1106 (D.C. Cir. 2019), "even if the

requester did not raise the issue of segregability before the [C]ourt[,]" <u>Sussman</u>, 494 F.3d at

1116.

        To accord the Court the ability to appropriately assess segregability, it "must be provided

with a 'relatively detailed description' of the withheld material."  <u>Jud. Watch, Inc.</u>, 245 F. Supp.

3d at 36 (quoting <u>Krikorian v. Dep't of State</u>, 984 F.2d 461, 467 (D.C. Cir. 1993)).  To comply

with this requirement, "[a]gencies must review the withheld documents and determine whether,

absent the exempted material, the resulting document would still be comprehensible, or whether

'the result would be an essentially meaningless set of words and phrases.'"  <u>Id.</u> (quoting <u>Mead</u>

<u>Data Cent., Inc.</u>, 566 F.2d at 261).  "[T]o show that an entire document cannot be produced[,]"

an agency must conduct "[a] 'document-by-document' review and [provide] a declaration that

each piece of information that is withheld is not reasonably segregable[.]"  <u>Id.</u> at 36–37 (quoting

<u>Beltranena v. U.S. Dep't of State</u>, 821 F. Supp. 2d 167, 178 (D.D.C. 2011) (citing <u>Juarez v.</u>

<u>Dep't of Just.</u>, 518 F.3d 54, 61 (D.C. Cir. 2008)).

Although "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material[,]" Ecological Rts. Found., 541 F. Supp. 3d at 66 (first alteration in original), an "agency must provide a 'detailed justification' for [the exempt material's] non-segregability," id. (alterations in original) (quoting Johnson v. Exec. Off. for U.S. Att'ys, 310 F.3d 771, 776 (D.C. Cir. 2002)).  "Affidavits attesting to the agency's 'line-by-line review of each document withheld in full' and the agency's determination 'that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions,' in conjunction with a Vaughn index describing the withheld record, suffice."  Id. (quoting Johnson, 310 F.3d at 776).

Here, the Court concludes that the defendant has adequately demonstrated that it "disclose[d all] reasonably segregable material."  Sussman, 494 F.3d at 1117.  The defendant represents that it "provided [the p]laintiff all responsive non-exempt records or portions of records responsive to [the p]laintiff's requests, excluding the requests that the FBI determined were not valid FOIA requests[,]" and "[a]fter careful examination of the records, . . . released all reasonably segregable non-exempt information from responsive records."  Def.'s Mem. at 16.  Furthermore, the defendant represents that

> [t]he coded, Bates-numbered pages together with [the Second Hardy Declaration] and the Vaughn Index demonstrate that all challenged material withheld by the FBI . . . is exempt from disclosure pursuant to the cited FOIA exemptions, or is so intertwined with protected material that segregation is not reasonably possible without revealing the underlying protected material.

2d Hardy Decl. ¶ 187.  Based upon these representations, as well as its review of the defendant's declarations and the defendant's briefs, the Court agrees that the defendant only withheld information that is exempt from disclosure or material "inextricably intertwined with exempt portions."  Mead Data Ctr., Inc., 566 F.2d at 260; see Porup v. Cent. Intel. Agency, 997 F.3d

1224, 1239 (D.C. Cir. 2021) (concluding that "the [a]gency [ ] carried its burden in demonstrating that it released all segregable portions of the responsive documents" where it gave sworn statements that "attested that the [a]gency had 'conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information' within responsive records . . . [and it] 'determined that no additional information may be released without divulging information that [ ] falls within the scope of one or more FOIA exemptions'" (internal citations omitted)).

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendant's motion for summary judgment and grant in part and deny in part the plaintiff's cross-motion for summary judgment.

**SO ORDERED** this 25th day of November, 2025.[44]

REGGIE B. WALTON
United States District Judge

---

[44] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.